Craig S. Denney
Nevada Bar No. 6953
SNELL & WILMER LLP
6100 Neil Road, Suite 555
Reno, NV 89511
cdenney@swlaw.com
T 775.829.6011
F 775.829.6001

Mitchell R. Kreindler
KREINDLER & ASSOCIATES
9219 Katy Freeway, Suite 206
Houston, Texas 77024-1415
mkreindler@blowthewhistle.com
T 713.647.8888
F 713.647.8889

Attorneys for Plaintiff/Relator

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* CECILIA GUARDIOLA and ) ) ) | 3:12-cv-00295 |
| STATE OF NEVADA *ex rel.* CECILIA GUARDIOLA, ) ) ) | Civil Action No. __ |
| *Plaintiffs*, ) ) ) | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| *v.* ) ) | |
| RENOWN HEALTH, RENOWN REGIONAL MEDICAL CENTER, and RENOWN SOUTH MEADOWS MEDICAL CENTER, ) ) ) ) ) | **COMPLAINT** **JURY DEMANDED** |
| *Defendants*. ) ) | |

On behalf of the United States of America and State of Nevada, plaintiff and relator Cecilia

Guardiola files this *qui tam* complaint against defendants Renown Health, Renown Regional

Medical Center, and Renown South Meadows Medical Center (collectively, "Renown" or the

"Renown Health defendants") to recover damages resulting from the defendants' knowing efforts to defraud government-funded health insurance programs by improperly billing outpatient procedures as inpatient claims and falsely inflating the number of hours billed as outpatient observation.   In both cases, the defendants reaped substantial and illicit profits at taxpayer expense.   Ms. Guardiola alleges:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.   This Court has supplemental jurisdiction over the counts relating to the Nevada False Claims Act pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

2.      The Court has personal jurisdiction over defendants pursuant to 31 U.S.C. § 3732(a) because the FCA authorizes nationwide service of process and defendants have sufficient minimum contacts with the United States.

3.      Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the defendants can be found, reside or have transacted business in the District of Nevada.

4.      This suit is not based upon the prior public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit, or investigation or in a United States Government Accountability Office or Auditor General's report, hearing, audit, investigation, from the news media or in an investigation, report, hearing or audit conducted by or at the request of a house of the Nevada Legislature, an auditor or the governing body of a Nevada political subdivision.

5.      To the extent that there has been a public disclosure unknown to the relator, the

relator is an original source under 31 U.S.C. § 3730(e)(4) and Nev. Rev. Stat § 357.100. Relator

has direct and independent knowledge of the information on which the allegations are based, has

knowledge that is independent of and materially adds to any publicly disclosed allegations or

transactions, and voluntarily provided the information to the Government before filing this *qui tam*

action. *See* 31 U.S.C. § 3730(e)(4) and Nev. Rev. Stat § 357.100.

## INTRODUCTION

6.      This is an action to recover damages and civil penalties on behalf of the United

States of America and State of Nevada arising from false or fraudulent claims and statements made

or caused to be made by the defendants to the United States in violation of the False Claims Act

("FCA"), 31 U.S.C. §§ 3729, *et seq.*, and/or State of Nevada in violation of the Nevada False

Claims Act ("NFCA"), Nev. Rev. Stat § 357.010, *et seq.* The false or fraudulent claims,

statements and records at issue involve payments made by government-funded health insurance

programs, such as Medicare and Medicaid, for services provided by the defendants.

7.      In general, the FCA and NFCA provide that any person who knowingly submits or

causes to submit to the Government a false or fraudulent claim for payment or approval is liable

for a civil penalty of between $5,000 and $11,000 for each such claim, plus three times the amount

of damages sustained by the Government. The Acts empower private persons having information

regarding a false or fraudulent claim against the Government to bring an action on behalf of the

Government and to share in the recovery. The complaint must be filed under seal without service

on any defendant. The complaint remains under seal while the Government conducts an

investigation of the allegations in the complaint and determines whether to join the action.

8.      Pursuant to the FCA and NFCA, Relator seeks to recover on behalf of the United

States and State of Nevada damages and civil penalties arising from false and fraudulent claims,

supported by false statements, that defendants submitted or caused to be submitted to government-funded health insurance programs.

**PARTIES**

9.     Relator Cecilia Guardiola is a registered nurse, compliance professional and law school graduate with extensive nursing and compliance experience.   On June 1, 2009, Ms. Guardiola was hired by the defendants as Director of Clinical Documentation.   Her role was to improve the medical documentation in each patient's record to support improved billing.   As Ms. Guardiola's responsibilities increased, she was promoted to Director of Clinical Compliance. She resigned her position with the defendants on January 15, 2012.

10.     Ms. Guardiola brings this action for violations of the FCA on behalf of herself, the United States, pursuant to 31 U.S.C. § 3730(b)(1), and State of Nevada, pursuant to Nev. Rev. Stat § 357.080.

11.     Defendant Renown Health, a Nevada nonprofit corporation, is the umbrella organization under which related entities provide health care services through three acute care hospitals, a children's hospital, and a number of other health care facilities in Nevada. Renown Health was established in 2006 as the rebranded successor to Washoe Health System.   Washoe Health System was founded as a private, non-profit corporation in 1984 when Washoe County transferred Washoe Medical Center (formerly Washoe County Hospital) to the newly-created entity.   For fiscal year 2011, Renown Health reported 34,782 inpatient admissions and 101,707 ER visits at its two primary hospitals.

12.     Defendant Renown Regional Medical Center ("Regional") is a Nevada non-profit corporation located in Reno, Nevada and, upon information and belief, is a wholly-owned subsidiary of defendant Renown Health.   Regional is a 558-bed acute care hospital that generated

– 4 –

close to $1.7 billion in total patient revenue during fiscal year 2011. The hospital treats a significant Medicare and Medicaid population and admits almost 8,500 Medicare inpatients annually.

13.     Defendant Renown South Meadows Medical Center is a Nevada non-profit corporation located in Reno, Nevada and, upon information and belief, is a wholly-owned subsidiary of defendant Renown Health. It is a 138-bed acute care hospital that generated over $280 million in total patient revenue during 2011. The hospital treats a significant Medicare and Medicaid population and admits almost 1,800 Medicare inpatients annually.

## BACKGROUND ALLEGATIONS

### Government-funded Health Insurance Programs

14.     The defendants' wrongdoing was committed against government-funded health insurance programs, including, without limitation, Medicare and Medicaid.

15.     Medicare is a federally-funded health insurance program primarily benefiting the elderly. It was created in 1965 when Title XVIII of the Social Security Act was adopted. Medicare is administered by and through Centers for Medicare & Medicaid Services ("CMS").

16.     Medicaid is a public assistance program providing for the payment of medical expenses for low income patients. It was created in 1965 when Title XIX was added to the Social Security Act. *See* 42 U.S.C. §§ 1391-1396. The Federal Government identifies basic services that each state participating in Medicaid must offer its indigent population and establishes certain optional services that states may choose to provide and for which they can receive federal matching funding. Nevada is responsible for administering the program.

**Inpatient and Outpatient Status Defined**

17.     Medicare defines an inpatient as a "person who has been admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services." *Medicare Benefit Policy Manual*, Ch.1, § 10 (Pub. 100-02).   The patient's physician is "responsible for deciding whether the patient should be admitted as an inpatient." *Id.*   Physicians may order inpatient "admission for patients who are expected to need hospital care for 24 hours or more, and treat others on an outpatient basis." *Id.*

18.     CMS recognizes that "the decision to admit is a complex medical judgment" requiring a physician to consider various factors such as "[t]he severity of the signs and symptoms exhibited by the patient" and "[t]he medical predictability of something adverse happening to the patient." *Id.*   Significantly, CMS notes that "[a]dmissions of particular patients are not covered or noncovered solely on the basis of the length of time the patient actually spends in the hospital." *Id.*   In particular, "when patients with known diagnoses enter a hospital for a specific minor surgical procedure or other treatment" that is expected to keep a patient in the hospital for less than 24 hours, the patient must be considered an outpatient for Medicare coverage purposes." *Id.*

19.     Bridging the gap between inpatient and outpatient admission status is "outpatient observation" status.   "Observation care is a well-defined set of specific, clinically appropriate services, which include ongoing short term treatment, assessment, and reassessment before a decision can be made regarding whether patients will require further treatment as hospital inpatients or if they are able to be discharged from the hospital." *Medicare Benefit Policy Manual*, Ch. 6, § 20.6.B. (Pub. 100-02).

20.     Outpatient observation is a specific hospital admission status that may be appropriate under a variety of circumstances.   It is "commonly assigned to patients . . . who

require a significant period of treatment or monitoring before a decision is made concerning their admission or discharge." *Id.* at § 20.5.A.; *see Medicare Claims Processing Manual*, Ch. 4, § 290.1 (Rev. 1, 10-03-03). Outpatient observation also is appropriate when the physician requires additional time to evaluate the patient before deciding whether the patient needs inpatient admission, the physician anticipates that the patient's condition can be evaluated or treated within 24 hours or rapid improvement in the patient's condition is anticipated within 24 hours. Observation status is commonly assigned to patients who present to the emergency department and require a period of treatment or monitoring before a decision is made concerning their admission or discharge. *Medicare Benefit Policy Manual*, Pub. at § 20.5.A Observation status is also often appropriate for outpatient surgical patients whose condition requires extra recovery or follow up care. *Id.*

21. CMS directs that services "provided for the convenience of the patient, the patient's family, or a physician" including — services "following an uncomplicated treatment or a procedure" — are not covered as outpatient observation services. In addition, "[s]tanding orders for observation following outpatient surgery" are not covered. *Id.* at § 20.5.D.

22. Hospitals are prohibited from reporting as outpatient observation care services that are part of another Part B service, such as postoperative monitoring during a standard recovery period (e.g., 4-6 hours). *Medicare Claims Processing Manual*, Ch. 4, § 290.2.2.

**Coding of Patient Claims**

23. Outpatient procedures are classified and reported using Medicare's Healthcare Common Procedure Coding System ("HCPCS"). This system is based primarily on *Current Procedural Terminology* ("CPT"), published by the American Medical Association. The CPT

uses five-digit codes with descriptive terms to identify services performed by health care providers and is the country's most widely-accepted coding reference.

24.     Outpatient services provided under HCPCS codes are classified into ambulatory payment classifications (APCs) on the basis of clinical and cost similarity.   All services within an APC have the same payment rate.   Within each APC, CMS packages certain related services and items with the primary service.

25.     Inpatient procedures are billed using a different system.  For hospitals, there are several types of charges that are incorporated into the hospital bill, including facility and ancillary charges.  Hospital facility charges consist of room, board and nursing care.  Ancillary charges include radiology, laboratory, pharmacy and miscellaneous supplies.  The facility and ancillary charges are coded using the ICD-9-CM system for inpatient hospital care for diagnoses and procedures.

26.     Inpatient hospital stays are also coded using a three-digit Medicare severity diagnosis-related group (MS-DRG).  The MS-DRG system was developed for Medicare as part of the inpatient prospective payment system.  It is used to classify hospital cases into one of approximately 500 groups based on the expectation that the cases use similar hospital resources. The MS-DRG charge is dependent upon the level of care that the patient requires, with higher intensity of care being reflected with a higher charge.  The patient's level of care is, in part, determined by the procedures performed while in the hospital.  Such procedures are coded using a 4-digit number in the form xx.xx based on the International Classification of Diseases, Ninth Revision, Clinical Modification ("ICD-9-CM") system, established by CMS and the National Center for Health Statistics.  The MS-DRG payment is intended to be a single, all-encompassing

payment covering all facility and ancillary charges, regardless of how long the patient is admitted or the number of services provided.

**Evaluating Appropriate Patient Status**

27.     When evaluating a patient's admission status, hospitals overwhelmingly rely on guidance known as InterQual Criteria.   InterQual is an industry-standard suite of products designed by McKesson Corporation that allows healthcare organizations to achieve a clinically validated approach to decision-making on patient care, patient status and billing issues.   The InterQual Criteria are used to objectively measure the severity of the illness (SI) and the intensity of the service (IS) provided to arrive at a determination of the appropriate service level.

28.     Of critical importance in determining patient status is Medicare's "Inpatient Only List," which identifies those specific surgical procedures that may be billed exclusively on an inpatient basis.   The list creates a rebuttable presumption that any procedure not on the list must be performed on an outpatient basis.   Many of the claims alleged to have been improperly billed by the defendants as inpatient are for procedures not on the Inpatient Only List and for which no other criteria justified inpatient admission.

**Services Must be "Medically Necessary" and Fully Documented**

29.     Medicare and Medicaid require, as a condition of coverage, that services be reasonable and medically necessary.   42 U.S.C. § 1395y(a)(1)(A).   Providers must provide economical medical services and, then, provide such services only where medically necessary. 42 U.S.C. § 1320c-(a)(1).   Providers must provide evidence that the service is medically necessary and appropriate, 42 U.S.C. § 1320c-5(a)(3), and must ensure that services provided are not substantially in excess of patient needs, 42 U.S.C. § 1320a-7(b)(6), (8).

30.     Federal law specifically prohibits providers from making "any false statement or representation of a material fact in any application for any . . . payment under a Federal health care program." *See* 42 U.S.C. § 1320-a-7b(a)(1). Similarly, Federal law requires providers who discover material omissions or errors in claims submitted to the Medicare to disclose those omissions or errors to the Government. *See* 42 U.S.C. § 1320-a-7b(a)(3). The requirement that providers be truthful in submitting claims for reimbursement is a precondition for participation in the Medicare program. *See, e.g.*, 42 C.F.R. §§ 1003.105, 1003.102(a)(1)-(2).

31.     Federal law specifically obligates every provider to return to the United States any payment that it improperly receives. It is a felony for an entity to conceal or fail to disclose errors in payments received from government-funded health insurance programs. 42 U.S.C. § 1320A-7b(a)(3).

## SPECIFIC ALLEGATIONS

32.     When Ms. Guardiola first arrived at Renown, she conferred with colleagues and conducted a non-scientific review of patient charts to determine the quality of clinical documentation. She quickly discovered that clinical documentation at Renown was subpar and that the institution possessed a culture that did not emphasize compliance. The problems at Renown cause the defendants to violate the FCA and NFCA by submitting (1) short-stay inpatient claims ("one-day stays") that should be billed on an outpatient basis, and (2) outpatient observation claims that inflate the number of hours for which the defendants are entitled to be paid.

**Renown Routinely Submitted Fraudulent Inpatient Claims**

33.     The defendants systematically submitted to the government claims for short-term inpatient treatment that should have been properly categorized as outpatient because of (1) inadequate clinical documentation to support claims submitted; (2) antiquated computer systems

that generated false claims; (3) processes designed to improperly assign patient admission status; and (4) a lack of required utilization review to ensure appropriate patient status.

34.    Ms. Guardiola alleges that a high percentage of patient files at Regional and South Meadows were missing physician orders for inpatient status and/or contained inadequate documentation of the patient's severity of illness.

35.    Renown used an aging patient management system designed by Siemens.  When entered into the Siemens system, a patient that is initially and improperly registered as an inpatient remained in that status until discharge because the status of an "active" patient cannot be changed. Even if the patient is treated on an outpatient or outpatient observation basis and properly coded as such, the Siemens system overrides such accurate coding and sequences the billing codes according to the original patient status, resulting in an incorrect inpatient billing.  This problem affects both medical and surgical procedures at Regional and South Meadows.

36.    Ms. Guardiola first detected the one-day stay problem during the fourth quarter of 2009.  Renown administrators are well aware of the problem and have done nothing to prevent it.

37.    Because Renown intended to install a new billing system, called EPIC, in March 2012, it was unwilling to expend any resources to correct the problems arising from the Siemens system, opting to continue lining its own pockets at the government's expense.

38.    The EPIC system will improve Renown's billing capabilities but it will not solve the problems alleged here.  In addition, the new system will create other problems.  For instance, the new system allows physicians to sign all pending orders without reviewing them individually or having any direct interaction with them.  Because Renown is now permitting such "rubber stamping," the EPIC system will exacerbate the existing problems of inadequate physician orders failing to document patient status.

**Processing of Patients for Elective Surgical Procedures**

39.     While the inflexible Siemens system presents challenges, its problems could be overcome by appropriate patient admissions processes.  For years, Renown failed to implement any procedures to prevent the improper admissions generated by the Siemens system and, in fact, maintained procedures that amplified the shortcomings of the Siemens system.

40.     When a patient is scheduled for a procedure, her doctor's office calls the hospital scheduler and sets up a surgical appointment.  This is a ministerial, clerical activity — a simple reservation — that allows the hospital to schedule necessary operating room time and arrange needed equipment.

41.     Once the appointment is scheduled, hospital personnel assign a patient account number that is unique for that encounter.  Account numbers preceded by a '1' designate inpatient status.  Numbers that start with a '2' specify outpatient treatment.  Account numbers beginning with a '3' reflect patients entering the hospital through the ER and are not used by the advance schedulers.

42.     Unless the doctor's office specifically tells the hospital that the patient should be listed as a "same day surgery" or specifically says that the procedure will be done on an outpatient basis, Renown automatically assigns an inpatient account number.  When the patient arrives at Renown, the patient's actual treatment is irrelevant to the Medicare billing because the patient account number has predetermined how the Siemens system will bill Medicare.

43.     Typically, from three to seven days before the scheduled procedure, the patient's physician issues a preoperative order that provides specific orders, requests labs, and designates the patient's admission status.  Renown does not use this information to change or correct the status already associated with the patient account number.

44. After the patient is discharged, the medical records are presented to a medical coder who assigns procedure and ICD-9 codes appropriate to the treatment provided. Assuming the patient was treated on an outpatient or outpatient observation basis, the coder will correctly use outpatient CPT and APC codes to bill the claim. Renown does not use this information to change or correct the status already associated with the patient account number.

45. At that point, Renown's Siemens system takes over. Because of the inpatient account number that was pre-assigned during the reservation process, the Siemens system detects an inconsistency between the numeric patient status and assigned billing codes, recognizes that the MS-DRG inpatient billing code is missing and automatically generates an MS-DRG.

46. Renown — through the Siemens system — ignores the coder's work and appropriate outpatient status and automatically bills the claim as if inpatient status was correct.

47. Despite understanding the problems created, Renown was unwilling to correct the problem by providing staff to perform appropriate pre-admission review. Until late 2011, Ms. Guardiola's repeated requests to have a trained pre-access nurse hired to oversee the admissions intake process were denied, primarily due to the opposition of the Case Management Department.

**Post-Procedure Review Lacking**

48. In addition to the pre-admission procedural and computer problems, post-procedure orders continue to cause improper Medicare billing at Renown. For instance, even if an incorrect inpatient status is corrected by a pre-access review, Renown still has significant problems with post-procedure orders that do not meet inpatient criteria. Due to the lack of an effective utilization review plan or any type of post-procedure review, Renown continues to submit false claims to government-funded health insurance programs.

49. At the time of her hiring, Ms. Guardiola found that Renown performed no timely

review to ensure correct patient status.   Defendants did not have a Utilization Review Committee or any type of utilization review plan at any of their hospitals, a violation of Medicare's conditions of participation.   A Utilization Review Committee would ordinarily provide real-time review after a patient admission had occurred to ensure that patient status is properly assigned before billing takes place.   The defendants also did not and do not use any objective, third-party tools to conduct post-procedure utilization review and verify medical necessity determinations.

50.     At Ms. Guardiola's urging, a Utilization Review Committee was established, but it met only four times.   The Committee has not met since July 2010 and has been, effectively, disbanded.

51.     Renown's Case Management Department is wholly inadequate.   At Regional, the ineffective head of Case Management, Kelly Wilcher, resigned in or about March 2011 for her role in a HIPAA violation and the department has continued to be ineffective since that time.   The then-interim head of Case Management, Kim Lewis, opposed Ms. Guardiola's efforts including her attempts to hire a pre-access nurse, but has since left Renown.   Despite Ms. Guardiola's efforts, Case Management refused to review any claims that are less than 2 days in length.   As a result, Renown failed to address the one-day stay and outpatient observation problems that Ms. Guardiola identified.

**Renown's Senior Management is Well-Aware of and Directed the Wrongdoing**

52.     Realizing the need to quantify her findings more specifically to gain support for the reforms she knew were needed, Ms. Guardiola in 2009 approached her then-boss, Renown Health CFO Mark Johnson, with her concerns that Renown was billing Medicare for one-day inpatient stays for what should have been outpatient claims.   Johnson approved Ms. Guardiola's proposed formation of a Patient Status Committee (PSC) to explore the scope of the problem and

recommend and implement corrections. In November 2009, CFO Johnson resigned from Renown.

53. Shortly after Johnson's departure, Ms. Guardiola provided Dawn Ahner, the new Renown Health CFO, with a patient status PowerPoint presentation. Ahner was concerned with Ms. Guardiola's report about the systemic misbilling of outpatient claims and inadequate Case Management function at Renown and agreed to proceed with the previously-approved PSC proposal.

54. The PSC operated under Ms. Guardiola's stewardship for the ensuing nine months. The Committee brought together representatives of five hospital departments — Case Management, Physicians, Patient Access/Registration, Audit and Nursing — with the goal of ensuring the accuracy of patient status orders and billing. Each department acted as a subcommittee of the PSC. The PSC met monthly, and the subcommittees met weekly.

55. One of the PSC's first initiatives was to address the findings of an audit of 282 randomly-selected and statistically significant Medicare claims to verify the accuracy and completeness of clinical documentation. The audit revealed that Renown had a significant "one-day stay" problem based on inaccurate clinical documentation. It demonstrated that Renown was submitting inpatient claims for patients whose one-day hospital stays should have been billed on an outpatient basis.

56. The PSC attempted to implement in early 2010 some corrections to Renown's billing processes, but only for certain situations. First, nurse managers and case managers began conducting a daily "census reconciliation" that sought to ensure that a patient's status matched an actual physician order and case management was permitted to place a "bill hold" on problem claims. Second, coders started reviewing every case for a physician status order and were

allowed to place a "hold" on claims that did not have an appropriate order.

57.     The new safeguards did not correct the most significant problems at Renown, because their implementation was inconsistent.  The nurse managers and case managers did not perform consistently the daily census reconciliation.  High turnover among Renown coders made the coder review process inconsistent.  Even when it did work, coders were only looking for situations when the physician's order was inconsistent with the patient's status.

58.     In addition, Renown still refused to undertake any post-procedure reviews to ensure that a patient's status was determined immediately after a surgical procedure was completed and that the patient's status was correct.  Such reviews, usually conducted by a nurse case manager, quickly determine whether a patient's care and condition are routine or whether complications arose which might require a status change.

59.     Ms. Guardiola and Sue Sutherland from Billing Compliance unsuccessfully raised concerns about the lack of an effective utilization review function numerous times with their superiors, particularly Renown Health CFO Dawn Ahner and all senior members of the patient status committee (CFO Mark Johnson, COO Kris Gaw, Director of Patient Financial Services Laurence Laughlin, VP of Utilization Karla Pambogo and Chief Medical Officer Max Jackson).

**Failed Educational Efforts and Other Factors Contributed to Renown's Problems**

60.     In connection with the PSC's efforts, Ms. Guardiola conducted extensive counseling sessions and educational efforts throughout the hospital to encourage greater compliance with admissions status standards.  Written guidance was distributed repeatedly to physicians and staff.  The status decisions being applied to patients undergoing scheduled surgical procedures continued to be a huge challenge because physicians and surgical departments refused to adopt the PSC's safeguards, including a failure to implement pre-access or

post-procedure review.

61.     Ms. Guardiola conducted a series of meetings — as many as 20 in all — during the first half of 2010 to educate physicians and hospital personnel on the importance of selecting an accurate patient status and the factors that go into making the selection.

62.     On December 17, 2010, Ms. Guardiola conducted a separate physician training program to provide education on the patient status issues and billing requirements for surgical procedures performed using the da Vinci robotic system.

63.     Renown, at Ms. Guardiola's recommendation, hired Executive Health Resources (EHR), a medical management consulting firm, to work with physicians in a peer-to-peer setting to educate them on appropriate patient status decisionmaking and perform patient status utilization review for Medicare ER patients.

64.     Despite these extensive efforts, Renown was unable or unwilling to address the one-day stay problem.

65.     A counseling session held for the Admissions Department proved useless in improving patient status accuracy because the department openly ignored the guidance provided. The Admissions Department's inaction resulted from physicians who were demanding that their patients be admitted on an inpatient basis, regardless of whether the patient's condition warranted.

66.     Physicians were skeptical of the educational efforts and openly challenged the guidance that certain diagnoses could not be billed as inpatient.

67.     For instance, in March 2010, Business Development Administrator Joan Lapham received from Dr. Michael Song "a list of frequently used CPT codes for neurosurgery and asked that [she] verify which of them CMS classifies as inpatient vs. outpatient." Lapham responded that "only two of the CPT codes . . . are on the Inpatient Only list; all of the others are outpatient

. . . ."  Dr. Song responded, "Are you sure? Most of these codes are inpatient codes I believe."

68.     In January 2011, emails between hospital personnel and physicians' staff included reports that "Renown and [Dr. Martin Naughton's] management team had a meeting and said that all Da Vinci hysterectomy procedures need to be inpatient," even though such procedures are not on the Medicare Inpatient Only List.

69.     As late as May 2011, Ms. Guardiola had conversations with cardiologist Dr. Devang Desai who insisted that stenting procedures should be performed on an inpatient basis even though they are not on Medicare's Inpatient Only List.

70.     Dr. Eric Drummer was counseled by Ms. Guardiola after she found that he was routinely performing outpatient cardiac stent insertions on an inpatient basis.

71.     During her conversations with Drs. Drummer and Desai, Ms. Guardiola determined that they had been improperly billing for stents for a long time and got the impression that the improper billing would continue, despite her efforts.

72.     Moreover, Renown's coding department was usually understaffed.  Hospital management placed intense pressure on the coders to produce, especially at month's end. Regional and South Meadows usually employed three coders in-house and an additional 11 or 12 coders on a contract basis, but the department's effectiveness is compromised by frequent personnel changes.   Management's emphasis is always on productivity and reducing the backlog of uncoded claims, leaving little time to review suspect charts.

73.     Coders routinely code claims that are missing required documentation.  Coders focus on getting the diagnosis and DRG/CPT coding done in order to meet productivity requirements, which places little emphasis on accuracy.  Renown's use of contract coders only exacerbates this situation, because the short-term needs of these non-employees are

productivity-based, leaving them with little interest in serving the long-term goals of the institution.

**Specific False Claims — One-Day Stays**

74.     Although Ms. Guardiola cannot identify every false claim that the defendants submitted to government-funded health insurance programs, such information being in the possession of the defendants, she alleges that the following claims are representative of the defendants' fraudulent billing.   For each claim, the procedures performed or treatment provided were improperly billed to government-funded health insurance programs on an inpatient basis and should have been billed on an outpatient or outpatient observation basis:

| # | NAME | ADMITTED | DISCHARGED | TYPE | ACCT NO. |
|---|------|----------|------------|------|----------|
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |

| # | NAME | ADMITTED | DISCHARGED | TYPE | ACCT NO. |
|---|------|----------|------------|------|----------|
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |
| 26 | | | | | |
| 27 | | | | | |
| 28 | | | | | |
| 29 | | | | | |
| 30 | | | | | |
| 31 | | | | | |
| 32 | | | | | |
| 33 | | | | | |

| # | NAME | ADMITTED | DISCHARGED | TYPE | ACCT NO. |
|---|------|----------|------------|------|----------|
| 34 | | | | | |
| 35 | | | | | |
| 36 | | | | | |
| 37 | | | | | |
| 38 | | | | | |
| 39 | | | | | |
| 40 | | | | | |
| 41 | | | | | |
| 42 | | | | | |
| 43 | | | | | |
| 44 | | | | | |
| 45 | | | | | |
| 46 | | | | | |
| 47 | | | | | |
| 48 | | | | | |
| 49 | | | | | |
| 50 | | | | | |
| 51 | | | | | |
| 52 | | | | | |
| 53 | | | | | |





| # | NAME | ADMITTED | DISCHARGED | TYPE | ACCT NO. |
|---|---|---|---|---|---|
| 54 | | | | | |
| 55 | | | | | |
| 56 | | | | | |
| 57 | | | | | |
| 58 | | | | | |
| 59 | | | | | |
| 60 | | | | | |
| 61 | | | | | |
| 62 | | | | | |
| 63 | | | | | |
| 64 | | | | | |
| 65 | | | | | |
| 66 | | | | | |
| 67 | | | | | |
| 68 | | | | | |

75. Every claim identified in the preceding paragraph (except #34 Patient ▮▮▮) is for an elective outpatient surgical procedure. Although the reasons differ for individual patients, there are common themes reflected across the patient files. Often the procedures involved are not listed on Medicare's Inpatient Only List and, as a result, must be billed on an outpatient basis absent pre-admission documentation identifying a comorbidity supporting the need for inpatient

treatment or post-procedure documentation of a complication requiring inpatient care. Many are missing doctor's admission orders indicating that inpatient status is medically necessary. Most patients were discharged within 24 hours and doctors' orders prescribed discharge after a period in recovery. All lack any medical documentation of pre-existing conditions or post-procedure complications that would justify inpatient admission. In each case, there is no evidence that during or after performance of the procedure the patient developed a condition that would warrant inpatient treatment. In each case, the government paid an inflated amount as a direct result of Renown's fraud.

76.     Patient ▆▆▆ (#34) entered Renown with a medical condition through the emergency room. Despite a physician's order placing the patient in outpatient observation status, Renown billed the claim as inpatient. As a direct result of Renown's wrongdoing, the government paid an inflated amount for this patient's care.

**Fraudulent Billing for Outpatient Observation**

77.     Another major problem was Renown's billing of outpatient observation services. The problem acutely affects all ER patients who receive surgical services and patients admitted into outpatient observation after undergoing an elective surgical procedure.

78.     Renown's fraudulent billing of outpatient observation claims results from its failures to ensure appropriate physician documentation and provide post-procedure review for outpatient observation orders. Due to these shortcomings, billing for observation hours occurs without regard to medical necessity and/or fails to account for the 4-6 hour recovery period already included in the payment for all surgical procedures.

79.     Renown admits the vast majority of ER patients into outpatient observation status. In doing so, Renown accounts for outpatient observation status from the moment of admission,

which means it bills Medicare for outpatient observation hours even when the patient later receives a surgical procedure and is placed into post-operative recovery. For such patients, government-funded health insurance programs are overcharged outpatient observation hours from the time the patient arrives at the hospital until the 4-6 hour included recover period expires.

80.    For patients who enter Renown hospitals for elective surgery, outpatient observation hours are also inflated. Although in this situation, the hours are not accrued until after the patient exits from surgery, outpatient observation hours are billed in a manner that fails to account for the 4-6 hours of recovery time for which the hospital is already being compensated as part of the surgical procedure.

81.    Despite clear regulatory requirements, Renown, in effect, double bills for outpatient observation time, getting paid twice for up to 4-6 hours of outpatient observation time for each such patient. And for ER patients, Renown also improperly bills outpatient observation hours for the time when the patient is waiting to undergo his or her procedure, the time when the procedure is being performed and during the recovery period already included in the procedure charges.

82.    Ms. Guardiola raised this issue repeatedly with the Patient Status Committee and in one-on-one meetings with Dawn Ahner, Renown Health CFO, Cora Case, CFO for South Meadows, Kelly Wilcher, Manager of Case Management, Karla Pambogo, former VP of utilization review, Laurence Laughlin, former Director of Business Office, Marti Hessen-May, former Director of Health Information Management, and Roger Stevens, Charge Master coordinator.

83.    In her conversations and meetings with Renown's managers, Ms. Guardiola's goal was to ensure that observation hours were calculated correctly and accurately. She sought a

manual review for any patient in an outpatient observation status to ensure reporting of the status's correct start and end time. Alternatively, she proposed to automatically deduct 4-6 hours from outpatient observation claims associated with a surgical procedure.

84.    Ms. Guardiola was routinely rebuffed. Eventually, it was decided to have Case Management conduct the "manual" hour calculation. The effort proved fruitless because the case managers did not review patient charts immediately post-procedure. If done at all, such reviews continued to be done the day following surgery. By that time, due to a lack of documentation in the patient chart, it was difficult, if not impossible to assess properly whether the patient required observation and, if so, when the patient entered observation status.

**Specific False Claims — Outpatient Observation**

85.    Although Ms. Guardiola cannot identify every false claim that the defendants submitted to government-funded health insurance programs, such information being in the possession of the defendants, she alleges that the following claims are representative of the defendants' fraudulent billing. She alleges that each such claim was improperly billed by inflating the number of billable outpatient observation hours when submitting claims to government-funded health insurance programs.



| | NAME | ADMITTED | DISCHARGED | TYPE | ACCT NO. |
|---|---|---|---|---|---|
| 69 | | | | | |
| 70 | | | | | |
| 71 | | | | | |
| 72 | | | | | |
| 73 | | | | | |



| NAME | ADMITTED | DISCHARGED | TYPE | ACCT NO. |
|---|---|---|---|---|
| 74 | | | | |
| 75 | | | | |

86.     For every claim identified in the preceding paragraph, Renown billed and was paid by government-funded health insurance programs for multiple hours of outpatient observation to which it was not entitled.

**Renown Management Directed that Claims Be Billed Improperly**

87.     The defendants' management at individual hospitals, as well as the corporate level, are aware of these fraudulent practices and encouraged and facilitated the continuing fraud against government-funded health insurance programs.

88.     The cultural and systemic resistance Ms. Guardiola faced in trying to correct problems at Renown were caused by directives from corporate and senior hospital management.

89.     During two meetings in which Ms. Guardiola participated during the 4th quarter of 2011, physicians identified Renown management as the source of instructions to always bill certain types of procedures as inpatient.  The meetings, which were attended by Renown CEO Greg Boyer, COO Kris Gaw and several other corporate executives, were held with cardiologists to explain claim denials being imposed on Renown as a result of audits performed by Medicare's Recovery Audit Contractors (RACs).  During the meetings, several physicians chaffed at the notion that they were improperly categorizing patients as inpatient.  Drs. Francis Kelley and Thomas Nylk objected, saying that the inpatient designations were used at the explicit direction of Renown.

90.     COO Gaw and CEO Boyer reacted to the comments by admitting that had occurred

in the past, but stating that a new procedure needed to be used going forward.

91.     In a separate meeting with Drs. John Erickson and Larry Klaich from OB/GYN Associates to discuss billing of da Vinci procedures in OB/GYN cases, Ms. Guardiola was told that they had been directed by Linda Ferris, Renown's former VP of Oncology, to treat all procedures performed using the da Vinci robotic system as inpatient.

92.     The physicians' statements were consistent with prior emails that Ms. Guardiola had seen. For instance, in April 2011, Dr. Martin Naughton's office contacted Jessica Marquis, a Patient Access Lead at Regional, to complain about a patient's da Vinci hysterectomy not being approved for inpatient admission. When informed that the procedures "are outpatient codes per Medicare's inpatient only list," the physician's representative told Ms. Marquis that "Renown and her [the doctor's] management team had a meeting and said that all Da Vinci hysterectomy procedures need to be inpatient."

93.     The high dollar value of an inpatient admission gives Renown ample motive to encourage physicians to increase inpatient admissions. And physicians have ample motive to be generous in categorizing patients as inpatients. This is because Renown engages in a financial strategy known as "service line management" by which the profitability of each medical specialty is evaluated separately and the referral volume and revenue performance of individual physicians is tracked meticulously.

94.     As a result, Renown and physicians are under pressure to generate additional revenues. In the Cardiology area, for instance, the defendants created the Renown Institute for Heart & Vascular Health and incurred significant investment in expensive cutting-edge technology. During 2011, Renown constructed four new cardiac catheter suites at a cost of between $5-10 million.

95.    Moreover, Renown was also under pressure to generate revenues in its da Vinci robotics practices.   Dr. Lim, a physician specializing in OB/GYN Oncology and Renown's medical director for da Vinci robotics, successfully pressed for Renown to purchase two da Vinci robotic systems at a cost of almost $4 million during 2009 and 2010.   Such expenditures must be paid for by increased patient treatment and billing.

96.    By the end of 2011, Ms. Guardiola realized that defendants' leadership would not implement corrections to address the billing fraud. Recognizing that her effectiveness was undermined and discouraged by the ongoing fraud, Ms. Guardiola resigned her position in January 2012.

97.    The Renown Health defendants know that when a patient does not meet inpatient level of care criteria but is admitted for a one-day stay, payment may not be sought under the inpatient MS-DRG system (Medicare Part A) and must be submitted as an outpatient claim (Medicare Part B).   Renown Health also recognizes that if a patient's treatment is erroneously billed as an inpatient service, a corrected claim form should be submitted to correct the billing. Renown knowingly submitted false claims for inpatient claims to government-funded health insurance programs and failed to correct inaccurate bills it submitted.

98.    The Renown Health defendants know the Medicare and Medicaid rules pertaining to billing for outpatient observation services.   Renown knowingly submitted false claims for outpatient observation claims to government-funded health insurance programs and failed to correct inaccurate bills it submitted.

### COUNT ONE
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

99.    Relator re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 98 of this complaint.

100.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

101.    By virtue of the acts described above, the defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United State Government.

102.    By virtue of the acts described above, the defendants knowingly concealed the existence of their improper conduct from the United State Government in order to induce payment of false or fraudulent claims.

103.    The United States, unaware of the defendants' wrongdoing or the falsity of the records, statements or claims made by the defendants or the defendants' wrongdoing, paid claims that would not otherwise have been allowed.

104.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

### COUNT TWO
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

105.    Relator re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 98 of this complaint.

106.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

107.    By virtue of the acts described above, the defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid by the United States Government.

108.    By virtue of the acts described above, the defendants knowingly concealed the existence of their improper conduct from the United States Government in order to induce payment of their false or fraudulent claims.

109.    The United States, unaware of the defendants' wrongdoing or the falsity of the records, statements, or claims made by the defendants or defendants' wrongdoing, paid claims that would not otherwise have been allowed.

110.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT THREE
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)

111.    Relator re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 98 of this complaint.

112.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

113.    By virtue of the acts described above, the defendants knowingly concealed an obligation to pay or transmit money to the United States Government.

114.    By virtue of the acts described above, the defendants knowingly and improperly avoided or decreased an obligation to pay or transmit money to the United States Government.

115.    By virtue of the acts described above, the defendants knowingly concealed the existence of their improper conduct from the United States Government in order to conceal and

retain payments received as a result of their violations of the Act.

116.    The United States, unaware of the defendants' wrongdoing or the falsity of the records, statements, or claims made by the defendants or the defendants' wrongdoing, paid claims that would not otherwise have been allowed.

117.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

**COUNT FOUR**
**Nevada False Claims Act**
**Nev. Rev. Stat § 357.040 1(a)**

118.    Relator re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 98 of this complaint.

119.    This is a claim for treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat § 357.010, *et seq.*, as amended.

120.    By virtue of the acts described above, the defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of Nevada.

121.    By virtue of the acts described above, the defendants knowingly concealed the existence of their improper conduct from the State of Nevada in order to induce payment of false or fraudulent claims.

122.    The State of Nevada, unaware of the defendants' wrongdoing or the falsity of the records, statements or claims made by the defendants or the defendants' wrongdoing, paid claims that would not otherwise have been allowed.

123.    By reason of these payments, the State of Nevada has been damaged, and continues to be damaged, in substantial amount.

## COUNT FIVE
### Nevada False Claims Act
### Nev. Rev. Stat § 357.040 1(b)

124.    Relator re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 98 of this complaint.

125.    This is a claim for treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat § 357.010, *et seq.*, as amended.

126.    By virtue of the acts described above, the defendants knowingly made, used, or caused to be made or used, false records or statements to obtain payment or approval of false claims.

127.    By virtue of the acts described above, the defendants knowingly concealed the existence of their improper conduct from the State of Nevada in order to induce payment of their false or fraudulent claims.

128.    The State of Nevada, unaware of the defendants' wrongdoing or the falsity of the records, statements, or claims made by the defendants or defendants' wrongdoing, paid claims that would not otherwise have been allowed.

129.    By reason of these payments, the State of Nevada has been damaged, and continues to be damaged, in substantial amount.

## COUNT SIX
### Nevada False Claims Act
### Nev. Rev. Stat § 357.040 1(g)

130.    Relator re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 98 of this complaint.

131.    This is a claim for treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat § 357.010, *et seq.*, as amended.

132.    By virtue of the acts described above, the defendants knowingly made or used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money to the State of Nevada or a political subdivision.

133.    By virtue of the acts described above, the defendants knowingly concealed the existence of their improper conduct from the State of Nevada in order to conceal and retain payments received as a result of their violations of the Act.

134.    The State of Nevada, unaware of the defendants' wrongdoing or the falsity of the records, statements, or claims made by the defendants or the defendants' wrongdoing, paid claims that would not otherwise have been allowed.

135.    By reason of these payments, the State of Nevada has been damaged, and continues to be damaged, in substantial amount.

**COUNT SIX**
**Nevada False Claims Act**
**Nev. Rev. Stat § 357.040 1(h)**

136.    Relator re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 98 of this complaint.

137.    This is a claim for treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat § 357.010, *et seq.*, as amended.

138.    By virtue of the acts described above, the defendants are the beneficiaries of inadvertent submissions of false claims and, after discovering the falsity of the claims, failed to disclose the falsity to the State of Nevada or a political subdivision within a reasonable time.

139.    By virtue of the acts described above, the defendants knowingly concealed the existence of their improper conduct from the State of Nevada in order to conceal and retain payments received as a result of their violations of the Act.

140.    The State of Nevada, unaware of the defendants' wrongdoing paid claims that would not otherwise have been allowed.

141.    By reason of these payments, the State of Nevada has been damaged, and continues to be damaged, in substantial amount.

WHEREFORE, relator requests that judgment be entered in favor of the United States, State of Nevada and Relator against the defendants, ordering that:

a.      the defendants cease and desist from violating the FCA, 31 U.S.C. ' 3729, *et seq.* and NFCA, Nev. Rev. Stat. 357.010, *et seq.*;

b.      the defendants pay an amount equal to three times the amount of damages that the United States and the State of Nevada have sustained because of the defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of the FCA, 31 U.S.C. ' 3729, and a civil penalty of not less than $5,000 and not more than $10,000 for each violation of the NFCA, Nev. Rev. Stat. 357.040;

c.      Relator be awarded the maximum amount allowed pursuant to the FCA, 31 U.S.C. ' 3730(d), and NFCA, Nev. Rev. Stat. § 357.210;

d.      Relator be awarded all costs of this action, including attorneys= fees and costs pursuant to the FCA, 31 U.S.C. '' 3730(d), and NFCA, Nev. Rev. Stat § 357.180; and

f.      the United States, State of Nevada and Relator recover such other relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, relator hereby demands

a trial by jury.

Respectfully submitted,

Craig S. Denney
Nevada Bar No. 6953
SNELL & WILMER LLP
6100 Neil Road, Suite 555
Reno, NV 89511
cdenney@swlaw.com
T 775.829.6011
F 775.829.6001

Mitchell R. Kreindler*
Texas Bar No. 24033518
KREINDLER & ASSOCIATES
9219 Katy Freeway, Suite 206
Houston, Texas 77024-1415
T 713.647.8888
F 713.647.8889
mkreindler@blowthewhistle.com
*will comply with LR IA 10-2 within 45 days

ATTORNEY FOR *QUI TAM*
RELATOR CECILIA GUARDIOLA