1
2
3
4
5
6                        UNITED STATES DISTRICT COURT
7                              DISTRICT OF NEVADA
8                                   * * * * *
9   UNITED STATES OF AMERICA ex rel.    )
    CECILIA GUARDIOLA,                   )
10                                       )   3:12-cv-00295-LRH-VPC
                            Plaintiff,   )
11                                       )   <u>ORDER</u>
    vs.                                  )
12                                       )
    RENOWN HEALTH, RENOWN                )
13  REGIONAL MEDICAL CENTER, and         )
    RENOWN SOUTH MEADOWS MEDICAL         )
14  CENTER,                              )
                                         )
15                          Defendants.  )
    _____ )
16

17          Before the Court is Defendants Renown Health, Renown Regional Medical Center, and

18  Renown South Meadows Medical Center's (collectively "Renown") Motion to Dismiss.

19  Doc. #28.[1]  Relator Cecilia Guardiola ("Guardiola") filed an Opposition (Doc. #42), to which

20  Renown replied (Doc. #43).

21  **I.      Factual and Procedural History**

22          Renown Health, a Nevada nonprofit organization, is the umbrella corporation under

23  which related entities, including Renown Regional Medical Center ("Regional") and Renown

24  South Meadows Medical Center ("South Meadows"), provide acute health care services.  Doc.

25  #17, ¶11.  Guardiola is a registered nurse and compliance professional who, on June 1, 2009, was

26  hired by Renown as Director of Clinical Documentation.  *Id.*, ¶9.  Guardiola's role was to

27  improve medical documentation in order to support improved billing.  *Id.*  Guardiola was

28  _____

            [1] Refers to the Court's docket number.

1  eventually promoted to Director of Clinical Compliance, but after her efforts at improving the

2  billing system were allegedly stifled by Renown, she resigned on January 15, 2012. *Id.*

3        On January 10, 2014, Guardiola filed an Amended *qui tam* Complaint against Renown to

4  recover damages resulting from Renown's knowing efforts to defraud government-funded health

5  insurance programs, specifically Medicare.[2] *Id.*, pp. 1-2. Guardiola alleges that, from July 2007

6  through March 2011, Renown knowingly submitted or, in reckless disregard of the truth, allowed

7  to be submitted, short-stay inpatient claims ("zero-day stays" and "one-day stays") that should

8  have been billed as outpatient claims. *Id.*, ¶¶29, 72-77. Guardiola further alleges that these

9  improperly billed claims were caused by (1) inadequate clinical documentation to support

10 inpatient claims, (2) antiquated computer systems that generated false claims, (3) internal

11 processes designed to improperly assign inpatient admission status, and (4) a lack of review to

12 ensure appropriate inpatient status assignments. *Id.*, ¶30. Guardiola became aware of the alleged

13 deficiencies in the Renown billing system during the fourth quarter of 2009. *Id.*, ¶33. Allegedly

14 Renown did nothing to correct and/or prevent these problems. *Id.* Guardiola claims that she

15 brought these problems to the attention of Renown management personnel and none of them

16 acted to correct and/or prevent the Medicare claims from being improperly labeled and billed.

17 *Id.*, ¶¶49-71. Moreover, Guardiola alleges that Renown management encouraged, directed, and

18 facilitated the continued fraudulent activity against Medicare. *Id.*, ¶¶78-89. Finally, Guardiola

19 alleges that Renown management engaged in the aforementioned fraudulent activity in order to

20 obtain higher payments from Medicare. *Id.*

21 **II.**    **Legal Standard**

22       Renown seeks dismissal of Guardiola's Amended Complaint pursuant to Federal Rule of

23 Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. To survive

24

25 _____

26     [2] Guardiola filed her initial Complaint on June 1, 2012. Doc. #1. A *qui tam* claim pursuant to 31 U.S.C. § 3730(b)(1) allows an individual to bring a civil action in violation of 31

27 U.S.C. § 3729 (the "False Claims Act" or the "FCA") on behalf of and in the name of the United States Government. In *qui tam* actions, the individual bringing the claim on behalf of the

28 Government is considered the "Relator."

1    a motion to dismiss for failure to state a claim, a complaint must satisfy the Federal Rule of Civil

2    Procedure 8(a)(2) notice pleading standard.  *See Mendiondo v. Centinela Hosp. Med. Ctr.*, 521

3    F.3d 1097, 1103 (9th Cir. 2008).  That is, a complaint must contain "a short and plain statement

4    of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The Rule

5    8(a)(2) pleading standard does not require detailed factual allegations; however, a pleading that

6    offers "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'"

7    will not suffice.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v.

8    Twombly*, 550 U.S. 544, 555 (2007)).

9            Furthermore, Rule 8(a)(2) requires a complaint to "contain sufficient factual matter,

10   accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*,

11   550 U.S. at 570).  A claim has facial plausibility when the pleaded factual content allows the

12   court to draw the reasonable inference, based on the court's judicial experience and common

13   sense, that the defendant is liable for the misconduct alleged.  *See id.* at 678-79.  "The plausibility

14   standard is not akin to a probability requirement, but it asks for more than a sheer possibility that

15   a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with

16   a defendant's liability, it stops short of the line between possibility and plausibility of entitlement

17   to relief."  *Id.* at 678 (internal quotation marks and citation omitted).

18           In reviewing a motion to dismiss, the court accepts the facts alleged in the complaint as

19   true.  *Id.*  The "factual allegations that are taken as true must plausibly suggest an entitlement to

20   relief, such that it is not unfair to require the opposing party to be subjected to the expense of

21   discovery and continued litigation."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

22   Moreover, "bare assertions . . . amount[ing] to nothing more than a formulaic recitation of the

23   elements of a . . . claim . . . are not entitled to an assumption of truth."  *Moss v. U.S. Secret Serv.*,

24   572 F.3d 962, 969 (9th Cir. 2009) (citing *Iqbal*, 556 U.S. at 681) (brackets in original) (internal

25   quotation marks omitted).  The court discounts these allegations because "they do nothing more

26   than state a legal conclusion—even if that conclusion is cast in the form of a factual allegation."

27   *Id.* (citing *Iqbal*, 556 U.S. at 681).  "In sum, for a complaint to survive a motion to dismiss, the

28   non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly

1    suggestive of a claim entitling the plaintiff to relief." *Id.*

2           Moreover, because FCA claims are grounded in fraud, they must meet the heightened

3    pleading standard of Federal Rule of Civil Procedure 9(b).  *See Cafasso v. Gen. Dynamics C4*

4    *Sys., Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011).  Rule 9 provides that "[i]n alleging fraud or

5    mistake, a party must state with particularity the circumstances constituting fraud or mistake."

6    Fed. R. Civ. P. 9(b).  An allegation of fraud must be "specific enough to give defendants notice

7    of the particular misconduct which is alleged to constitute the fraud so that they can defend

8    against the charge and not just deny that they have done anything wrong."  *Semegen v. Weidner*,

9    780 F.2d 727, 731 (9th Cir. 1985).  Averments of fraud must be accompanied by "'the who,

10   what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading

11   about [the purportedly fraudulent] statement, and why it is false.'"  *Cafasso*, 637 F.3d at 1055

12   (quoting *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010)).

13          Nevertheless, "this is a pleading requirement, not an evidentiary burden.  Thus, although

14   the focus of the FCA is on false claims, plaintiff need not identify representative examples of

15   false claims at the pleading stage."  *United States ex rel. Huey v. Summit Healthcare Ass'n, Inc.*,

16   2011 WL 814898, at *4 (D. Ariz. March 3, 2011) (citing *Ebeib*, 616 F.3d at 998-99).  "Instead,

17   'it is sufficient to allege particular details of a scheme to submit false claims paired with reliable

18   indicia that lead to a strong inference that claims were actually submitted.'"  *Id.*

19   **III.    Discussion**

20          Here, Guardiola alleges that Renown violated subparagraphs (A), (B), and (G) when it

21   knowingly submitted inpatient claims to Medicare for payment that should have been billed on

22   an outpatient or outpatient observation basis.  *See* Doc. #17, ¶¶ 90-108.  As amended, the FCA

23   extends civil liability to any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment
> or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or
> statement material to a false or fraudulent claim; . . . or (G) knowingly makes, uses, or
> causes to be made or used, a false record or statement material to an obligation to pay or
> transmit money or property to the Government, or knowingly conceals or knowingly and
> improperly avoids or decreases an obligation to pay or transmit money or property to the
> Government, is liable to the United States Government . . . .

28   31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(B), 3729(a)(1)(G).  An FCA suit "require[s] a false

4

1    claim," and "attaches liability, not to the underlying fraudulent activity or to the government's

2    wrongful payment, but to the claim for payment." *Cafasso*, 637 F.3d at 1055 (citations and

3    internal quotation marks omitted).  "The plain language of the FCA contemplates liability not

4    only for fraudulently causing the Government to pay a claim, but also for causing the

5    Government to *approve* a claim." *United States v. Eghbal*, 548 F.3d 1281, 1283 (9th Cir. 2008)

6    (emphasis in original) (citing 31 U.S.C. § 3729(a)(1)).  Moreover, "FCA liability attaches to a

7    false statement that has a 'material effect' on the Government's eventual decision to pay a

8    claim." *Eghbal*, 548 F.3d at 1283 (quoting *Allison Engine Co., Inc. v. United States ex rel.*

9    *Sanders*, 553 U.S. 662, 671-73 (2008)).

10         "[T]he FCA recognizes two types of actionable claims—factually false claims and legally

11   false ['false certification'] claims." *United States ex rel. Conner v. Salina Reg'l Health Ctr.,*

12   *Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008); *see also United States v. Corinthian Colleges*, 655

13   F.3d 984, 992 (9th Cir. 2011) (citing *United States ex rel. Hendow v. University of Phoenix*, 461

14   F.3d 1166, 1171 (9th Cir. 2006)).  Factually false claims arise when "the government payee has

15   submitted 'an incorrect description of goods or services provided or a request for reimbursement

16   for goods or services never provided.'" *Id.* (citing *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir.

17   2001).  "Factual falsity" simply means a provider may not bill for something it does not provide.

18   On the other hand, "in a claim based on a [false certification], the relator must demonstrate that

19   the defendant has 'certifie[d] compliance with a statute or regulation as a *condition* to

20   government payment,' yet knowingly failed to comply with such statute or regulation." *Id.*

21   (emphasis in original).

22         Although the FCA is targeted at fraud, its "knowingly" scienter requirement does not

23   require "proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B).  A person acts

24   "knowingly" with respect to information if he has actual knowledge of the information, or he acts

25   in deliberate ignorance of, or in reckless disregard of, the truth or falsity of the information.  31

26   U.S.C. § 3729(b)(1)(A).  Moreover, "the phrase 'known to be false' in that sentence does not

27   mean 'scientifically untrue'; it means 'a lie.' The [FCA] is concerned with ferreting out

28   'wrongdoing,' not scientific errors." *Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992)

1    (citation omitted).

2          Here, the Court finds that Guardiola adequately alleges that Renown engaged in a

3    fraudulent course of conduct whereby it knowingly submitted claims to Medicare for

4    reimbursement for patients who were improperly characterized as inpatient.  Specifically,

5    Guardiola alleges that Renown submitted inpatient claims for patients who should not have been

6    characterized as such under the applicable Medicare regulations.  Guardiola further alleges that

7    Renown submitted inpatient claims for patients who were not actually characterized as such by

8    hospital physicians or staff.  In essence, Guardiola alleges that Renown submitted these inpatient

9    claims with "an incorrect description of the goods or services provided" or "requested

10   reimbursement for goods or services never provided."  *See Conner*, 543 F.3d at 1217.  As such,

11   Guardiola proceeds on the theory that Renown's claims were "factually false," as opposed to

12   "legally false."[3]

13   ///

14

15

16        [3]  Although Guardiola does not specify in her Amended Complaint whether she is
proceeding on a theory of factual falsity, false certification, or both, the Court finds that her
17   allegations speak for themselves.  The allegedly fraudulent scheme rests on an incorrect
description of the goods or services provided as well as a request for reimbursement for goods or
18   services never provided.  As such, the Court finds that Guardiola's claims are appropriately
characterized as factually false claims under the FCA.   Additionally, in her Opposition to
19   Renown's Motion to Dismiss, Guardiola clarifies that this "is substantively a case of factually
false submissions" as her claim is that Renown "falsely billed the Medicare program for
20   inappropriate inpatient claims."  Doc. #42, pp. 11, 15-16.  Accordingly, the Court declines to
address Renown's argument that Guardiola's Amended Complaint should be dismissed for
21   failure to state a claim for legally false certification.
22

23        Moreover, because Guardiola did not address Renown's argument as to the sufficiency of
any false certification claims, the Court shall not entertain this as a basis on which Guardiola's
24   Amended Complaint may proceed.  *See id.*, p. 16 n.8 ("Relator declines to engage the Defendants
as to whether the identified conduct can independently serve as the basis for a [legally false] FCA
25   violation.").  The Court rejects Guardiola' attempt to "reserve the right to demonstrate that these
so-called 'conditions of participation'—such as being truthful when submitting claims—can
26   serve a basis for liability."  *See id.*  Should Guardiola wish to assert claims for legally false
certification under the FCA at a later time, she must file an appropriate motion requesting leave
27   to amend.
28

6

## A.    Medicare Guidelines

The Medicare regulations governing the determination of inpatient status form the basis for Guardiola's allegation that Renown submitted factually false claims.  Guardiola's references thereto do not transform her factually false claim into a legally false claim.  In this regard, the Court finds *United States v. R&F Properties of Lake County, Inc.*, 433 F.3d 1349 (11th Cir. 2005), instructive.  In reversing the district court on summary judgment, the Eleventh Circuit found that the relator should be permitted to present evidence to a fact-finder supporting her allegations that Medicare claims submitted for certain services were not, in fact, rendered in compliance with the applicable Medicare regulation, and, therefore, were false.  *Id.* at 1356.  The court proceeded on the theory that Medicare claims may be false if they claim reimbursement for services or costs that were not rendered as claimed.  *Id.*  Similarly here, Guardiola alleges that Renown submitted claims for certain services (i.e., inpatient services) that were not, in fact, rendered in compliance with the applicable Medicare regulations.

Medicare is a federally-funded health insurance program administered by the Centers for Medicare & Medicaid Services ("CMS") through a framework of statutes, regulations, and guidelines governing billing and payment services under Medicare.  Doc. #17, ¶15.  According to the Medicare Claims Processing Manual, "[participant hospitals] may bill only for services provided.  If the provider billing system initiates billing based on services ordered, the provider must confirm that the service has been provided before either the carrier or intermediary (FI)."  *See Medicare Claims Processing Manual*, Chapter 3, § 10.

Medicare claims for hospital patients are labeled within at least three distinct categories: (1) inpatient, (2) outpatient observation, and (3) outpatient.  Doc. #17, ¶¶16-19.  Medicare defines an inpatient as "a person who has been admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services."  *Medicare Benefit Policy Manual*, Chapter 1, § 10.  "Inpatient hospital services" are defined in Title XVIII of the Social Security Act and in the regulations (42 C.F.R. § 409.10).  According to the Medicare Benefit Policy Manual:

> [t]he physician or other practitioner responsible for a patient's care at the hospital is also responsible for deciding whether the patient should be admitted as an inpatient.  Physicians should use a 24-hour period as a benchmark, i.e., they

7

1   should order admission for patients who are expected to need hospital care for 24
    hours or more, and treat other patients on an outpatient basis.  However, the
2   decision to admit a patient is a complex medical judgment which can be made
    only after the physician has considered a number of factors, including the patient's
3   medical history and current medical needs, the types of facilities available to
    inpatients and to outpatients, the hospital's by-laws and admissions policies, and
4   the relative appropriateness of treatment in each setting.

5   *Medicare Benefit Policy Manual*, Chapter 1, § 10.  Moreover, "[a]dmissions of particular patients

6   are not covered or noncovered solely on the basis of the length of time the patient actually spends

7   in the hospital." *Id.*  For example:

8       [w]hen patients with known diagnoses enter a hospital for a specific minor
        surgical procedure or other treatment that is expected to keep them in the hospital
9       for only a few hours (less than 24), they are considered outpatients for coverage
        purposes regardless of: the hour they came to the hospital, whether they used a
10      bed, and whether they remained in the hospital past midnight.

11  *Id.*

12          In contrast, "[a] hospital outpatient is a person who has not been admitted by the hospital

13  as an inpatient but is registered on the hospital records as an outpatient and receives services

14  (rather than supplies alone) from the hospital[.]"  *Id.*, Chapter 6, §20.2.  Outpatient observation

15  care is defined as:

16      a well-defined set of specific, clinically appropriate services, which include
        ongoing short term treatment, assessment, and reassessment before a decision can
17      be made regarding whether patients will require further treatment as hospital
        inpatients or if they are able to be discharged from the hospital.  Observation
18      services are commonly ordered for patients who present to the emergency
        department and who then require a significant period of treatment or monitoring
19      in order to make a decision concerning their admission or discharge.

20  *Id.*, Chapter 6, § 20.6.A.  "When a physician orders that a patient receive observation care, the

21  patient's status is that of an outpatient." *Id.*, Chapter 6, § 20.6.B.  In her Amended Complaint,

22  Guardiola explains that the coding system for classifying and reporting outpatient procedures to

23  Medicare is different than that for inpatient procedures.  Doc. #17, ¶¶20-23.

24          **B.      Guardiola's Specific Allegations**

25          Guardiola sets forth a list of 579 inpatient claims for "zero-day stays," in which the

26  patient was admitted to and discharged from the hospital on the same calendar day.  *Id.*, ¶72.

27  Additionally, Guardiola specifically sets forth a list of 68 inpatient claims for "one-day stays,"

28  the vast majority of which she claims were for patients who were discharged within 24 hours of

admission to the hospital. *Id.*, ¶¶74, 76. Each of those claims, Guardiola alleges, was for an elective outpatient surgical procedure. *Id.*, ¶75. Moreover, none of the procedures involved are listed on the Medicare Inpatient Only List. *Id.*, ¶76. Guardiola further alleges that many of the patient files which accompany these short-stay claims are missing doctor's admission orders indicating that inpatient status is necessary or any other medical documentation that would justify inpatient admission. *Id.* In addition, Guardiola alleges that patient #34 on the "one-day stay" list was placed, by physician order, in outpatient observation status and then later billed as inpatient. *Id.*, ¶77. In each of these cases, Guardiola alleges that Medicare paid an inflated amount for the patient's care as a result of Renown's fraudulent inpatient assignments. *Id.*, ¶¶76, 77.

Guardiola further sets forth four circumstances that, if accepted as true, plausibly suggest the existence of a scheme whereby Renown knowingly submitted claims for payment to Medicare that falsely represented that the patients were inpatient and, thus, received inpatient services. *Id.*, ¶30; *See also United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1172 (10th Cir. 2010) ("claims under the FCA need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme") (citing *United States ex rel. Duxbury v. Ortho Biotech Prods.*, 579 F.3d 13, 29 (1st Cir. 2009); *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854-55 (7th Cir. 2009); *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).

First, Guardiola alleges that a high percentage of the patient files at Regional and South Meadows were missing physician orders for inpatient status and/or contained inadequate documentation to support a determination of the same. Doc. #17, ¶31. Guardiola further alleges that Renown deliberately failed and refused to maintain proper documentation in order to facilitate improper billing. *Id.*, ¶30.

Second, Guardiola alleges that Renown maintained an antiquated patient management computer system that generated false claims. *Id.*, ¶32. According to Guardiola, once a patient is initially and improperly registered as an inpatient, that status could not be changed until the patient was discharged. *Id.* As such, even if a patient is later treated on an outpatient or outpatient observation basis and properly coded as such, the computer system overrides the

9

accurate coding with billing codes according to the original patient status. *Id.* Guardiola alleges that she first detected the problem in the fourth quarter of 2009 and that Renown administrators were well aware of the problem, but did nothing to remedy it. *Id.*, ¶33.

Third, Guardiola alleges that Renown maintained internal processes designed to assign improper patient statuses. *Id.*, ¶36. When a patient is scheduled for an elective surgical procedure, his or her doctor's office calls the hospital scheduler to set up an appointment. *Id.*, ¶37. Once the surgical appointment is scheduled, hospital administrative personnel assign a patient account number that is unique for that encounter. *Id.*, ¶38. Account numbers preceded by a '1' designate inpatient status and account numbers preceded by a '2' designate outpatient status. *Id.* Unless the doctor's office specifically indicates at that time that the patient should be listed as a "same day surgery" or outpatient status, Renown automatically assigns an inpatient account number. *Id.*, ¶39. Three to seven days before the scheduled procedure, the patient's physician will issue a preoperative order that designates the patient's admission status. *Id.*, ¶40. Renown does not use this information to change or correct the status already associated with the patient account number. *Id.* Accordingly, the physician's designation as to the patient's status and patient's actual treatment is irrelevant for purposes of billing because the patient account number has already been determined and the computer system will not allow changes to the original patient status. *Id.*, ¶39.

Guardiola further maintains that a patient's inpatient or outpatient status cannot be altered once the patient has been discharged and his or her claim goes to billing. Even where Renown's billing coder correctly assigns outpatient billing codes for a patient who has received outpatient services, the computer system will detect any inconsistencies between the patient's numeric inpatient status and his or her assigned outpatient billing codes and automatically generate an inpatient billing code. *Id.*, ¶¶41, 42. In essence, the computer system ignores the billing coder's work and appropriate outpatient status and automatically bills the claim as if the inpatient status was correct. *Id.*, ¶43. Guardiola alleges that Renown was aware of these problems, but was unwilling to correct them by providing staff to perform an appropriate pre-admission review as she suggested. *Id.*, ¶44.

1        Additionally, Guardiola alleges that Renown management actually directed that certain

2   types of procedures always be billed as inpatient claims.  *Id.*, ¶80.  For example, Guardiola

3   discovered that two physicians were performing outpatient procedures on an exclusively

4   inpatient basis even though they were not on Medicare's Inpatient Only List and no other

5   circumstances justified their performance as inpatient procedures.[4]  *Id.*, ¶¶65-68.  Additionally,

6   Guardiola discovered that Renown, in conjunction with another physician's management team,

7   mandated that all Da Vinci hysterectomy procedures be performed on an inpatient basis, even

8   though such procedures are not on the Medicare Inpatient Only List.  *Id.*, ¶¶65, 82.  Evidently,

9   CEO Greg Boyer and COO Kris Gaw admitted that these directives existed in the past, but stated

10   that a new procedure needed to be developed.  *Id.*, ¶81.  However, Renown leadership did not

11   ultimately implement corrections to address the alleged billing fraud.  *Id.*, ¶87.

12        Fourth, Guardiola alleges that the absence of any sort of post-procedure review process to

13   ensure that patients are assigned the correct status further perpetuates a scheme whereby Renown

14   knowingly submits false claims for inpatient services to Medicare.  *Id.*, ¶¶45, 46.

15        **C.**    **Renown's Knowledge**

16        Considering the aforementioned allegations, the Court finds that Guardiola has

17   sufficiently alleged that Renown had actual knowledge of the fraud, or, at a minimum, acted in

18   deliberate ignorance of, or in reckless disregard of, the falsity of the inpatient claims.  Guardiola

19   specifically alleges that in 2009 she approached her then-boss, Renown Health CFO Mark

20   Johnson, with her concerns that Renown was systematically billing Medicare for one-day

21   inpatient stays for what should have been outpatient claims.  *Id.*, ¶49.  Johnson approved of

22

23   _____

24      [4]  Medicare's "Inpatient Only List" identifies certain surgical procedures that may be
billed exclusively on an inpatient basis.  However, there is no indication that this is an exhaustive

25   list of procedures for which Renown may properly bill as inpatient claims.  While the Court is
not required or inclined to accept Guardiola's legal conclusion that the Inpatient Only List

26   "creates a rebuttable presumption that any procedure not on the list must be performed on an
outpatient basis[,]" the Court must accept as true Guardiola's factual assertion that many of the

27   improperly billed inpatient claims were for procedures not listed on the Inpatient Only List and

28   for which no other criteria justified inpatient admission.  *Id.*, ¶25.

1   Guardiola's proposed formation of a Patient Status Committee ("PSC") to explore the scope of

2   the problem and recommend and implement corrections. *Id.* After Johnson resigned, his

3   successor, Dawn Ahner, agreed to proceed with the previously approved PSC proposal. *Id.*, ¶50.

4   One of the PSC's first initiates was to address the findings of a recent audit that revealed that

5   Renown had a significant "one-day stay" problem based on inaccurate clinical documentation

6   and that Renown was submitting inpatient claims for patients whose one-day hospital stays

7   should have been billed on an outpatient basis. *Id.*, ¶52. Despite some efforts to remedy the

8   "short-stay" billing problems, Renown was ultimately aware that the new safeguards were

9   inadequate and further refused to undertake any sort of post-procedure review to ensure that a

10   patient's status was correct. *Id.*, ¶¶53-55. Moreover, Guardiola asserts that her efforts to educate

11   physicians and staff at Renown about appropriate admission status standards were largely

12   ignored or challenged, by both Renown and the physicians who worked there. *Id.*, ¶¶57-68.

13   Again in 2011, during meetings in which Guardiola participated, Renown management

14   acknowledged the billing problems. *Id.*, ¶¶80, 81. Nevertheless, Renown leadership failed to

15   undertake appropriate corrective measures. *Id.*, ¶87.

16         Guardiola also alleges that Renown was aware of the Medicare rules pertaining to billing

17   for inpatient/outpatient services. *Id.*, ¶89. Specifically, Renown knew that when a patient does

18   not meet inpatient criteria and is admitted for a one-day stay, that payment may not be sought for

19   an inpatient claim and must be submitted as an outpatient claim. *Id.*, ¶88. Additionally,

20   Guardiola alleges that Renown knew that if a patient is erroneously billed as an inpatient claim, a

21   corrected claim form should be submitted to correct the billing. *Id.*

22         **D.**     **Pleading Specificity Under Rule 8(a)(a) and Rule 9(b)**

23         Considering the length of time for which the patients were admitted to the hospital, the

24   lack of documentation supporting an inpatient determination, the type of procedures that were

25   performed (i.e., outpatient procedures), the fact that none of the procedures were listed on

26   Medicare's Inpatient Only List, the faulty computer billing systems, Renown's admittedly

27   problematic directives regarding characterization of inpatient procedures, the absence of any

28   post-discharge review process, and Renown's awareness of the inpatient billing issues, the Court

1    finds that Guardiola has plausibly alleged that Renown knowingly billed Medicare for inpatient

2    claims that should have been billed as outpatient claims.  The Court also finds that Guardiola has

3    satisfied Rule 9(b)'s heightened pleading standard.  Guardiola sets forth the details of the alleged

4    scheme and its falsehoods, as well as the manner in which the allegedly false claims were

5    submitted to Medicare for payment.  Moreover, without pre-discovery access to patient specifics,

6    it would be nearly impossible for Guardiola to access the medical records of both Renown

7    facilities and specify every instance where Medicare was improperly billed for inpatient claims.

8    *See U.S. Ex. Rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052 (9th Cir. 2001) (Rule

9    9(b)'s pleading standard may be relaxed to permit discovery in cases where the evidence of fraud

10   is within a defendant's exclusive possession); *see also Ebeid*, 616 F.3d at 999 (while relator "is

11   not required to allege all facts supporting each and every instance of [fraudulent] billing . . . [,]

12   Rule 9(b) still requires [relator] to plead the fraud with some level of specificity") (internal

13   quotation marks and citations omitted).  Certainly, Guardiola's Amended Complaint is specific

14   enough to give Renown notice of the particular misconduct which is alleged to constitute the

15   fraud so that they can defend against the charge and not just deny that they have done anything

16   wrong.

17          Renown misrepresents Guardiola's allegations when it states that "[t]he response brief

18   admits the amended complaint 'does *not* allege that these patients did not *require or receive* the

19   procedures or treatments' for which Medicare was billed."  Doc. #43, p. 3 (quoting Doc. #43, p.

20   14 n.6) (underline added).  Contrary to Renown's assertion, Guardiola merely admits that the

21   Amended Complaint "does not allege that the patients did not require or receive the procedures

22   or treatments rendered to them by [Renown]."  *Id.* at 14 n.6 (underline added).  In this regard, it

23   is clear that Guardiola does not allege that Renown actually administered procedures or

24   treatments that were unnecessary or unreasonable.  This lawsuit has nothing to do with whether

25   the procedures or treatments Renown actually administered were necessary and reasonable.

26   Rather, the crux of the Amended Complaint is that Medicare claims were improperly billed as

27   inpatient when they should have been billed as outpatient or observation status based on the

28   procedures or treatments provided by Renown.  In other words, Guardiola alleges that Renown

1   submitted claims for services that were not actually provided and submitted claims with an

2   incorrect description of the services provided.

3          Renown further distorts the issue when it claims that in order "to state a claim for factual

4   falsity, the amended complaint must plausibly allege that the defendants knowingly submitted

5   inpatient claims for patients who were not actually admitted as inpatients." *Id.* at 3.  However,

6   the issue is not whether Renown submitted inpatient claims for patients who were *admitted* as an

7   inpatient.  Rather, the issue is whether Renown submitted inpatient claims for patients who were

8   not properly admitted and/or characterized by Renown as inpatient based on the services

9   provided.

10         Finally, the Court rejects Renown's assertion that Guardiola's allegations as to "one-day

11  stay" patient #34 do not plausibly suggest wrongdoing with respect to that single claim, but

12  merely suggest a mistake.  Whether the facts will ultimately support Guardiola's claims or

13  whether they will show only an innocent mistake or mere negligence on the part of Renown are

14  issues that cannot be resolved on a motion to dismiss.  Accordingly, the Court rejects Renown's

15  argument in this regard.

16         In sum, the Court finds that Guardiola has adequately alleged a plausible claim for relief

17  against Renown under the FCA.

18

19         IT IS THEREFORE ORDERED that Renown's Motion to Dismiss (Doc. #28) is

20  DENIED.

21         IT IS SO ORDERED.

22         DATED this 19th day of August, 2014.

23

24                                                      _____
25                                                      LARRY R. HICKS
                                                        UNITED STATES DISTRICT JUDGE
26

27

28

                                                    14