UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. CECILIA GUARDIOLA, <br><br> Plaintiff, <br><br> vs. <br><br> RENOWN HEALTH, RENOWN REGIONAL MEDICAL CENTER, and RENOWN SOUTH MEADOWS MEDICAL CENTER, <br><br> Defendants. | 3:12-cv-00295-LRH-VPC <br><br> ORDER |

Before the Court is Defendants Renown Health, Renown Regional Medical Center, and Renown South Meadows Medical Center's (collectively "Renown") Motion to Dismiss for Lack of Subject Matter Jurisdiction. Doc. #48.[1] Relator Cecilia Guardiola ("Guardiola") filed an Opposition (Doc. #58), to which Renown replied (Doc. #64).

**I.     Factual and Procedural History**

Renown Health, a Nevada nonprofit organization, is the umbrella corporation under which related entities, including Renown Regional Medical Center and Renown South Meadows Medical Center, provide acute health care services. Doc. #17 ¶11. Guardiola is a registered nurse and compliance professional who was hired by Renown as Director of Clinical Documentation on June 1, 2009. *Id.* ¶9. Guardiola's role was to improve medical documentation in order to support improved billing. *Id.* Guardiola was eventually promoted to

---

[1] Refers to the Court's docket number.

Director of Clinical Compliance, but after her efforts at improving the billing system were allegedly stifled by Renown, she resigned on January 15, 2012. *Id.*

On June 1, 2012, Guardiola filed a *qui tam* Complaint, and on January 10, 2014, filed an Amended *qui tam* Complaint against Renown to recover damages resulting from Renown's knowing efforts to defraud government-funded health insurance programs, specifically Medicare.[2] Doc. #1; Doc. #17. Guardiola alleges that, from July 2007 through March 2011, Renown knowingly submitted or, in reckless disregard of the truth, allowed to be submitted, short-stay inpatient claims ("zero-day stays" and "one-day stays") that should have been billed as outpatient claims. Doc. #17 ¶¶29, 72-77. Guardiola further alleges that these improperly billed claims were caused by (1) inadequate clinical documentation to support inpatient claims, (2) antiquated computer systems that generated false claims, (3) internal processes designed to improperly assign inpatient admission status, and (4) a lack of review to ensure appropriate inpatient status assignments. *Id.* ¶30. Guardiola became aware of the alleged deficiencies in the Renown billing system during the fourth quarter of 2009. *Id.* ¶33. Renown allegedly did nothing to correct and/or prevent these problems. *Id.* Guardiola claims that she brought these problems to the attention of Renown management personnel and none of them acted to correct and/or prevent the Medicare claims from being improperly labeled and billed. *Id.* ¶¶49-71. Moreover, Guardiola alleges that Renown management encouraged, directed, and facilitated the continued fraudulent activity against Medicare. *Id.* ¶¶78-89. Finally, Guardiola alleges that Renown management engaged in the aforementioned fraudulent activity in order to obtain higher payments from Medicare. *Id.*

Specifically, Guardiola sets forth a list of 579 inpatient claims for "zero-day stays," in which the patient was admitted to and discharged from the hospital on the same calendar day. *Id.* ¶72. Additionally, Guardiola sets forth a list of 68 inpatient claims for "one-day stays," the vast

---

[2] Guardiola filed her initial Complaint on June 1, 2012. Doc. #1. A *qui tam* claim pursuant to 31 U.S.C. § 3730(b)(1) allows an individual to bring a civil action in violation of 31 U.S.C. § 3729 (the "False Claims Act" or the "FCA") on behalf of and in the name of the United States Government. In *qui tam* actions, the individual bringing the claim on behalf of the Government is considered the "Relator."

1  majority of which she claims were for patients who were discharged within twenty-four hours of
2  admission to the hospital. *Id.* ¶¶74, 76. Guardiola alleges that each of those claims was for an
3  elective outpatient surgical procedure. *Id.* ¶75. Moreover, none of the procedures involved are
4  listed on the Medicare Inpatient Only List. *Id.* ¶76. Guardiola alleges further that many of the
5  patient files that accompany these short-stay claims are missing doctor's admission orders
6  indicating that inpatient status is necessary, or any other medical documentation that would
7  justify inpatient admission. *Id.* In addition, Guardiola alleges that patient #34 on the "one-day
8  stay" list was placed, by physician order, in outpatient observation status and then later billed as
9  inpatient. *Id.* ¶77. In each of these cases, Guardiola alleges that Medicare paid an inflated
10 amount for the patient's care as a result of Renown's fraudulent inpatient assignments. *Id.* ¶¶76,
11 77. Guardiola alleges further that physicians connected to Renown were complicit in Renown's
12 billing practices. *Id.* ¶¶57, 62-68. Additionally, Guardiola alleges that on numerous occasions
13 she reported the allegedly fraudulent billing practices to her superiors, including Renown
14 executives. *Id.* ¶¶46, 49-50, 56. Guardiola alleges that Renown senior management directed
15 physicians to carry on the fraudulent billing practices. *Id.* ¶¶80-82.

16       The improperly recorded "zero-day stays" and "one-day stays" were also reported in
17 audits conducted by Recovery Audit Contractors ("RAC").[3] Doc. #49 at 5. When RAC audits
18 revealed that a claim was improperly billed as an inpatient status, Renown received a letter
19 requesting repayment. *Id.* at 6. The RAC audit results were shared internally with the
20 compliance, billing, and quality departments, as well as at medical director, department, and
21 executive committee meetings. Doc. #50 ¶9. Results were also shared externally, as Renown
22 officers would inform Renown physicians and their staff, "including non-employee physicians
23 and their non-Renown staff, that a high percentage (sometimes over 90%) of RAC denials
24 stemmed from short-term inpatient stays." *Id.*

25 ///

26

27     [3] An affidavit attached to Renown's motion states that the RAC "program began with the 2003
Medicare Modernization Act, . . . [and] mandated by Congress and required by the Secretary of the
28 Department of Health and Human Services to institute . . . a program to identify and recoup improper
payments made on claims of health care services provided to Medicare beneficiaries." Doc. #50 at 1-2.

On February 21, 2014, Renown filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Doc. #28. While the 12(b)(6) Motion was still pending before the Court, Renown filed this Motion to Dismiss for Lack of Subject Matter Jurisdiction. Doc. #48. The Court denied the 12(b)(6) Motion to Dismiss on August 20, 2014. Doc. #87. The Court now considers the jurisdictional question.

**II.     Legal Standard**

Federal courts are of limited jurisdiction; jurisdiction must be granted by the Constitution or Congress before a federal district court may hear a case. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "It is presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.* (citations omitted). Federal Rule of Civil Procedure 12(b)(1) provides for dismissal if the court finds that it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Unlike motions to dismiss under Rule 12(b)(6), in a motion to dismiss for lack of subject matter jurisdiction, the moving party may submit affidavits or other supporting evidence to the court. *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 776 (9th Cir. 2000). A motion for lack of subject matter jurisdiction is never waived, and can be raised at any time during the litigation. *Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1202 (2011).

The False Claims Act "prohibits submitting false or fraudulent claims for payment to the United States, and authorizes *qui tam* suits, in which private parties bring civil actions in the Government's name." *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 131 S. Ct. 1885, 1889 (2011). The FCA, as amended on March 23, 2010, states that:

> The court shall dismiss an action or claim . . . if substantially the same allegations or transactions as alleged in the claim were publicly disclosed (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

///

///

4

1    31 U.S.C. § 3730(e)(4)(A).[4]  The statute defines "original source" as:

2       an individual who either (i) prior to a public disclosure under subsection (e)(4)(a),
        has voluntarily disclosed to the Government the information on which allegations
3       or transactions in a claim are based, or (2) who has knowledge that is independent
        of and materially adds to the publicly disclosed allegations or transactions, and
4       who has voluntarily provided the information to the Government before filing an
        action under this section.
5

6    31 U.S.C. § 3730(e)(4)(B).  A court need only consider whether relator was the "original source"

7    of the information disclosed if the court finds that the relator's claims were not previously

8    publicly disclosed.  *U.S. ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1199 (9th Cir.

9    2009).

10   **III.    Discussion**

11           **A.    Retroactivity**

12           "The presumption against retroactive legislation is deeply rooted" in the Supreme Court's

13   jurisprudence.  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994).  Courts cannot infer

14   retroactive application of a statute unless the statute evinces "clear congressional intent" for the

15   statute to apply retroactively.  *Id.* at 283.  Guardiola argues that the 2010 amendment to

16   § 3730(e)(4) should apply because the 1986 public disclosure bar is merely jurisdictional, and

17   "does not affect Defendants' substantive rights but merely provides for the forum where the case

18   will be heard."  Doc. #58 at 8.  Renown states that in light of Guardiola's stated preference, "the

19   Court does not need to decide the effect of the prior bar."  Doc. #64 at 8.[5]

20           Guardiola argues that this precedent against retroactivity absent clear congressional intent

21   does not apply to statutes that are merely jurisdictional—like § 3730(e)(4).  Guardiola cites

---

[4] Prior to March 23, 2010, the FCA's public disclosure bar, as amended in 1986, included different language. *See Schindler Elevator Corp.*, 131 S. Ct. at 1891 ("No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information."). For the reasons discussed in Part III.A of this Order, the Court adopts the 2010 amendment of the FCA.

[5] Renown maintains, however, that if the Court decides to apply the prior public disclosure bar, "the plaintiff's claims based on conduct before March 23, 2010, must be dismissed." Doc. #64 at 8.

1  *Landgraf* for the proposition that present law normally applies to jurisdictional statutes that
2  "speak to the power of the court rather than to the rights or obligations of the parties." 511 U.S.
3  at 274 (internal quotation marks omitted). In *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, the
4  Supreme Court stated that "[s]tatutes merely addressing *which* court shall have jurisdiction to
5  entertain a particular cause of action can fairly be said merely to regulate the secondary conduct
6  of litigation and not the underlying primary conduct of the parties." 520 U.S. 939, 951 (1997).
7  "Such statutes affect only *where* a suit may be brought, not *whether* it may be brought at all." *Id.*
8  (emphasis in original). Ultimately, however, the Court held that the 1986 amendment to § 3730
9  "does not merely allocate jurisdiction among forums. . . . it *creates* jurisdiction where none
10 previously existed" and therefore applied the pre-1986 amendment. *Id.* (emphasis in original).
11         Guardiola argues that *Hughes* does not preclude application of the 2010 amendment
12 because the Ninth Circuit held in *U.S. ex rel. Anderson v. N. Telecom, Inc.* that for purposes of
13 determining retroactivity, the relevant date is when the relator *disclosed* the fraudulent conduct,
14 not when the conduct *occurred*. 52 F.3d 810, 814 (9th Cir. 1995) ("*Anderson I*"). Guardiola
15 adds that the Ninth Circuit held in an amendment to *Anderson* that "*Hughes* left undisturbed this
16 court's holding in *Anderson I* that the relevant conduct for purposes of determining the
17 appealability of the 1986 amendment is the disclosure of information to the government." 141
18 F.3d 1179, *3 (9th Cir. 1998) ("*Anderson II*"). This distinction is important because "the 1986
19 amendment did not change the legal consequences of Northern Telecom's conduct. If Northern
20 Telecom really did submit a fraudulent claim, it became liable and remained liable to the
21 government and to potential *qui tam* relators." *Anderson I*, 52 F.3d at 814. Thus, the 1986
22 amendment applied because it merely "changed the consequences of [relator's] conduct, not
23 Northern Telecom's." *Id.* Here, as in *Anderson*, the 2010 amendment had no substantive impact
24 on Renown's liability, but only impacted Guardiola's *qui tam* rights.
25         The Supreme Court and Ninth Circuit have both directly addressed the retroactive
26 application of the § 3730(e)(4) 2010 amendment. In *Graham County Soil and Water*
27 *Conservation District v. U.S. ex. rel. Wilson*, which involved a claim brought before adoption of
28 the 2010 amendment, the Court applied the 1986 amendment because the 2010 amendment

6

"makes no mention of retroactivity." 559 U.S. 280, 283 n.1 (2010).  The Court held in *Schindler*, also filed before the 2010 amendment went into effect, that the amendments to § 3730(e)(4) "are not applicable to *pending cases*." 131 S. Ct. at 1886 n.1 (emphasis added).  Similarly, the Ninth Circuit noted in *Berg v. Honeywell Int'l, Inc.* that because the 2010 amendment did not address retroactivity, it applied "the previous version of § 3730(e)(4), which was in effect at the time of the filing of this action." 502 Fed. Appx. 674, 676 n.1 (2012).  Accordingly, Supreme Court and Ninth Circuit precedent related to § 3730(e)(4) indicates that the *Anderson* analysis still applies, and that the 2010 amendment can be applied to *qui tam* actions that were filed after adoption of the 2010 amendment.

Guardiola filed the *qui tam* complaint at issue on June 1, 2012.  Doc. #1.  Additionally, Guardiola disclosed her allegations of fraud to the government—the U.S. Attorney's Office for the District of Nevada—on May 2, 2012.  Doc. #58 at 21.  Accordingly, given that the relevant disclosures and filing of this action occurred after the adoption of the 2010 amendment, the Court finds that the 2010 amendment of § 3730(e)(4) applies.[6]

**B.     Public Disclosure**

Under the 2010 amendment of § 3730(e)(4), a court must dismiss the relator's action if it is based on "allegations or transactions" that were previously disclosed to the public in a federal hearing, by the news media, or "in a congressional, Government Accountability Office, or other Federal report, hearing, *audit*, or investigation." § 3730(e)(4)(A) (emphasis added).  A disclosure constitutes a "public disclosure" if the disclosure "originated in one of the sources enumerated in the statute" and if "the content of the disclosure consisted of the 'allegations or transactions' giving rise to the relator's claim, as opposed to 'mere information.'" *A-1 Ambulance Serv. v. California*, 202 F.3d 1238, 1243 (9th Cir. 2000) (quoting *United States ex rel. Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 1473 (9th Cir. 1996)).  "[A] government employee to whom information relevant to an FCA action is disclosed is not a member of the public under

---

[6] Renown does not object to the application of the 2010 amendment.  Doc. #64 at 8 ("[T]he Court does not need to decide the effect of the prior bar.").  In fact, Renown argues that under the 2010 public disclosure bar, "the case for dismissal is even stronger." Doc. #64 at 2.

this section." *Seal 1 v. Seal A*, 255 F.3d 1154, 1161 (9th Cir. 2001). Employees of an organization named in a *qui tam* action also are not members of the public under this section: "Because the employee has a strong economic incentive to protect the information from outsiders, revelation of information to an employee does not trigger the potential for corrective action presented by other forms of disclosure." *Id.* (quoting *U.S. ex rel. Schumer v. Hughes Aircraft Co.*, 63 F.3d 1512, 1518 (9th Cir. 1995), *overruled on other grounds by Hughes*, 520 U.S. 939).

Renown argues that the public disclosure bar applies because prior to Guardiola's disclosures, the results of RAC audits were disclosed to multiple sources outside of government and Renown employees. Doc. #64 at 3. Specifically, Renown states that these audits were disclosed to 585 doctors connected to Renown. *Id.* at 4. Guardiola argues that the audit results were marked "confidential" and "were never communicated to anyone other than Renown-employed physicians . . . and Renown-employed staff." Doc. #58 at 15.[7] Therefore, Guardiola argues, the audit results were not communicated to "outsiders," and the public disclosure bar should not apply. *Id.* Indeed, although the audit was allegedly made available to a large number of doctors connected to Renown, such disclosure does not by itself make the audit public. *See Gonzales v. Planned Parenthood of L.A.*, 392 Fed. Appx. 524, 526-27 (9th Cir. 2010) (finding that an audit of Planned Parenthood of San Diego was not made public "in any sense" although it was sent by email to other Planned Parenthood offices throughout California); *cf Seal 1*, 255 F.3d at 1162 (finding that disclosure of an investigation to one person, "an outsider," made the disclosure public because "he had significant incentive (and no disincentive) to use allegations of fraud . . . to his own advantage").

The Ninth Circuit has expressly declined to apply the public disclosure bar to an audit that was disclosed only to individuals "with a strong economic incentive to protect the information from outsiders." *Schumer*, 63 F.3d at 1518. In *Schumer*, the court responded to a

---

[7] Guardiola "disputes the fact that staff who were not employed by Renown were informed of the audit results," but states that "there is no different treatment for purposes of the public disclosure bar [because] the staff should be considered to be included within the 'private sphere.'" Doc. #58 at 15 n.3.

8

Second Circuit Court of Appeals decision finding that the public disclosure bar applied when audit information was disclosed to innocent employees. *Id.* (citing *U.S. ex rel. Doe v. John Doe Corp.*, 960 F.2d 318 (2d Cir. 1992)). The court found that "[u]nder a 'practical, commonsense interpretation' of the jurisdictional provisions, information that was 'disclosed in private' has not been publicly disclosed." *Id.* (quoting *U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante v. Prudential Ins. Co.*, 944 F.2d 1149, 1161 (3d Cir. 1991)). To support this finding, *Schumer* considered Congress' "stated purposes" for the 1986 amendment to the FCA. *Id*. (noting that the amendments "were adopted in part to correct a restrictive interpretation of the Act which barred *qui tam* suits whenever 'the government already possessed the information' upon which the lawsuit was based"). Congress' stated intent for the 2010 amendments to the FCA was similar: "The Committee does not intend to bar suits solely because the Government already knew of the fraud or could have learned of the fraud from information in the public domain." S. Rep. 110-507 (2008), at 22. As in *Schumer*, applying the public disclosure bar here would thwart the stated purpose of the 2010 amendment and "drastically curtail[] the ability of insiders to bring suit once the government becomes involved in the matter." *Schumer*, 63 F.3d at 1519.

Guardiola has presented a strong argument that the doctors who had access to the RAC audit were economically linked to Renown and were therefore not "outsiders" because they had an "economic incentive to protect the information from outsiders." *See Seal I*, 255 F.3d at 1161. Accordingly, the Court finds that Guardiola has met her burden to establish that the RAC audits were not public disclosures under § 3730(e)(4).[8]

**C.     Original Source**

If the Court determines that relator's information was not publicly disclosed under § 3730(e)(4)(A), then the Court need not consider whether relator was an "original source" under § 3730(e)(4)(B). The Court notes, however, that even if the RAC audits were public disclosures, jurisdiction would still be proper because Guardiola is an "original source" under

---

[8] Both parties discussed whether the information contained in the RAC audits constituted "allegations or transactions." Doc. #58 at 16-18; Doc. #64 at 6-8. Because the audits were not public disclosures under the statute, it is not necessary for the Court to resolve this question.

9

§ 3730(e)(4)(B). A relator is an "original source" of publicly disclosed information if she "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and [] has voluntarily provided the information to the government before filing an action under" the FCA. 31 U.S.C. § 3730(e)(4)(B).

Under Ninth Circuit case law, Guardiola's independent knowledge is sufficient to establish that she was "an original source" under § 3730(e)(4)(B). In *Hagood*, the relator reported to his superiors potentially illegal cost allocation that he discovered while he volunteered for the defendant agency. 81 F.3d at 1476. The court held that the relator was an original source because the public disclosure "was at least partially based on records resulting" from his complaints. *Id.* In *Wang v. FMC Corp.*, the court held that even though the information underlying relator's *qui tam* action had been publicly disclosed, he was not precluded by the FCA statute's jurisdictional bar because he had "direct and independent knowledge . . . of what he thought was a fraud on the government." 975 F.2d 1412, 1417 (9th Cir. 1992). The court added that the fact that someone else publicly disclosed the alleged fraud first did not "rob [the relator] of what he saw with his own eyes." *Id.*

Guardiola's First Amended Complaint describes in detail her "direct and independent knowledge" of Renown's alleged fraudulent billing practices. Guardiola was hired by Renown in June 2012 as Director of Clinical Documentation to improve medical documentation and support improved billing. Doc. #17 ¶9. She was soon promoted to Director of Clinical Compliance, and she remained in that position until she resigned on January 15, 2012. *Id.* Soon after beginning at Renown, Guardiola states that she learned from conferring with colleagues and reviewing patient charts that poor documentation led Renown to submit short-stay inpatient claims that should have been billed on an outpatient basis. *Id.* ¶29. Guardiola has provided information of nearly 650 zero-day and one-day stays that she alleges were improperly billed as inpatients. *Id.* ¶¶72-79. Perhaps most importantly, Guardiola reported the improper billing practices to her superiors on multiple occasions. In 2009, Guardiola told Renown CFO Mark Johnson that Renown was billing Medicare for one-day inpatient stays that should have been outpatient stays. *Id.* ¶¶49; 56. After Johnson resigned in November 2009, Guardiola reported "the systematic misbilling of

10

outpatient claims and inadequate Case Management" at Renown to the new Renown CFO Dawn Ahner. *Id.* ¶¶50; 56. Guardiola then led a Patient Service Committee—comprised of case management, physician, patient access, audit, and nursing departments—charged with the goal of "ensuring the accuracy of patient status orders and billing." *Id.* ¶51. Guardiola also states that she voluntarily disclosed her knowledge of the information that she gathered to the U.S. Attorney for the District of Nevada orally and by email before filing her complaint. Doc. #58 at 12.

Accordingly, even if the RAC audits constituted public disclosures under § 3730(e)(4)(A), the Court finds that Guardiola would not be precluded by the jurisdictional bar because she has met her burden to show that she was an "original source": (1) she has alleged direct and independent knowledge of the information on which the allegations are based, and (2) she voluntarily disclosed this information to the government before filing her original complaint. *See* 31 U.S.C. § 3730(e)(2)(B); *U.S. ex rel. Bajaras v. Northrop Corp.*, 5 F.3d 407, 411 (9th Cir. 1993).

IT IS THEREFORE ORDERED that Renown's Motion to Dismiss (Doc. #48) is DENIED.

IT IS SO ORDERED.

DATED this 13th day of October, 2014.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE