1   William E. Peterson
2   Nevada Bar No. 1528
    Craig S. Denney
3   Nevada Bar No. 6953
    SNELL & WILMER L.L.P.
4   50 West Liberty, Suite 510
    Reno, NV  89501
5   wpeterson@swlaw.com
    cdenney@swlaw.com
6   T 775.785.5440
7   F 775.785.5441

8   Mitchell R. Kreindler
    Admitted *pro hac vice*
9   Sharon M. Gurak
    Admitted *pro hac vice*
10  KREINDLER & ASSOCIATES
    9219 Katy Freeway, Suite 206
11  Houston, TX  77024
    mkreindler@blowthewhistle.com
12  T 713.647.8888
    F 713.647.8889
13
14  Attorneys for Plaintiff/Relator
15
                IN THE UNITED STATES DISTRICT COURT
16
                        DISTRICT OF NEVADA
17

18  UNITED STATES OF AMERICA *ex rel.*
    CECILIA GUARDIOLA and
19
20          *Plaintiffs*,                    Case No. 3:12-cv-00295-LRH-VPC

21          *v.*

22  RENOWN HEALTH,                          **SECOND AMENDED COMPLAINT**
    RENOWN REGIONAL MEDICAL CENTER,
23  and RENOWN SOUTH MEADOWS
    MEDICAL CENTER,
24                                          **JURY DEMANDED**
            *Defendants*.
25

26

27          On behalf of the United States of America, plaintiff and relator Cecilia Guardiola files

28

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

this second amended *qui tam* complaint against defendants Renown Health, Renown Regional Medical Center, and Renown South Meadows Medical Center (collectively, "Renown" or the "Renown Health defendants") to recover damages resulting from the defendants' knowing efforts to defraud government-funded health insurance programs by improperly billing short-stay, outpatient services that should have been reimbursed on an outpatient basis as if they were more expensive inpatient services. In many situations, defendants billed the services as inpatient even though the patient was admitted to and discharged from the hospital on the same calendar day. As a result of their conduct, the defendants reaped substantial and illicit profits at taxpayer expense. Ms. Guardiola alleges:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

2.      The Court has personal jurisdiction over defendants pursuant to 31 U.S.C. § 3732(a) because the FCA authorizes nationwide service of process and defendants have sufficient minimum contacts with the United States.

3.      Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the defendants can be found, reside or have transacted business in the District of Nevada.

4.      Substantially the same allegations or transactions as alleged in this action have not been publicly disclosed in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or from the news media.

5.      To the extent that there has been a public disclosure unknown to the relator, the relator is an original source under 31 U.S.C. § 3730(e)(4). Relator is an individual who (1) prior

to any public disclosure voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, and/or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing this action.

## INTRODUCTION

6.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from false or fraudulent claims and statements made or caused to be made by the defendants to the United States in violation of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*  The false or fraudulent claims, statements and records at issue involve payments made by government-funded health insurance programs, such as Medicare, for services provided by the defendants.

7.      In general, the FCA provides that any person who knowingly submits or causes to submit to the Government a false or fraudulent claim for payment or approval is liable for a civil penalty of between $5,500 and $11,000 for each such claim, plus three times the amount of damages sustained by the Government.  The Act empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in the recovery.  The complaint must be filed under seal without service on any defendant.  The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to join the action.

8.      Pursuant to the FCA, relator seeks to recover on behalf of the United States damages and civil penalties arising from false and fraudulent claims, supported by false statements, that defendants submitted or caused to be submitted to government-funded health insurance programs.

- 3 -

**PARTIES**

9.     Relator Cecilia Guardiola is a registered nurse, compliance professional and law school graduate with extensive nursing and compliance experience.   On June 1, 2009, Ms. Guardiola was hired by the defendants as Director of Clinical Documentation.   Her role was to improve the medical documentation in each patient's record to support improved billing.   As Ms. Guardiola's responsibilities increased, she was promoted to Director of Clinical Compliance.   She resigned her position with the defendants on January 15, 2012.

10.     Ms. Guardiola brings this action for violations of the FCA on behalf of herself and the United States pursuant to 31 U.S.C. § 3730(b)(1).

11.     Defendant Renown Health, a Nevada nonprofit corporation, is the umbrella organization under which related entities provide health care services through three acute care hospitals, a children's hospital, and a number of other health care facilities in Nevada. Renown Health was established in 2006 as the rebranded successor to Washoe Health System.   Washoe Health System was founded as a private, non-profit corporation in 1984 when Washoe County transferred Washoe Medical Center (formerly Washoe County Hospital) to the newly-created entity.   For fiscal year 2011, Renown Health reported 34,782 inpatient admissions and 101,707 ER visits at its two primary hospitals.

12.     Defendant Renown Regional Medical Center ("Regional") is a Nevada non-profit corporation located in Reno, Nevada and, upon information and belief, is a wholly-owned subsidiary of defendant Renown Health.   Regional is a 558-bed acute care hospital that generated close to $1.7 billion in total patient revenue during fiscal year 2011. The hospital treats a significant Medicare and Medicaid population and admits almost 8,500 Medicare inpatients annually.

13.     Defendant Renown South Meadows Medical Center is a Nevada non-profit

- 4 -

corporation located in Reno, Nevada and, upon information and belief, is a wholly-owned subsidiary of defendant Renown Health.  It is a 138-bed acute care hospital that generated over $280 million in total patient revenue during 2011.  The hospital treats a significant Medicare and Medicaid population and admits almost 1,800 Medicare inpatients annually.

## BACKGROUND ALLEGATIONS

### Government-funded Health Insurance Programs

14.    The defendants' wrongdoing was committed against government-funded health insurance programs, including, without limitation, Medicare.

15.    Medicare is a federally-funded health insurance program primarily benefiting the elderly.  It was created in 1965 when Title XVIII of the Social Security Act was adopted. Medicare is administered by and through Centers for Medicare & Medicaid Services ("CMS").

### Inpatient and Outpatient Status Defined

16.    During relevant time periods, Medicare defined an inpatient as a "person who has been admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services." *Medicare Benefit Policy Manual,* Ch. 1, § 10 (Pub. 100-02).  The patient's physician is "responsible for deciding whether the patient should be admitted as an inpatient." *Id.*  Physicians may order inpatient "admission for patients who are expected to need hospital care for 24 hours or more, and treat others on an outpatient basis." *Id.*

17.    CMS recognizes that "the decision to admit is a complex medical judgment" requiring a physician to consider various factors such as "[t]he severity of the signs and symptoms exhibited by the patient" and "[t]he medical predictability of something adverse happening to the patient." *Id.*  Significantly, CMS notes that "[a]dmissions of particular patients are not covered or noncovered solely on the basis of the length of time the patient actually spends in the hospital." *Id.*  In particular, "[w]hen patients with known diagnoses enter a hospital for a

- 5 -

Snell & Wilmer

L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada  89501
775.785.5440

specific minor surgical procedure or other treatment" that is expected to keep a patient in the hospital for less than 24 hours, the patient must be considered an outpatient for Medicare coverage purposes. *Id.*

18.     Bridging the gap between inpatient and outpatient admission status is "outpatient observation" status. "Observation care is a well-defined set of specific, clinically appropriate services, which include ongoing short term treatment, assessment, and reassessment before a decision can be made regarding whether patients will require further treatment as hospital inpatients or if they are able to be discharged from the hospital." *Medicare Benefit Policy Manual*, Ch. 6, § 20.6.B. (Pub. 100-02).

19.     Outpatient observation is a specific hospital admission status that may be appropriate under a variety of circumstances. It is "commonly assigned to patients . . . who require a significant period of treatment or monitoring before a decision is made concerning their admission or discharge." *Id.* at § 20.5.A.; *see Medicare Claims Processing Manual*, Ch. 4, § 290.1 (Rev. 1, 10-03-03). Outpatient observation also is appropriate when the physician requires additional time to evaluate the patient before deciding whether the patient needs inpatient admission, the physician anticipates that the patient's condition can be evaluated or treated within 24 hours or rapid improvement in the patient's condition is anticipated within 24 hours. Observation status is commonly assigned to patients who present to the emergency department and require a period of treatment or monitoring before a decision is made concerning their admission or discharge. *Medicare Benefit Policy Manual,* Pub. at § 20.5.A. Observation status is also often appropriate for outpatient surgical patients whose condition requires extra recovery or follow up care. *Id.*

**Coding of Patient Claims**

20.     Outpatient procedures are classified and reported using Medicare's Healthcare

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775/785-5440

Snell & Wilmer

L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775-785-5440

Common Procedure Coding System ("HCPCS"). This system is based primarily on *Current Procedural Terminology* ("CPT"), published by the American Medical Association. The CPT uses five-digit codes with descriptive terms to identify services performed by health care providers and is the country's most widely-accepted coding reference.

21. Outpatient services provided under HCPCS codes are classified into ambulatory payment classifications (APCs) on the basis of clinical and cost similarity. All services within an APC have the same payment rate. Within each APC, CMS packages certain related services and items with the primary service.

22. Inpatient procedures are billed using a different system. For hospitals, there are several types of charges that are incorporated into the hospital bill, including facility and ancillary charges. Hospital facility charges consist of room, board and nursing care. Ancillary charges include radiology, laboratory, pharmacy and miscellaneous supplies. The facility and ancillary charges are coded using the ICD-9-CM system for inpatient hospital care for diagnoses and procedures.

23. Inpatient hospital stays are also coded using a three-digit Medicare severity diagnosis-related group (MS-DRG). The MS-DRG system was developed for Medicare as part of the inpatient prospective payment system. It is used to classify hospital cases into one of approximately 500 groups based on the expectation that the cases use similar hospital resources. The MS-DRG charge is dependent upon the level of care that the patient requires, with higher intensity of care being reflected with a higher charge. The patient's level of care is, in part, determined by the procedures performed while in the hospital. Such procedures are coded using a 4-digit number in the form xx.xx based on the International Classification of Diseases, Ninth Revision, Clinical Modification ("ICD-9-CM") system, established by CMS and the National Center for Health Statistics. The MS-DRG payment is intended to be a single, all-encompassing

payment covering all facility and ancillary charges, regardless of how long the patient is admitted or the number of services provided.

**Evaluating Appropriate Patient Status**

24.     When evaluating a patient's admission status, hospitals overwhelmingly rely on guidance known as InterQual Criteria.  InterQual is an industry-standard suite of products designed by McKesson Corporation that allows healthcare organizations to achieve a clinically validated approach to decision-making on patient care, patient status and billing issues.  The InterQual Criteria are used to objectively measure the severity of the illness (SI) and the intensity of the service (IS) provided to arrive at a determination of the appropriate service level.

25.     Of critical importance in determining patient status is Medicare's "Inpatient Only List," which identifies those specific surgical procedures that are only paid on an inpatient basis. While procedures not included on the inpatient-only list are not precluded from being performed on an inpatient basis, inpatient billing is only appropriate when justified by the patient's medical needs. Many of the claims alleged to have been improperly billed by the defendants as inpatient are for procedures not on the Inpatient Only List and for which no other criteria justified inpatient admission.

**Services Must be "Medically Necessary" and Fully Documented**

26.     CMS requires, as a condition of coverage, that services be reasonable and medically necessary.  42 U.S.C. § 1395y(a)(1)(A). Providers must provide economical medical services and, then, provide such services only where medically necessary.   42 U.S.C. § 1320c-5(a)(1). Providers must provide evidence that the service is medically necessary and appropriate, 42 U.S.C. § 1320c-5(a)(3), and must ensure that services provided are not substantially in excess of patient needs, 42 U.S.C. § 1320a-7(b)(6), (8).

27.     Federal law specifically prohibits providers from making "any false statement or

- 8 -

representation of a material fact in any application for any . . . payment under a Federal health care program." *See* 42 U.S.C. § 1320a-7b(a)(1).  Similarly, Federal law requires providers who discover material omissions or errors in claims submitted to Medicare to disclose those omissions or errors to the Government.  *See* 42 U.S.C. § 1320a-7b(a)(3).  The requirement that providers be truthful in submitting claims for reimbursement is a precondition for participation in the Medicare program. *See, e.g.*, 42 C.F.R. §§ 1003.105, 1003.102(a)(1)-(2).

28.     In order to establish eligibility to receive reimbursement from the Medicare program, CMS requires all hospitals to sign a Certification Statement as part of the Medicare Provider Agreement (CMS-855A Enrollment Application), which states in pertinent part,

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.
>                  *        *        *
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*Medicare Provider Agreement*, Sec. 15 (Certification Statement) at ¶¶ 4, 6 (CMS-855A Enrollment Application (07-11)).

29.     In order to establish eligibility to receive reimbursement from the Medicare program, CMS requires all physicians to sign a Certification Statement as part of the Medicare Provider Agreement (CMS-855I Enrollment Application), which states in pertinent part,

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 4A of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775/785-5440

with all applicable conditions of participation in Medicare.

\*     \*     \*

I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*Medicare Provider Agreement*, Sec. 15 (Certification Statement) at ¶¶ 4, 8 (CMS-855I Enrollment Application (07-11)).

30.     Defendants, as participants in the Medicare program, signed and submitted to CMS the Medicare Provider Agreement (CMS-855A) and required that their physicians sign and submit the CMS Medicare Provider Agreement for Physicians (CMS-855I), containing the language cited in paragraphs 28-29 herein, and indicating their agreement to be bound by the laws and regulations governing Medicare reimbursement for services.

31.     Medicare requires providers to submit claims on paper or electronically using universal billing formats. Regardless of the format used, a provider's obligations to Medicare remain the same.

32.     Beginning in 2007, paper claim submissions have been made using Medicare's UB-04 Uniform Bill (CMS 1450). The UB-04 (CMS-1450) notifies the provider, such as defendants, as follows:

THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESEN-TATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS RE-QUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONE-TARY PENALTIES AND ASSESSMENTS AND MAY UPON CON-VICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).

The form also requires entities submitting a claim to certify:

Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts…

33.     To submit claims electronically, which most providers, including defendants, are

required to do, a provider must enroll in Medicare's Electronic Data Interchange (EDI) program. The enrollment process provides for the collection of the information needed to successfully exchange EDI transactions with Medicare and establishes the expectations of the parties to the exchange. The unique EDI number issued to a provider, along with its password, acts as the provider's electronic signature for claim submission.

34.     As part of the EDI enrollment process, a provider is required to certify, among other things, that "it will submit claims that are accurate, complete, and truthful," that "it will acknowledge that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law," and that "it will research and correct claim discrepancies." To complete its EDI enrollment, a provider representative must "certify that I have been appointed an authorized individual to whom the provider has granted the legal authority to enroll it in the Medicare Program . . . and to commit the provider to abide by the laws, regulations and the program instructions of Medicare." *See* Medicare Claims Processing Manual, Ch. 24, § 30.2. Upon information and belief, Ms. Guardiola alleges that defendants made these or similar certifications.

35.     Once an institutional provider, such as the defendants, has been enrolled in the EDI program, the provider submits Medicare claims electronically using CMS Form 837I. The electronic billing specifications and data elements prescribed by CMS for CMS-837I are consistent with the data elements present on the CMS UB-04 (CMS-1450) paper claim form. In fact, Renown personnel usually refer to Medicare claim billing documentation as the "UB," regardless of the method by which a claim was submitted to Medicare.

36.     Defendants, as participants in the Medicare program, submitted their bills for services to Medicare using the UB-04 (CMS-1450), CMS-837I, or their equivalents, containing the language cited in paragraphs 28, 32, or 34 herein, or similar language, and indicating their agreement to be bound by the laws and regulations governing Medicare reimbursement for services, including but not limited to certification of compliance with 42 U.S.C. § 1395y(a)(1)(A).

37.     Pursuant to the Medicare Provider Agreements, EDI Enrollment Agreements, UB-04 (CMS-1450), CMS-837I and/or similar documents, by submitting claims for Medicare reimbursement, defendants certified to CMS that those claims are for services provided in compliance with CMS and federal laws and regulations.

38.     Federal law specifically obligates every provider to return to the United States any payment that it improperly receives.  It is a felony for an entity to conceal or fail to disclose errors in payments received from government-funded health insurance programs.  42 U.S.C. § 1320a-7b(a)(3).

## SPECIFIC ALLEGATIONS

39.     When Ms. Guardiola first arrived at Renown, she conferred with colleagues and conducted a non-scientific review of patient charts to determine the quality of clinical documentation.  She quickly discovered that clinical documentation at Renown was subpar and that the institution possessed a culture that did not emphasize compliance.  The problems at Renown cause the defendants to violate the FCA by submitting short-stay inpatient claims ("zero day stays" and "one-day stays") that should be billed on an outpatient basis.  Renown's deliberate and knowing failure and refusal to maintain proper documentation and its deliberate intent to promote and foster a culture of non-compliance was intended to and did cause the defendants to falsely and intentionally misrepresent and submit short-stay inpatient claims ("zero day stays"

- 12 -

and "one-day stays") that should be billed on an outpatient basis.

**Renown Routinely Submitted Fraudulent Inpatient Claims**

40.     The defendants systematically submitted to the government claims for short-term inpatient treatment that should have been properly categorized as outpatient because of (1) inadequate clinical documentation to support claims submitted; (2) antiquated computer systems that generated false claims; (3) processes designed to improperly assign patient admission status; and (4) a lack of required utilization review to ensure appropriate patient status.  By virtue of the foregoing, Renown submitted claims that it knew were false or were submitted in reckless disregard of the truth.

41.     Ms. Guardiola alleges that a high percentage of patient files at Regional and South Meadows were missing physician orders for inpatient status and/or contained inadequate documentation of the patient's severity of illness.  Renown knew or, in reckless disregard of the truth, should have known that the documentation was missing and inadequate but submitted the claims anyway.  Renown knew or should have known that the claims were false or submitted in reckless disregard of the truth.

42.     Renown used an aging patient management system designed by Siemens.  When entered into the Siemens system, a patient who is initially and improperly registered as an inpatient remained in that status until discharge because the status of an "active" patient cannot be changed.  Even if the patient is treated on an outpatient or outpatient observation basis and properly coded as such, the Siemens system overrides such accurate coding and sequences the billing codes according to the original patient status, resulting in an incorrect inpatient billing. This problem affects both medical and surgical procedures at Regional and South Meadows. Notwithstanding its knowledge of such problems, Renown submitted claims that it knew were false or, in reckless disregard of the truth, should have known were false.

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

43.     Ms. Guardiola first detected the problem with the Siemens system during the fourth quarter of 2009.  Renown administrators are well aware of the problem and did nothing to prevent it.

44.     Because Renown intended to install a new billing system, called EPIC, in March 2012, it was unwilling to expend any resources to correct the problems arising from the Siemens system, opting to continue lining its own pockets at the government's expense.

45.     The EPIC system is expected to improve Renown's billing capabilities but it will not solve the problems alleged here.  In addition, the new system will create other problems.  For instance, the new system allows physicians to sign all pending orders without reviewing them individually or having any direct interaction with them.  Because Renown is now permitting such "rubber stamping," the EPIC system will exacerbate the existing problems of inadequate physician orders failing to document patient status.

**Processing of Patients for Elective Surgical Procedures**

46.     While the inflexible Siemens system presents challenges, its problems could be overcome by appropriate patient admissions processes.  For years, Renown failed to implement any procedures to prevent the improper admissions generated by the Siemens system and, in fact, maintained procedures that amplified the shortcomings of the Siemens system.  By virtue of maintaining such procedures, Renown knew or, in reckless disregard of the truth, should have known that claims it was submitting were false.

47.     When a patient is scheduled for a procedure, her doctor's office calls the hospital scheduler and sets up a surgical appointment.  This is a ministerial, clerical activity — a simple reservation — that allows the hospital to schedule necessary operating room time and arrange needed equipment.

48      Once the appointment is scheduled, hospital personnel assign a patient account

- 14 -

number that is unique for that encounter. Account numbers preceded by a '1' designate inpatient status. Numbers that start with a '2' specify outpatient treatment. Account numbers beginning with a '3' reflect patients entering the hospital through the Emergency Room (ER) and are not used by the advance schedulers.

49.     Unless the doctor's office specifically tells the hospital that the patient should be listed as a "same day surgery" or specifically says that the procedure will be done on an outpatient basis, Renown automatically assigns an inpatient account number. When the patient arrives at Renown, the patient's actual treatment is irrelevant to the Medicare billing because the patient account number has predetermined how the Siemens system will bill Medicare.

50.     Typically, from three to seven days before the scheduled procedure, the patient's physician issues a preoperative order that provides specific orders, requests labs, and designates the patient's admission status. Renown does not use this information to change or correct the status already associated with the patient account number.

51.     After the patient is discharged, the medical records are presented to a medical coder who assigns procedure and ICD-9 codes appropriate to the treatment provided. Assuming the patient was treated on an outpatient or outpatient observation basis, the coder will correctly use outpatient CPT and APC codes to bill the claim. Renown does not use this information to change or correct the status already associated with the patient account number.

52.     At that point, Renown's Siemens system takes over. Because of the inpatient account number that was pre-assigned during the reservation process, the Siemens system detects an inconsistency between the numeric patient status and assigned billing codes, recognizes that the MS-DRG inpatient billing code is missing and automatically generates an MS-DRG.

53.     Renown — through the Siemens system — ignores the coder's work and appropriate outpatient status and automatically bills the claim as if inpatient status was correct.

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775-785-5440

By virtue of such acts and conduct, Renown knows or, in reckless disregard of the truth, should have known that the claims it was submitting were false.

54.     Despite understanding the problems created, Renown was unwilling to correct the problem by providing staff to perform appropriate pre-admission review.  Until late 2011, Ms. Guardiola's repeated requests to have a trained pre-access nurse hired to oversee the admissions intake process were denied, primarily due to the opposition of the Case Management Department.

**Post-Procedure Review Lacking**

55.     In addition to the pre-admission procedural and computer problems, post-procedure orders continue to cause improper Medicare billing at Renown.  For instance, even if an incorrect inpatient status is corrected by a pre-access review, Renown still has significant problems with post-procedure orders that do not meet inpatient criteria.  Due to the lack of an effective utilization review plan or any type of post-procedure review, Renown continues to submit false claims to government-funded health insurance programs.  Due to the lack of effective utilization review plan or any type of post-procedure review, Renown submitted claims that it knew were false or, in reckless disregard of the truth, should have known were false.

56.     At the time of her hiring, Ms. Guardiola found that Renown performed no timely review to ensure correct patient status.  Defendants did not have a Utilization Review Committee or any type of utilization review plan at any of their hospitals, a violation of Medicare's conditions of participation.  A Utilization Review Committee would ordinarily provide real-time review after a patient admission had occurred to ensure that patient status is properly assigned before billing takes place.  The defendants also did not and do not use any objective, third-party tools to conduct post-procedure utilization review and verify medical necessity determinations, all with the design, purpose and intent of submitting false claims.

57.     At Ms. Guardiola's urging, a Utilization Review Committee was established, but it

met only four times.  During Ms. Guardiola's time at Renown, the Committee did not meet after July 2010 and had been, effectively, disbanded.

58.     Renown's Case Management Department is wholly inadequate.  At Regional, the ineffective head of Case Management, Kelly Wilcher, resigned in or about March 2011 for her role in a HIPAA violation and the department has continued to be ineffective since that time.  The then-interim head of Case Management, Kim Lewis, opposed Ms. Guardiola's efforts including her attempts to hire a pre-access nurse, but has since left Renown.  Despite Ms. Guardiola's efforts, Case Management refused to review any claims that are less than 2 days in length.  As a result, Renown failed to address the short stay problem that Ms. Guardiola identified and, by such failure, intended to and did continue to submit false claims.

**Renown's Senior Management is Well-Aware of and Directed the Wrongdoing**

59.     Realizing the need to quantify her findings more specifically to gain support for the reforms she knew were needed, Ms. Guardiola in 2009 approached her then-boss, Renown Health CFO Mark Johnson, with her concerns that Renown was billing Medicare for one-day inpatient stays for what should have been outpatient claims.  Johnson approved Ms. Guardiola's proposed formation of a Patient Status Committee (PSC) to explore the scope of the problem and recommend and implement corrections.   In November 2009, CFO Johnson resigned from Renown.

60.     Shortly after Johnson's departure, Ms. Guardiola provided Dawn Ahner, the new Renown Health CFO, with a patient status PowerPoint presentation.  Ahner was concerned with Ms. Guardiola's report about the systemic misbilling of outpatient claims and inadequate Case Management function at Renown and agreed to proceed with the previously-approved PSC proposal.

61.     The PSC operated under Ms. Guardiola's stewardship for the ensuing nine months.

- 17 -

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775/785-5440

The Committee brought together representatives of five hospital departments — Case Management, Physicians, Patient Access/Registration, Audit and Nursing — with the goal of ensuring the accuracy of patient status orders and billing. Each department acted as a subcommittee of the PSC. The PSC met monthly, and the subcommittees met weekly.

62. One of the PSC's first initiatives was to address the findings of an audit of 282 randomly-selected and statistically significant Medicare claims to verify the accuracy and completeness of clinical documentation. The audit revealed that Renown had a significant "one-day stay" problem based on inaccurate clinical documentation. It demonstrated that Renown was submitting inpatient claims for patients whose one-day hospital stays should have been billed on an outpatient basis.

63. The PSC attempted to implement in early 2010 some corrections to Renown's billing processes, but only for certain situations. First, nurse managers and case managers began conducting a daily "census reconciliation" that sought to ensure that a patient's status matched an actual physician order and case management was permitted to place a "bill hold" on problem claims. Second, coders started reviewing every case for a physician status order and were allowed to place a "hold" on claims that did not have an appropriate order.

64. The new safeguards did not correct the most significant problems at Renown, because their implementation was inconsistent. The nurse managers and case managers did not perform consistently the daily census reconciliation. High turnover among Renown coders made the coder review process inconsistent. Even when it did work, coders were only looking for situations when the physician's order was inconsistent with the patient's status. Renown was aware that the new safeguards were not adequate, did nothing to correct the problems and, by such awareness and failure, knew or should have known that it was continuing to submit false claims.

Snell & Wilmer

L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

65.     In addition, Renown still refused to undertake any post-procedure reviews to ensure that a patient's status was determined immediately after a surgical procedure was completed and that the patient's status was correct.  Such reviews, usually conducted by a nurse case manager, quickly determine whether a patient's care and condition are routine or whether complications arose which might require a status change.  By such refusal, Renown knew or should have known that it was continuing to submit false claims.

66.     Ms. Guardiola and Sue Sutherland from Billing Compliance unsuccessfully raised concerns about the lack of an effective utilization review function numerous times with their superiors, particularly Renown Health CFO Dawn Ahner and all senior members of the patient status committee (CFO Mark Johnson, COO Kris Gaw, Director of Patient Financial Services Laurence Laughlin, VP of Utilization Karla Pambogo and Chief Medical Officer Max Jackson).

**Failed Educational Efforts and Other Factors Contributed to Renown's Problems**

67.     In connection with the PSC's efforts, Ms. Guardiola conducted extensive counseling sessions and educational efforts throughout the hospital to encourage greater compliance with admissions status standards.  Written guidance was distributed repeatedly to physicians and staff.  The status decisions being applied to patients undergoing scheduled surgical procedures continued to be a huge challenge because physicians and surgical departments refused to adopt the PSC's safeguards, including a failure to implement pre-access or post-procedure review.

68.     Ms. Guardiola conducted a series of meetings — as many as 20 in all — during the first half of 2010 to educate physicians and hospital personnel on the importance of selecting an accurate patient status and the factors that go into making the selection.

69.     On December 17, 2010, Ms. Guardiola conducted a separate physician training program to provide education on the patient status issues and billing requirements for surgical

- 19 -

procedures performed using the daVinci robotic system.

70.     Renown, at Ms. Guardiola's recommendation, hired Executive Health Resources (EHR), a medical management consulting firm, to work with physicians in a peer-to-peer setting to educate them on appropriate patient status decisionmaking and perform patient status utilization review for Medicare ER patients.

71.     Despite these extensive efforts, Renown was unable or unwilling to address the short stay problem.  And by virtue of its unwillingness to rectify the problem, knew or, in reckless disregard of the truth, should have known it was submitting false claims.

72.     A counseling session held for the Admissions Department proved useless in improving patient status accuracy because the department openly ignored the guidance provided. The Admissions Department's inaction resulted from physicians who were demanding that their patients be admitted on an inpatient basis, regardless of whether the patient's condition warranted it.

73.     Physicians were skeptical of the educational efforts and openly challenged the guidance that certain diagnoses could not be billed as inpatient.

74.     For instance, in March 2010, Business Development Administrator Joan Lapham received from Dr. Michael Song "a list of frequently used CPT codes for neurosurgery and asked that [she] verify which of them CMS classifies as inpatient vs. outpatient."  Lapham responded that  "only two of the CPT codes . . . are on the Inpatient Only list; all of the others are outpatient . . . ." Dr. Song responded, "Are you sure? Most of these codes are inpatient codes I believe."

75.     In January 2011, emails between hospital personnel and physicians' staff included reports that "Renown and [Dr. Martin Naughton's] management team had a meeting and said that all Da Vinci hysterectomy procedures need to be inpatient," even though such procedures are not on the Medicare Inpatient Only List.

- 20 -

76.     As late as May 2011, Ms. Guardiola had conversations with cardiologist Dr. Devang Desai who insisted that stenting procedures should be performed on an inpatient basis even though they are not on Medicare's Inpatient Only List.

77.     Dr. Eric Drummer was counseled by Ms. Guardiola after she found that he was routinely performing outpatient cardiac stent insertions on an inpatient basis.

78.     During her conversations with Drs. Drummer and Desai, Ms. Guardiola determined that they had been improperly billing for stents for a long time and got the impression that the improper billing would continue, despite her efforts.

79.     Moreover, Renown's coding department was usually understaffed.  Hospital management placed intense pressure on the coders to produce, especially at month's end. Regional and South Meadows usually employed three coders in-house and an additional 11 or 12 coders on a contract basis, but the department's effectiveness is compromised by frequent personnel changes.  Management's emphasis is always on productivity and reducing the backlog of uncoded claims, leaving little time to review suspect charts.

80.     Coders routinely code claims that are missing required documentation.  Coders focus on getting the diagnosis and DRG/CPT coding done in order to meet productivity requirements, which places little emphasis on accuracy.  Renown's use of contract coders only exacerbates this situation, because the short-term needs of these non-employees are productivity-based, leaving them with little interest in serving the long-term goals of the institution.  And by virtue of the acts and omissions set forth above, Renown knew or, in reckless disregard of the truth, should have known that it was continuing to submit false claims.

81.     Renown's fraudulent conduct and its false billings preceded Ms. Guardiola's employment. During the course of Ms. Guardiola's review and audit of Medicare claims, she discovered false claims dating back to 2006, 2007 and 2008, some of which are set forth in

paragraphs 85 and 88. In addition, Ms. Guardiola learned from colleagues that the aging and inadequate Siemens system, which Renown knew was the source for some of the fraud alleged, had been in operation for more than ten years. Because of the inherent and long-term problems with the Siemens billing system, the systemic nature of defendants' fraudulent scheme, the lack of utilization review or case management, and Renown's cultural resistance to correct the fraudulent billing, defendants knowingly and routinely submitted the types of false claims alleged here for many years prior to Ms. Guardiola's employment at Renown. As a result, Ms. Guardiola alleges, upon information and belief, that defendants' wrongdoing occurred for up to ten years prior to her employment.

82.  Renown's fraudulent conduct and its false billings also continued after Ms. Guardiola's employment. The cultural, systemic and integrated nature of the wrongdoing described herein continued when Ms. Guardiola's employment ended. These practices persisted after her departure because key personnel who opposed process and billing changes that would have corrected the fraud remained in defendants' employ, physician groups responsible for certain irregularities continued to practice at Renown, and Renown managers who resisted and obstructed corrective actions and instructed physicians to bill improperly remained in their positions long after Ms. Guardiola's departure. As a result, Ms. Guardiola alleges, upon information and belief, that defendants' wrongdoing continued to occur even after her employment ended.

83.  Although Ms. Guardiola cannot identify every false claim that the defendants submitted to government-funded health insurance programs, such information being in the possession of the defendants, she alleges that the following claims are representative of the defendants' fraudulent billing.  For each claim, the procedures performed or treatment provided were improperly billed to government-funded health insurance programs on a more expensive

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775/785-5440

inpatient basis and should have been billed on an outpatient or outpatient observation basis.

**Specific False Claims — Zero-Day Stays**

84.     Ms. Guardiola alleges that defendants routinely submitted to Medicare false claims for inpatient admissions lasting less than 24 hours ("Zero Day Stays"). Zero Day Stays may occur when a patient is admitted to and discharged from the hospital on the same calendar day or may involve an overnight stay that spans more than one calendar day.

85.     The following claims are illustrative examples of both medical and surgical treatments for which the patient was admitted to and discharged from the hospital on the same calendar day. These Zero Day Stays include the following Medicare claims for which relator will, under an appropriate protective order, provide additional patient information:

| CLAIM | ADMITTED | DISCHARGED |
|---|---|---|
| 1 | 2007/07/07 | 2007/07/07 |
| 2 | 2007/07/25 | 2007/07/25 |
| 3 | 2007/08/13 | 2007/08/13 |
| 4 | 2007/09/17 | 2007/09/17 |
| 5 | 2007/10/22 | 2007/10/22 |
| 6 | 2008/04/26 | 2008/04/26 |
| 7 | 2006/09/07 | 2006/09/07 |
| 8 | 2007/02/12 | 2007/02/12 |
| 9 | 2007/06/14 | 2007/06/14 |
| 10 | 2006/07/31 | 2006/07/31 |
| 11 | 2008/02/01 | 2008/02/01 |
| 12 | 2008/03/22 | 2008/03/22 |
| 13 | 2007/06/27 | 2007/06/27 |
| 14 | 2007/07/14 | 2007/07/14 |
| 15 | 2007/09/07 | 2007/09/07 |
| 16 | 2006/09/21 | 2006/09/21 |
| 17 | 2007/06/03 | 2007/06/03 |
| 18 | 2008/05/31 | 2008/05/31 |
| 19 | 2007/06/13 | 2007/06/13 |
| 20 | 2007/08/13 | 2007/08/13 |
| 21 | 2007/05/25 | 2007/05/25 |
| 22 | 2007/11/03 | 2007/11/03 |
| 23 | 2008/01/17 | 2008/01/17 |
| 24 | 2008/02/09 | 2008/02/09 |
| 25 | 2008/02/21 | 2008/02/21 |
| 26 | 2008/01/22 | 2008/01/22 |
| 27 | 2008/04/11 | 2008/04/11 |
| 28 | 2006/08/25 | 2006/08/25 |

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775-785-5440

| CLAIM | ADMITTED | DISCHARGED |
|---|---|---|
| 29 | 2006/10/10 | 2006/10/10 |
| 30 | 2006/10/19 | 2006/10/19 |
| 31 | 2007/01/27 | 2007/01/27 |
| 32 | 2007/06/15 | 2007/06/15 |
| 33 | 2006/12/05 | 2006/12/05 |
| 34 | 2008/05/03 | 2008/05/03 |
| 35 | 2008/05/06 | 2008/05/06 |
| 36 | 2007/12/31 | 2007/12/31 |
| 37 | 2007/06/06 | 2007/06/06 |
| 38 | 2007/05/22 | 2007/05/22 |
| 39 | 2007/05/20 | 2007/05/20 |
| 40 | 2008/05/30 | 2008/05/30 |
| 41 | 2008/01/07 | 2008/01/07 |
| 42 | 2008/05/04 | 2008/05/04 |
| 43 | 2007/05/01 | 2007/05/01 |
| 44 | 2006/08/10 | 2006/08/10 |
| 45 | 2006/11/22 | 2006/11/22 |
| 46 | 2007/01/29 | 2007/01/29 |
| 47 | 2007/09/20 | 2007/09/20 |
| 48 | 2007/10/11 | 2007/10/11 |
| 49 | 2007/12/07 | 2007/12/07 |
| 50 | 2007/12/12 | 2007/12/12 |
| 51 | 2007/12/19 | 2007/12/19 |
| 52 | 2008/03/02 | 2008/03/02 |
| 53 | 2006/08/17 | 2006/08/17 |
| 54 | 2006/10/10 | 2006/10/10 |
| 55 | 2006/12/17 | 2006/12/17 |
| 56 | 2007/03/28 | 2007/03/28 |
| 57 | 2007/06/29 | 2007/06/29 |
| 58 | 2007/07/14 | 2007/07/14 |
| 59 | 2007/02/22 | 2007/02/22 |
| 60 | 2007/09/25 | 2007/09/25 |
| 61 | 2008/05/20 | 2008/05/20 |
| 62 | 2006/09/05 | 2006/09/05 |
| 63 | 2007/01/01 | 2007/01/01 |
| 64 | 2007/01/14 | 2007/01/14 |
| 65 | 2007/01/20 | 2007/01/20 |
| 66 | 2007/04/08 | 2007/04/08 |
| 67 | 2007/05/16 | 2007/05/16 |
| 68 | 2007/06/26 | 2007/06/26 |
| 69 | 2007/09/29 | 2007/09/29 |
| 70 | 2007/10/23 | 2007/10/23 |
| 71 | 2008/04/14 | 2008/04/14 |
| 72 | 2006/07/29 | 2006/07/29 |
| 73 | 2007/02/07 | 2007/02/07 |
| 74 | 2007/04/24 | 2007/04/24 |
| 75 | 2007/06/04 | 2007/06/04 |
| 76 | 2007/06/11 | 2007/06/11 |
| 77 | 2007/06/22 | 2007/06/22 |
| 78 | 2007/07/17 | 2007/07/17 |

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

| CLAIM | ADMITTED | DISCHARGED |
|-------|----------|------------|
| 79 | 2007/09/05 | 2007/09/05 |
| 80 | 2008/02/15 | 2008/02/15 |
| 81 | 2008/03/11 | 2008/03/11 |
| 82 | 2006/10/24 | 2006/10/24 |
| 83 | 2006/11/28 | 2006/11/28 |
| 84 | 2006/12/27 | 2006/12/27 |
| 85 | 2007/12/18 | 2007/12/18 |
| 86 | 2008/02/28 | 2008/02/28 |
| 87 | 2007/09/26 | 2007/09/26 |
| 88 | 2006/09/30 | 2006/09/30 |
| 89 | 2006/11/22 | 2006/11/22 |
| 90 | 2007/02/28 | 2007/02/28 |
| 91 | 2007/04/11 | 2007/04/11 |
| 92 | 2007/04/20 | 2007/04/20 |
| 93 | 2007/05/12 | 2007/05/12 |
| 94 | 2007/09/11 | 2007/09/11 |
| 95 | 2007/10/29 | 2007/10/29 |
| 96 | 2007/11/02 | 2007/11/02 |
| 97 | 2007/11/24 | 2007/11/24 |
| 98 | 2007/11/29 | 2007/11/29 |
| 99 | 2007/12/02 | 2007/12/02 |
| 100 | 2007/12/22 | 2007/12/22 |
| 101 | 2006/08/31 | 2006/08/31 |
| 102 | 2006/09/25 | 2006/09/25 |
| 103 | 2006/10/01 | 2006/10/01 |
| 104 | 2006/10/02 | 2006/10/02 |
| 105 | 2006/10/04 | 2006/10/04 |
| 106 | 2006/10/16 | 2006/10/16 |
| 107 | 2006/10/22 | 2006/10/22 |
| 108 | 2006/11/01 | 2006/11/01 |
| 109 | 2007/01/08 | 2007/01/08 |
| 110 | 2007/02/18 | 2007/02/18 |
| 111 | 2007/02/28 | 2007/02/28 |
| 112 | 2007/03/05 | 2007/03/05 |
| 113 | 2007/04/14 | 2007/04/14 |
| 114 | 2007/05/09 | 2007/05/09 |
| 115 | 2007/06/03 | 2007/06/03 |
| 116 | 2007/06/10 | 2007/06/10 |
| 117 | 2007/07/10 | 2007/07/10 |
| 118 | 2007/07/16 | 2007/07/16 |
| 119 | 2007/08/17 | 2007/08/17 |
| 120 | 2007/08/23 | 2007/08/23 |
| 121 | 2007/08/24 | 2007/08/24 |
| 122 | 2007/12/22 | 2007/12/22 |
| 123 | 2008/01/11 | 2008/01/11 |
| 124 | 2008/01/20 | 2008/01/20 |
| 125 | 2008/01/28 | 2008/01/28 |
| 126 | 2008/03/05 | 2008/03/05 |
| 127 | 2006/07/26 | 2006/07/26 |
| 128 | 2007/02/23 | 2007/02/23 |

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775-785-5440

| CLAIM | ADMITTED | DISCHARGED |
|-------|----------|------------|
| 129 | 2007/08/05 | 2007/08/05 |
| 130 | 2008/03/27 | 2008/03/27 |
| 131 | 2008/04/30 | 2008/04/30 |
| 132 | 2008/03/01 | 2008/03/01 |
| 133 | 2008/02/08 | 2008/02/08 |
| 134 | 2007/12/29 | 2007/12/29 |
| 135 | 2006/09/06 | 2006/09/06 |
| 136 | 2008/02/13 | 2008/02/13 |
| 137 | 2007/12/28 | 2007/12/28 |
| 138 | 2006/12/17 | 2006/12/17 |
| 139 | 2007/01/12 | 2007/01/12 |
| 140 | 2007/08/05 | 2007/08/05 |
| 141 | 2006/08/01 | 2006/08/01 |
| 142 | 2006/12/26 | 2006/12/26 |
| 143 | 2007/06/23 | 2007/06/23 |
| 144 | 2007/12/28 | 2007/12/28 |
| 145 | 2008/01/22 | 2008/01/22 |
| 146 | 2006/07/01 | 2006/07/01 |
| 147 | 2006/08/29 | 2006/08/29 |
| 148 | 2006/11/10 | 2006/11/10 |
| 149 | 2006/11/28 | 2006/11/28 |
| 150 | 2006/12/01 | 2006/12/01 |
| 151 | 2007/07/22 | 2007/07/22 |
| 152 | 2007/11/18 | 2007/11/18 |
| 153 | 2008/02/10 | 2008/02/10 |
| 154 | 2008/02/24 | 2008/02/24 |
| 155 | 2007/08/08 | 2007/08/08 |
| 156 | 2007/04/16 | 2007/04/16 |
| 157 | 2007/12/06 | 2007/12/06 |
| 158 | 2007/08/11 | 2007/08/11 |
| 159 | 2007/08/06 | 2007/08/06 |
| 160 | 2007/08/14 | 2007/08/14 |
| 161 | 2008/05/22 | 2008/05/22 |
| 162 | 2008/05/07 | 2008/05/07 |
| 163 | 2006/09/20 | 2006/09/20 |
| 164 | 2007/05/01 | 2007/05/01 |
| 165 | 2007/08/04 | 2007/08/04 |
| 166 | 2006/12/04 | 2006/12/04 |
| 167 | 2007/08/07 | 2007/08/07 |
| 168 | 2007/02/14 | 2007/02/14 |
| 169 | 2007/05/10 | 2007/05/10 |
| 170 | 2007/10/10 | 2007/10/10 |
| 171 | 2008/05/05 | 2008/05/05 |
| 172 | 2007/07/28 | 2007/07/28 |
| 173 | 2006/11/10 | 2006/11/10 |
| 174 | 2006/11/19 | 2006/11/19 |
| 175 | 2006/08/18 | 2006/08/18 |
| 176 | 2007/04/25 | 2007/04/25 |
| 177 | 2007/09/25 | 2007/09/25 |
| 178 | 2007/11/21 | 2007/11/21 |

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775-785-5440

| CLAIM | ADMITTED | DISCHARGED |
|-------|----------|------------|
| 179 | 2007/11/22 | 2007/11/22 |
| 180 | 2008/01/05 | 2008/01/05 |
| 181 | 2008/03/28 | 2008/03/28 |
| 182 | 2008/04/21 | 2008/04/21 |
| 183 | 2007/07/12 | 2007/07/12 |
| 184 | 2006/11/10 | 2006/11/10 |
| 185 | 2007/05/09 | 2007/05/09 |
| 186 | 2007/05/19 | 2007/05/19 |
| 187 | 2007/08/16 | 2007/08/16 |
| 188 | 2008/02/24 | 2008/02/24 |
| 189 | 2006/10/01 | 2006/10/01 |
| 190 | 2006/10/03 | 2006/10/03 |
| 191 | 2006/08/01 | 2006/08/01 |
| 192 | 2006/09/08 | 2006/09/08 |
| 193 | 2006/07/16 | 2006/07/16 |
| 194 | 2007/11/07 | 2007/11/07 |
| 195 | 2007/11/19 | 2007/11/19 |
| 196 | 2008/05/25 | 2008/05/25 |
| 197 | 2006/12/02 | 2006/12/02 |
| 198 | 2006/11/11 | 2006/11/11 |
| 199 | 2006/12/06 | 2006/12/06 |
| 200 | 2006/07/04 | 2006/07/04 |
| 201 | 2006/07/10 | 2006/07/10 |
| 202 | 2007/04/17 | 2007/04/17 |
| 203 | 2007/05/22 | 2007/05/22 |
| 204 | 2008/01/09 | 2008/01/09 |
| 205 | 2008/03/13 | 2008/03/13 |
| 206 | 2006/07/15 | 2006/07/15 |
| 207 | 2006/12/21 | 2006/12/21 |
| 208 | 2007/01/28 | 2007/01/28 |
| 209 | 2007/03/16 | 2007/03/16 |
| 210 | 2007/05/31 | 2007/05/31 |
| 211 | 2007/08/14 | 2007/08/14 |
| 212 | 2007/11/26 | 2007/11/26 |
| 213 | 2006/08/09 | 2006/08/09 |
| 214 | 2008/05/09 | 2008/05/09 |
| 215 | 2006/10/03 | 2006/10/03 |
| 216 | 2007/06/03 | 2007/06/03 |
| 217 | 2008/03/11 | 2008/03/11 |
| 218 | 2007/06/02 | 2007/06/02 |
| 219 | 2007/07/04 | 2007/07/04 |
| 220 | 2008/04/29 | 2008/04/29 |
| 221 | 2008/05/15 | 2008/05/15 |
| 222 | 2006/08/25 | 2006/08/25 |
| 223 | 2006/11/26 | 2006/11/26 |
| 224 | 2006/12/09 | 2006/12/09 |
| 225 | 2008/01/14 | 2008/01/14 |
| 226 | 2007/01/15 | 2007/01/15 |
| 227 | 2007/11/28 | 2007/11/28 |
| 228 | 2008/04/08 | 2008/04/08 |

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

| CLAIM | ADMITTED | DISCHARGED |
|---|---|---|
| 229 | 2006/10/05 | 2006/10/05 |
| 230 | 2007/10/28 | 2007/10/28 |
| 231 | 2008/04/29 | 2008/04/29 |
| 232 | 2007/12/09 | 2007/12/09 |
| 233 | 2007/04/27 | 2007/04/27 |
| 234 | 2007/04/24 | 2007/04/24 |
| 235 | 2006/10/03 | 2006/10/03 |
| 236 | 2007/01/22 | 2007/01/22 |
| 237 | 2008/01/19 | 2008/01/19 |
| 238 | 2008/03/16 | 2008/03/16 |
| 239 | 2007/12/23 | 2007/12/23 |
| 240 | 2006/09/22 | 2006/09/22 |
| 241 | 2006/11/04 | 2006/11/04 |
| 242 | 2006/12/10 | 2006/12/10 |
| 243 | 2006/12/12 | 2006/12/12 |
| 244 | 2007/01/13 | 2007/01/13 |
| 245 | 2007/02/28 | 2007/02/28 |
| 246 | 2007/07/13 | 2007/07/13 |
| 247 | 2007/08/13 | 2007/08/13 |
| 248 | 2007/12/22 | 2007/12/22 |
| 249 | 2007/12/21 | 2007/12/21 |
| 250 | 2007/11/21 | 2007/11/21 |
| 251 | 2007/12/29 | 2007/12/29 |
| 252 | 2007/04/19 | 2007/04/19 |
| 253 | 2007/06/08 | 2007/06/08 |
| 254 | 2008/02/23 | 2008/02/23 |
| 255 | 2008/03/22 | 2008/03/22 |
| 256 | 2006/08/19 | 2006/08/19 |
| 257 | 2007/08/13 | 2007/08/13 |
| 258 | 2007/12/05 | 2007/12/05 |
| 259 | 2007/01/23 | 2007/01/23 |
| 260 | 2007/07/06 | 2007/07/06 |
| 261 | 2007/11/10 | 2007/11/10 |
| 262 | 2008/05/26 | 2008/05/26 |
| 263 | 2007/11/01 | 2007/11/01 |
| 264 | 7/8/2010 | 7/8/2010 |
| 265 | 8/31/2010 | 8/31/2010 |
| 266 | 9/9/2010 | 9/9/2010 |
| 267 | 9/12/2010 | 9/12/2010 |
| 268 | 9/30/2010 | 9/30/2010 |
| 269 | 1/15/2011 | 1/15/2011 |
| 270 | 12/10/2010 | 12/10/2010 |
| 271 | 10/29/2010 | 10/29/2010 |
| 272 | 11/16/2010 | 11/16/2010 |
| 273 | 1/19/2011 | 1/19/2011 |
| 274 | 8/8/2010 | 8/8/2010 |
| 275 | 9/12/2010 | 9/12/2010 |
| 276 | 3/13/2011 | 3/13/2011 |
| 277 | 9/20/2010 | 9/20/2010 |
| 278 | 10/14/2010 | 10/14/2010 |

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

| CLAIM | ADMITTED | DISCHARGED |
|-------|----------|------------|
| 279 | 9/19/2010 | 9/19/2010 |
| 280 | 3/11/2011 | 3/11/2011 |
| 281 | 3/24/2011 | 3/24/2011 |
| 282 | 7/4/2010 | 7/4/2010 |
| 283 | 8/17/2010 | 8/17/2010 |
| 284 | 8/30/2010 | 8/30/2010 |
| 285 | 12/11/2010 | 12/11/2010 |
| 286 | 1/15/2011 | 1/15/2011 |
| 287 | 2/8/2011 | 2/8/2011 |
| 288 | 3/22/2011 | 3/22/2011 |
| 289 | 9/21/2010 | 9/21/2010 |
| 290 | 10/10/2010 | 10/10/2010 |
| 291 | 11/27/2010 | 11/27/2010 |
| 292 | 8/27/2010 | 8/27/2010 |
| 293 | 2/28/2011 | 2/28/2011 |
| 294 | 3/28/2011 | 3/28/2011 |
| 295 | 7/23/2010 | 7/23/2010 |
| 296 | 8/9/2010 | 8/9/2010 |
| 297 | 10/28/2010 | 10/28/2010 |
| 298 | 1/5/2011 | 1/5/2011 |
| 299 | 3/15/2011 | 3/15/2011 |
| 300 | 11/28/2010 | 11/28/2010 |
| 301 | 10/1/2010 | 10/1/2010 |
| 302 | 10/22/2010 | 10/22/2010 |
| 303 | 11/19/2010 | 11/19/2010 |
| 304 | 7/10/2010 | 7/10/2010 |
| 305 | 9/4/2010 | 9/4/2010 |
| 306 | 11/27/2010 | 11/27/2010 |
| 307 | 2/2/2011 | 2/2/2011 |
| 308 | 7/23/2010 | 7/23/2010 |
| 309 | 9/6/2010 | 9/6/2010 |
| 310 | 10/12/2010 | 10/12/2010 |
| 311 | 10/6/2010 | 10/6/2010 |
| 312 | 11/24/2010 | 11/24/2010 |
| 313 | 7/22/2010 | 7/22/2010 |
| 314 | 8/10/2010 | 8/10/2010 |
| 315 | 8/10/2010 | 8/10/2010 |
| 316 | 11/14/2010 | 11/14/2010 |
| 317 | 12/8/2010 | 12/8/2010 |
| 318 | 7/6/2010 | 7/6/2010 |
| 319 | 8/7/2010 | 8/7/2010 |
| 320 | 9/23/2010 | 9/23/2010 |
| 321 | 10/9/2010 | 10/9/2010 |
| 322 | 10/10/2010 | 10/10/2010 |
| 323 | 10/26/2010 | 10/26/2010 |
| 324 | 11/3/2010 | 11/3/2010 |
| 325 | 2/5/2011 | 2/5/2011 |
| 326 | 7/11/2010 | 7/11/2010 |
| 327 | 7/23/2010 | 7/23/2010 |
| 328 | 8/1/2010 | 8/1/2010 |

Snell & Wilmer

L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775-785-5440

| CLAIM | ADMITTED | DISCHARGED |
|-------|----------|------------|
| 329 | 8/22/2010 | 8/22/2010 |
| 330 | 9/5/2010 | 9/5/2010 |
| 331 | 9/18/2010 | 9/18/2010 |
| 332 | 10/18/2010 | 10/18/2010 |
| 333 | 11/25/2010 | 11/25/2010 |
| 334 | 11/28/2010 | 11/28/2010 |
| 335 | 12/30/2010 | 12/30/2010 |
| 336 | 2/4/2011 | 2/4/2011 |
| 337 | 2/12/2011 | 2/12/2011 |
| 338 | 3/10/2011 | 3/10/2011 |
| 339 | 3/14/2011 | 3/14/2011 |
| 340 | 2/14/2011 | 2/14/2011 |
| 341 | 2/16/2011 | 2/16/2011 |
| 342 | 2/23/2011 | 2/23/2011 |
| 343 | 12/1/2010 | 12/1/2010 |
| 344 | 3/8/2011 | 3/8/2011 |
| 345 | 9/8/2010 | 9/8/2010 |
| 346 | 7/7/2010 | 7/7/2010 |
| 347 | 1/14/2011 | 1/14/2011 |
| 348 | 7/2/2010 | 7/2/2010 |
| 349 | 7/8/2010 | 7/8/2010 |
| 350 | 7/22/2010 | 7/22/2010 |
| 351 | 7/23/2010 | 7/23/2010 |
| 352 | 7/26/2010 | 7/26/2010 |
| 353 | 7/30/2010 | 7/30/2010 |
| 354 | 8/4/2010 | 8/4/2010 |
| 355 | 8/18/2010 | 8/18/2010 |
| 356 | 9/5/2010 | 9/5/2010 |
| 357 | 11/27/2010 | 11/27/2010 |
| 358 | 1/26/2011 | 1/26/2011 |
| 359 | 1/31/2011 | 1/31/2011 |
| 360 | 7/26/2010 | 7/26/2010 |
| 361 | 10/27/2010 | 10/27/2010 |
| 362 | 10/8/2010 | 10/8/2010 |
| 363 | 11/14/2010 | 11/14/2010 |
| 364 | 11/23/2010 | 11/23/2010 |
| 365 | 10/1/2010 | 10/1/2010 |
| 366 | 11/12/2010 | 11/12/2010 |
| 367 | 12/3/2010 | 12/3/2010 |
| 368 | 10/5/2010 | 10/5/2010 |
| 369 | 11/30/2010 | 11/30/2010 |
| 370 | 7/15/2010 | 7/15/2010 |
| 371 | 3/23/2011 | 3/23/2011 |
| 372 | 11/10/2010 | 11/10/2010 |
| 373 | 9/18/2010 | 9/18/2010 |
| 374 | 11/14/2010 | 11/14/2010 |
| 375 | 12/29/2010 | 12/29/2010 |
| 376 | 12/30/2010 | 12/30/2010 |
| 377 | 1/10/2011 | 1/10/2011 |
| 378 | 1/28/2011 | 1/28/2011 |

Snell & Wilmer

L.L.P.

LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775-785-5440

| CLAIM | ADMITTED | DISCHARGED |
|-------|----------|------------|
| 379 | 11/30/2010 | 11/30/2010 |
| 380 | 1/3/2011 | 1/3/2011 |
| 381 | 1/18/2011 | 1/18/2011 |
| 382 | 7/8/2010 | 7/8/2010 |
| 383 | 9/3/2010 | 9/3/2010 |
| 384 | 1/10/2011 | 1/10/2011 |
| 385 | 1/16/2011 | 1/16/2011 |
| 386 | 10/28/2010 | 10/28/2010 |
| 387 | 2/16/2011 | 2/16/2011 |
| 388 | 7/28/2010 | 7/28/2010 |
| 389 | 3/3/2011 | 3/3/2011 |
| 390 | 9/8/2010 | 9/8/2010 |
| 391 | 12/18/2010 | 12/18/2010 |
| 392 | 9/17/2010 | 9/17/2010 |
| 393 | 8/31/2010 | 8/31/2010 |
| 394 | 9/7/2010 | 9/7/2010 |
| 395 | 12/20/2010 | 12/20/2010 |
| 396 | 12/26/2010 | 12/26/2010 |
| 397 | 1/15/2011 | 1/15/2011 |
| 398 | 2/6/2011 | 2/6/2011 |
| 399 | 3/2/2011 | 3/2/2011 |
| 400 | 8/13/2010 | 8/13/2010 |
| 401 | 9/19/2010 | 9/19/2010 |
| 402 | 9/2/2010 | 9/2/2010 |
| 403 | 7/28/2010 | 7/28/2010 |
| 404 | 3/6/2011 | 3/6/2011 |
| 405 | 7/22/2010 | 7/22/2010 |
| 406 | 8/8/2010 | 8/8/2010 |
| 407 | 8/29/2010 | 8/29/2010 |
| 408 | 12/12/2010 | 12/12/2010 |
| 409 | 7/28/2010 | 7/28/2010 |
| 410 | 8/17/2010 | 8/17/2010 |
| 411 | 9/3/2010 | 9/3/2010 |
| 412 | 11/8/2010 | 11/8/2010 |
| 413 | 1/12/2011 | 1/12/2011 |
| 414 | 1/31/2011 | 1/31/2011 |
| 415 | 2/22/2011 | 2/22/2011 |
| 416 | 8/9/2010 | 8/9/2010 |
| 417 | 9/10/2010 | 9/10/2010 |
| 418 | 2/1/2011 | 2/1/2011 |
| 419 | 3/11/2011 | 3/11/2011 |
| 420 | 8/9/2010 | 8/9/2010 |
| 421 | 8/31/2010 | 8/31/2010 |
| 422 | 7/8/2010 | 7/8/2010 |
| 423 | 8/31/2010 | 8/31/2010 |
| 424 | 9/9/2010 | 9/9/2010 |
| 425 | 9/12/2010 | 9/12/2010 |
| 426 | 9/30/2010 | 9/30/2010 |
| 427 | 1/15/2011 | 1/15/2011 |
| 428 | 12/10/2010 | 12/10/2010 |

Snell & Wilmer

L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

| CLAIM | ADMITTED | DISCHARGED |
|-------|----------|------------|
| 429 | 10/29/2010 | 10/29/2010 |
| 430 | 11/16/2010 | 11/16/2010 |
| 431 | 1/19/2011 | 1/19/2011 |
| 432 | 8/8/2010 | 8/8/2010 |
| 433 | 9/12/2010 | 9/12/2010 |
| 434 | 3/13/2011 | 3/13/2011 |
| 435 | 9/20/2010 | 9/20/2010 |
| 436 | 10/14/2010 | 10/14/2010 |
| 437 | 9/19/2010 | 9/19/2010 |
| 438 | 3/11/2011 | 3/11/2011 |
| 439 | 3/24/2011 | 3/24/2011 |
| 440 | 7/4/2010 | 7/4/2010 |
| 441 | 8/17/2010 | 8/17/2010 |
| 442 | 8/30/2010 | 8/30/2010 |
| 443 | 12/11/2010 | 12/11/2010 |
| 444 | 1/15/2011 | 1/15/2011 |
| 445 | 2/8/2011 | 2/8/2011 |
| 446 | 3/22/2011 | 3/22/2011 |
| 447 | 9/21/2010 | 9/21/2010 |
| 448 | 10/10/2010 | 10/10/2010 |
| 449 | 11/27/2010 | 11/27/2010 |
| 450 | 8/27/2010 | 8/27/2010 |
| 451 | 2/28/2011 | 2/28/2011 |
| 452 | 3/28/2011 | 3/28/2011 |
| 453 | 7/23/2010 | 7/23/2010 |
| 454 | 8/9/2010 | 8/9/2010 |
| 455 | 10/28/2010 | 10/28/2010 |
| 456 | 1/5/2011 | 1/5/2011 |
| 457 | 3/15/2011 | 3/15/2011 |
| 458 | 11/28/2010 | 11/28/2010 |
| 459 | 10/1/2010 | 10/1/2010 |
| 460 | 10/22/2010 | 10/22/2010 |
| 461 | 11/19/2010 | 11/19/2010 |
| 462 | 7/10/2010 | 7/10/2010 |
| 463 | 9/4/2010 | 9/4/2010 |
| 464 | 11/27/2010 | 11/27/2010 |
| 465 | 2/2/2011 | 2/2/2011 |
| 466 | 7/23/2010 | 7/23/2010 |
| 467 | 9/6/2010 | 9/6/2010 |
| 468 | 10/12/2010 | 10/12/2010 |
| 469 | 10/6/2010 | 10/6/2010 |
| 470 | 11/24/2010 | 11/24/2010 |
| 471 | 7/22/2010 | 7/22/2010 |
| 472 | 8/10/2010 | 8/10/2010 |
| 473 | 8/10/2010 | 8/10/2010 |
| 474 | 11/14/2010 | 11/14/2010 |
| 475 | 12/8/2010 | 12/8/2010 |
| 476 | 7/6/2010 | 7/6/2010 |
| 477 | 8/7/2010 | 8/7/2010 |

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada  89501
775.785.5440

| CLAIM | ADMITTED | DISCHARGED |
|-------|----------|------------|
| 478 | 9/23/2010 | 9/23/2010 |
| 479 | 10/9/2010 | 10/9/2010 |
| 480 | 10/10/2010 | 10/10/2010 |
| 481 | 10/26/2010 | 10/26/2010 |
| 482 | 11/3/2010 | 11/3/2010 |
| 483 | 2/5/2011 | 2/5/2011 |
| 484 | 7/11/2010 | 7/11/2010 |
| 485 | 7/23/2010 | 7/23/2010 |
| 486 | 8/1/2010 | 8/1/2010 |
| 487 | 8/22/2010 | 8/22/2010 |
| 488 | 9/5/2010 | 9/5/2010 |
| 489 | 9/18/2010 | 9/18/2010 |
| 490 | 10/18/2010 | 10/18/2010 |
| 491 | 11/25/2010 | 11/25/2010 |
| 492 | 11/28/2010 | 11/28/2010 |
| 493 | 12/30/2010 | 12/30/2010 |
| 494 | 2/4/2011 | 2/4/2011 |
| 495 | 2/12/2011 | 2/12/2011 |
| 496 | 3/10/2011 | 3/10/2011 |
| 497 | 3/14/2011 | 3/14/2011 |
| 498 | 2/14/2011 | 2/14/2011 |
| 499 | 2/16/2011 | 2/16/2011 |
| 500 | 2/23/2011 | 2/23/2011 |
| 501 | 12/1/2010 | 12/1/2010 |
| 502 | 3/8/2011 | 3/8/2011 |
| 503 | 9/8/2010 | 9/8/2010 |
| 504 | 7/7/2010 | 7/7/2010 |
| 505 | 1/14/2011 | 1/14/2011 |
| 506 | 7/2/2010 | 7/2/2010 |
| 507 | 7/8/2010 | 7/8/2010 |
| 508 | 7/22/2010 | 7/22/2010 |
| 509 | 7/23/2010 | 7/23/2010 |
| 510 | 7/26/2010 | 7/26/2010 |
| 511 | 7/30/2010 | 7/30/2010 |
| 512 | 8/4/2010 | 8/4/2010 |
| 513 | 8/18/2010 | 8/18/2010 |
| 514 | 9/5/2010 | 9/5/2010 |
| 515 | 11/27/2010 | 11/27/2010 |
| 516 | 1/26/2011 | 1/26/2011 |
| 517 | 1/31/2011 | 1/31/2011 |
| 518 | 7/26/2010 | 7/26/2010 |
| 519 | 10/27/2010 | 10/27/2010 |
| 520 | 10/8/2010 | 10/8/2010 |
| 521 | 11/14/2010 | 11/14/2010 |
| 522 | 11/23/2010 | 11/23/2010 |
| 523 | 10/1/2010 | 10/1/2010 |
| 524 | 11/12/2010 | 11/12/2010 |
| 525 | 12/3/2010 | 12/3/2010 |
| 526 | 10/5/2010 | 10/5/2010 |
| 527 | 11/30/2010 | 11/30/2010 |

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

| CLAIM | ADMITTED | DISCHARGED |
|-------|----------|------------|
| 528 | 7/15/2010 | 7/15/2010 |
| 529 | 3/23/2011 | 3/23/2011 |
| 530 | 11/10/2010 | 11/10/2010 |
| 531 | 9/18/2010 | 9/18/2010 |
| 532 | 11/14/2010 | 11/14/2010 |
| 533 | 12/29/2010 | 12/29/2010 |
| 534 | 12/30/2010 | 12/30/2010 |
| 535 | 1/10/2011 | 1/10/2011 |
| 536 | 1/28/2011 | 1/28/2011 |
| 537 | 11/30/2010 | 11/30/2010 |
| 538 | 1/3/2011 | 1/3/2011 |
| 539 | 1/18/2011 | 1/18/2011 |
| 540 | 7/8/2010 | 7/8/2010 |
| 541 | 9/3/2010 | 9/3/2010 |
| 542 | 1/10/2011 | 1/10/2011 |
| 543 | 1/16/2011 | 1/16/2011 |
| 544 | 10/28/2010 | 10/28/2010 |
| 545 | 2/16/2011 | 2/16/2011 |
| 546 | 7/28/2010 | 7/28/2010 |
| 547 | 3/3/2011 | 3/3/2011 |
| 548 | 9/8/2010 | 9/8/2010 |
| 549 | 12/18/2010 | 12/18/2010 |
| 550 | 9/17/2010 | 9/17/2010 |
| 551 | 8/31/2010 | 8/31/2010 |
| 552 | 9/7/2010 | 9/7/2010 |
| 553 | 12/20/2010 | 12/20/2010 |
| 554 | 12/26/2010 | 12/26/2010 |
| 555 | 1/15/2011 | 1/15/2011 |
| 556 | 2/6/2011 | 2/6/2011 |
| 557 | 3/2/2011 | 3/2/2011 |
| 558 | 8/13/2010 | 8/13/2010 |
| 559 | 9/19/2010 | 9/19/2010 |
| 560 | 9/2/2010 | 9/2/2010 |
| 561 | 7/28/2010 | 7/28/2010 |
| 562 | 3/6/2011 | 3/6/2011 |
| 563 | 7/22/2010 | 7/22/2010 |
| 564 | 8/8/2010 | 8/8/2010 |
| 565 | 8/29/2010 | 8/29/2010 |
| 566 | 12/12/2010 | 12/12/2010 |
| 567 | 7/28/2010 | 7/28/2010 |
| 568 | 8/17/2010 | 8/17/2010 |
| 569 | 9/3/2010 | 9/3/2010 |
| 570 | 11/8/2010 | 11/8/2010 |
| 571 | 1/12/2011 | 1/12/2011 |
| 572 | 1/31/2011 | 1/31/2011 |
| 573 | 2/22/2011 | 2/22/2011 |
| 574 | 8/9/2010 | 8/9/2010 |
| 575 | 9/10/2010 | 9/10/2010 |
| 576 | 2/1/2011 | 2/1/2011 |
| 577 | 3/11/2011 | 3/11/2011 |

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| CLAIM | ADMITTED | DISCHARGED |
|-------|----------|------------|
| 578 | 8/9/2010 | 8/9/2010 |
| 579 | 8/31/2010 | 8/31/2010 |

86.     Although a small number of the claims in the preceding paragraph may have been properly billed as inpatient under limited circumstances (*e.g.,* if the patient expired or was transferred to another facility), the vast majority of the identified claims were billed knowingly and improperly as inpatient when the patient was discharged from the hospital on the same calendar day that he or she entered it.

**Specific False Claims — One-Day Stays**

87.     Ms. Guardiola alleges that defendants also routinely submitted to Medicare false claims for inpatient admissions for elective surgical procedures where the patient's length of stay in the hospital was one day or less ("One-Day Stays"). A length of stay of one day or less means that the patient's time in the hospital spanned no more than one midnight. An elective outpatient surgical procedure is one performed when the patient's condition is neither urgent nor emergent and permitted adequate time to schedule the availability of a suitable accommodation. (A One-Day Stay might also be characterized as a Zero-Day Stay if a patient's time in the hospital was less than 24 hours.)

88.     The following elective surgical Medicare claims, for which relator will, under an appropriate protective order, provide additional patient information, are illustrative of the types of One-Day Stays for which Renown knowingly and improperly billed government-funded health insurance on an inpatient basis when the claims should have been billed on a less costly outpatient or outpatient observation basis:

| CLAIM | ADMITTED | DISCHARGED |
|-------|----------|------------|
| 1 | 03/10/09 | 03/11/09 |
| 2 | 04/08/09 | 04/09/09 |
| 3 | 03/22/09 | 03/22/09 |
| 4 | 03/27/09 | 03/28/09 |

Snell & Wilmer

L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775/785-5440

- 35 -

| CLAIM | ADMITTED | DISCHARGED |
|-------|----------|------------|
| 5 | 04/15/09 | 04/16/09 |
| 6 | 06/08/09 | 06/08/09 |
| 7 | 01/29/10 | 01/30/10 |
| 8 | 08/04/10 | 08/05/10 |
| 9 | 08/21/10 | 08/22/10 |
| 10 | 09/17/10 | 09/18/10 |
| 11 | 03/01/11 | 03/02/11 |
| 12 | 09/17/10 | 09/18/10 |
| 13 | 03/04/11 | 03/05/11 |
| 14 | 03/14/11 | 03/15/11 |
| 15 | 12/08/10 | 12/09/10 |
| 16 | 12/21/10 | 12/22/10 |
| 17 | 01/04/11 | 01/05/11 |
| 18 | 01/11/11 | 01/12/11 |
| 19 | 10/24/08 | 10/25/08 |
| 20 | 02/21/09 | 02/21/09 |
| 21 | 05/11/09 | 05/12/09 |
| 22 | 04/25/09 | 04/25/09 |
| 23 | 09/17/10 | 09/18/10 |
| 24 | 07/15/10 | 07/16/10 |
| 25 | 07/08/10 | 07/09/10 |
| 26 | 09/22/10 | 09/23/10 |
| 27 | 09/07/10 | 09/08/10 |
| 28 | 11/30/10 | 12/01/10 |
| 29 | 12/03/10 | 12/04/10 |
| 30 | 12/23/10 | 12/24/10 |
| 31 | 12/08/10 | 12/09/10 |
| 32 | 12/08/10 | 12/09/10 |
| 33 | 12/14/10 | 12/15/10 |
| 34 | 04/12/09 | 04/13/09 |
| 35 | 12/15/10 | 12/16/10 |
| 36 | 12/15/10 | 12/16/10 |
| 37 | 03/17/11 | 03/18/11 |
| 38 | 03/29/11 | 03/30/11 |
| 39 | 03/30/11 | 03/31/11 |
| 40 | 03/28/11 | 03/29/11 |
| 41 | 12/26/08 | 12/27/08 |
| 42 | 04/30/09 | 05/01/09 |
| 43 | 12/15/10 | 12/16/10 |
| 44 | 01/27/11 | 01/28/11 |
| 45 | 09/08/10 | 09/09/10 |
| 46 | 08/02/10 | 08/03/10 |
| 47 | 03/02/11 | 03/03/11 |

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

| CLAIM | ADMITTED | DISCHARGED |
|-------|----------|------------|
| 48 | 03/30/11 | 03/31/11 |
| 49 | 06/30/08 | 07/01/08 |
| 50 | 09/18/08 | 09/19/08 |
| 51 | 10/07/10 | 10/08/10 |
| 52 | 12/03/08 | 12/04/08 |
| 53 | 03/25/09 | 03/26/09 |
| 54 | 10/20/10 | 10/21/10 |
| 55 | 08/04/10 | 08/05/10 |

89.    Although relator's allegations are not limited by specialty, each claim identified in the preceding paragraph (except #34) involves an elective surgical procedure within the specialties of Thyroid, OB/GYN, Cardiology or "Spine."

90.    Although the reasons differ for individual patients, there are common themes reflected across the patient files. Often the procedures involved are not listed on Medicare's Inpatient Only List and, as a result, must be billed on an outpatient basis absent pre-admission documentation identifying a comorbidity supporting the need for inpatient treatment or post-procedure documentation of a complication requiring inpatient care. Many are missing doctor's admission orders indicating that inpatient status is medically necessary. Most patients were discharged within 24 hours and doctors' orders prescribed discharge after a period in recovery. All lack any medical documentation of pre-existing conditions or post-procedure complications that would justify inpatient admission. In each case, there is no evidence that during or after performance of the procedure the patient developed a condition that would warrant inpatient treatment. In each case, the government paid an inflated amount as a direct result of Renown's fraud.

91.    Patient #34 entered Renown with a medical condition through the emergency room. Despite a physician's order placing the patient in outpatient observation status, Renown billed the claim as inpatient. As a direct result of Renown's wrongdoing, the government paid an

- 37 -

inflated amount for this patient's care.

**Renown Management Directed that Claims Be Billed Improperly**

92.     The defendants' management at individual hospitals, as well as the corporate level, are aware of these fraudulent practices and encouraged and facilitated the continuing fraud against government-funded health insurance programs.

93.     The cultural and systemic resistance Ms. Guardiola faced in trying to correct problems at Renown were caused by directives from corporate and senior hospital management.

94.     During two meetings in which Ms. Guardiola participated during the 4th quarter of 2011, physicians identified Renown management as the source of instructions to always bill certain types of procedures as inpatient.  The meetings, which were attended by Renown CEO Greg Boyer, COO Kris Gaw and several other corporate executives, were held with cardiologists to explain claim denials being imposed on Renown as a result of audits performed by Medicare's Recovery Audit Contractors (RACs).  During the meetings, several physicians chaffed at the notion that they were improperly categorizing patients as inpatient.  Drs. Francis Kelley and Thomas Nylk objected, saying that the inpatient designations were used at the explicit direction of Renown.

95.     COO Gaw and CEO Boyer reacted to the comments by admitting that had occurred in the past, but stating that a new procedure needed to be used going forward.

96.     In a separate meeting with Drs. John Erickson and Larry Klaich from OB/GYN Associates to discuss billing of da Vinci procedures in OB/GYN cases, Ms. Guardiola was told that they had been directed by Linda Ferris, Renown's former VP of Oncology, to treat all procedures performed using the da Vinci robotic system as inpatient.

97.     The physicians' statements were consistent with prior emails that Ms. Guardiola had seen.  For instance, in April 2011, Dr. Martin Naughton's office contacted Jessica Marquis, a

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada  89501
775.785.5440

Patient Access Lead at Regional, to complain about a patient's da Vinci hysterectomy not being approved for inpatient admission. When informed that the procedures "are outpatient codes per Medicare's inpatient only list," the physician's representative told Ms. Marquis that "Renown and her [the doctor's] management team had a meeting and said that all Da Vinci hysterectomy procedures need to be inpatient."

98.     The high dollar value of an inpatient admission gives Renown ample motive to encourage physicians to increase inpatient admissions. And physicians have ample motive to be generous in categorizing patients as inpatients. This is because Renown engages in a financial strategy known as "service line management" by which the profitability of each medical specialty is evaluated separately and the referral volume and revenue performance of individual physicians is tracked meticulously.

99.     As a result, Renown and physicians are under pressure to generate additional revenues. In the Cardiology area, for instance, the defendants created the Renown Institute for Heart & Vascular Health and incurred significant investment in expensive cutting-edge technology. During 2011, Renown constructed four new cardiac catheter suites at a cost of between $5-10 million.

100.    Moreover, Renown was also under pressure to generate revenues in its daVinci robotics practices. Dr. Lim, a physician specializing in OB/GYN Oncology and Renown's medical director for daVinci robotics, successfully pressed for Renown to purchase two daVinci robotic systems at a cost of almost $4 million during 2009 and 2010. Such expenditures must be paid for by increased patient treatment and billing.

101.    By the end of 2011, Ms. Guardiola realized that defendants' leadership would not implement corrections to address the billing fraud. Recognizing that her effectiveness was undermined and discouraged by the ongoing fraud, Ms. Guardiola resigned her position in

January 2012.

102.    The Renown Health defendants know that when a patient does not meet inpatient level of care criteria but is admitted for a one-day stay, payment may not be sought under the inpatient MS-DRG system (Medicare Part A) and must be submitted as an outpatient claim (Medicare Part B).  Renown Health also recognizes that if a patient's treatment is erroneously billed as an inpatient service, a corrected claim form should be submitted to correct the billing. Renown knowingly submitted false claims for inpatient claims to government-funded health insurance programs and failed to correct inaccurate bills it submitted.

103.    The Renown Health defendants know the Medicare rules pertaining to billing for outpatient observation services.  Defendants knowingly submitted false claims for outpatient observation claims to government-funded health insurance programs and failed to correct inaccurate bills it submitted.

104.    The Renown Health defendants know that CMS will not pay for services that are not "medically necessary" and appropriate (*e.g.,* 42 U.S.C. § 1320c-5(a)(3), 42 U.S.C. § 1395y(a)(1)(A)), or for services provided that are substantially in excess of patient needs (*e.g.,* 42 U.S.C. § 1320a-7(b)(6), (8)).

105.    Based on the above and foregoing, the Renown Health defendants engaged in a scheme whereby they knowingly submitted claims for payment to CMS and the U.S. Government falsely representing that the patients were properly billed as inpatient and falsely certifying that inpatient admission was appropriate.

106.    The Renown Health defendants knowingly submitted false claims to Medicare for inpatient services that should have been billed on an outpatient basis.

107.    If CMS had known of the falsity of the claims submitted by defendants, it would not have paid or approved those claims.

108.    By submitting false claims to the Medicare program, the Renown Health defendants falsely certified compliance with Medicare laws (*e.g.*, 42 U.S.C. § 1395y(a)(1)(A)), regulations and program instructions, as set forth in the Medicare Provider Agreement (CMS-855A).

109.    By submitting false claims to the Medicare program, the Renown Health defendants falsely certified on the Provider Agreement (CMS-855A), the Medicare EDI Enrollment Form, the Medicare UB-04 (CMS-1450) Claim Form, the Medicare 837I Electronic Claim Form, and/or similar documents that the services were rendered and the claims were submitted in compliance with Medicare laws, regulations and program instructions.

110.    If CMS had known of the falsity of defendants' certification, it would not have paid or approved those claims submitted by defendants in violation of or noncompliance with those certifications.

111.    The Renown Health defendants knew at the time they submitted the false claims that the services provided under those claims did not comply with Medicare laws, regulations and program instructions and that defendants were not entitled to payment or approval of those claims under Medicare laws, regulations and program instructions.

112.    The United States, unaware of the defendants' wrongdoing or the falsity of the records, statements or claims made by the defendants, paid claims that would not otherwise have been paid or approved.

113.    Based on the material falsehoods contained in defendants' false claims for reimbursement to the Medicare system, CMS and the United States Government approved and paid claims that would not otherwise have been paid or approved.

**COUNT ONE**
**False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**

114.     Relator re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 113 of this complaint.

115.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

116.     By virtue of the acts described above, the defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States Government.

117.     By virtue of the acts described above, the defendants knowingly falsely certified on the Provider Agreement (CMS-855A), the Medicare EDI Enrollment Form, the Medicare UB-04 (CMS-1450) Claim Form, the Medicare 837I Electronic Claim Form and/or similar documents, that the claims for reimbursement submitted or caused to be submitted were for services provided in compliance with Medicare laws, regulations and program instructions.

118.     By virtue of the acts described above, the defendants knowingly concealed the existence of their improper conduct from the United States Government in order to induce payment of false or fraudulent claims.

119.     The United States, unaware of the defendants' wrongdoing or the falsity of the records, statements or claims made by the defendants, paid or approved claims that would not otherwise have been paid or approved.

120.   If the United States had been aware of the falsity of the claims submitted by defendants, the United States would not have paid or approved the claims.

121.     By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

- 42 -

**COUNT TWO**
**False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**

122.    Relator re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 113 of this complaint.

123.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

124.    By virtue of the acts described above, the defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid by the United States Government.

125.    By virtue of the acts described above, the defendants knowingly falsely certified on the Provider Agreement (CMS-855A), the Medicare EDI Enrollment Form, the Medicare UB-04 (CMS-1450) Claim Form, the Medicare 837I Electronic Claim Form and/or similar documents, that the claims for reimbursement submitted or caused to be submitted were for services provided in compliance with Medicare laws, regulations and program instructions.

126.    By virtue of the acts described above, the defendants knowingly concealed the existence of their improper conduct from the United States Government in order to induce payment of their false or fraudulent claims.

127.    The United States, unaware of the defendants' wrongdoing or the falsity of the records, statements or claims made by the defendants, paid claims that would not otherwise have been paid or approved.

128.    If the United States had been aware of the falsity of the claims submitted by defendants, the United States would not have paid or approved the claims.

129.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

**COUNT THREE**
**False Claims Act**
**31 U.S.C. § 3729(a)(1)(G)**

130.    Relator re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 113 of this complaint.

131.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

132.    By virtue of the acts described above, the defendants knowingly concealed an obligation to pay or transmit money to the United States Government.

133.    By virtue of the acts described above, the defendants knowingly and improperly avoided or decreased an obligation to pay or transmit money to the United States Government.

134.    By virtue of the acts described above, the defendants knowingly concealed the existence of their improper conduct from the United States Government in order to conceal and retain payments received as a result of their violations of the Act.

135.    The United States, unaware of the defendants' wrongdoing or the falsity of the records, statements, or claims made by the defendants, paid claims that would not otherwise have been paid or approved.

136.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

WHEREFORE, relator requests that judgment be entered in favor of the United States and relator against the defendants, ordering that:

a.    the defendants cease and desist from violating the FCA, 31 U.S.C. § 3729, *et seq*.;

b.    the defendants pay an amount equal to three times the amount of damages that the United States have sustained because of the defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of the FCA, 31 U.S.C. § 3729;

1        c.      Relator be awarded the maximum amount allowed pursuant to the FCA, 31 U.S.C.

2  § 3730(d);

3        d.      Relator be awarded all costs of this action, including attorneys' fees and costs

4  pursuant to the FCA, 31 U.S.C. § 3730(d); and

5

6        f.      the United States and relator recover such other relief as the Court deems just and

7  proper.

8                                    **REQUEST FOR TRIAL BY JURY**

9        Pursuant to Rule 38 of the Federal Rules of Civil Procedure, relator hereby demands a

10  trial by jury.

11                                  Respectfully submitted,

12

13                                  */s/ William E. Peterson*
                                William E. Peterson

14                                  Nevada Bar No. 1528
                                Craig S. Denney

15                                    Nevada Bar No. 6953
                                SNELL & WILMER L.L.P.

16                                    50 West Liberty, Suite 510
                                Reno, NV  89501

17                                    wpeterson@swlaw.com
                                cdenney@swlaw.com

18                                  T 775.785.5440

19                                  F 775.785.5441

20                                  Mitchell R. Kreindler

21                                  Admitted *pro hac vice*
                                Sharon M. Gurak

22                                  Admitted *pro hac vice*
                                KREINDLER & ASSOCIATES

23                                  9219 Katy Freeway, Suite 206
                                Houston, TX  77024

24                                  T 713.647.8888
                                F 713.647.8889

25                                  mkreindler@blowthewhistle.com

26                                  sgurak@blowthewhistle.com

27                                  ATTORNEYS FOR *QUI TAM*
                                RELATOR CECILIA GUARDIOLA

28

- 45 -

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

1

## CERTIFICATE OF SERVICE

2

3          I, the undersigned, declare under penalty of perjury, that I am over the age of eighteen

4   (18) years, and I am not a party to, nor interested in, this action.  On January 6, 2015, I caused to

5   be served a true and correct copy of the foregoing **SECOND AMENDED COMPLAINT** by the

6   method indicated:

7   ____   BY FAX:   by transmitting via facsimile the document(s) listed above to the fax
        number(s) set forth below on this date before 5:00 p.m. pursuant to EDCR Rule 7.26(a).
8        A printed transmission record is attached to the file copy of this document(s).

9   ____   BY U.S. MAIL:   by placing the document(s) listed above in a sealed envelope with
        postage thereon fully prepaid, in the United States mail at Las Vegas, Nevada addressed
10       as set forth below.

11

12  ____   BY EMAIL:  by emailing a PDF of the document(s) listed above to the email addresses
        of the individual(s) listed below.

13

14  ____   BY OVERNIGHT MAIL:   by causing document(s) to be picked up by an overnight
        delivery service company for delivery to the addressee(s) on the next business day.

15  ____   BY PERSONAL DELIVERY:   by causing personal delivery by                         , a
        messenger service with which this firm maintains an account, of the document(s) listed
16       above to the person(s) at the address(es) set forth below.

17   __X__   BY ELECTRONIC SUBMISSION:   submitted to the above-entitled Court for electronic
        filing and service upon the Court's Service List for the above-referenced case.
18

19  Roger W. Wenthe, Esq.
    Cliff B. Stricklin, Esq.                    David C. McElhinney, Esq.
20  Michael J. Hofmann, Esq.              LEWIS ROCA ROTHGERBER LLP
    Zhonette M. Brown, Esq.               50 W. Liberty Street, Suite 410
21  Andrew Mohraz, Esq.                     Reno, NV  89501
    Laura S. Perlov, Esq.
22  BRYAN CAVE LLP
    1700 Lincoln Street, Suite 4100
23  Denver, CO  80203-4541

24

25                                               /s/ Holly W. Longe
                                        _____
26                                      An employee of Snell & Wilmer L.L.P.

27

28
                                        - 46 -

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440