UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* CECILIA GUARDIOLA, <br><br> Plaintiff, <br><br> v. <br><br> RENOWN HEALTH, *et al.,* <br><br> Defendants. | 3:12-cv-00295-LRH-VPC <br><br><br> **ORDER** |

Before the court is the motion (#130) of relator Cecilia Guardiola ("relator") to compel production of "gap period" emails, which are email communications for the period from April 2011 through February 28, 2013. Defendants Renown Health, Renown Medical Center, and Renown South Medical Center (collectively "Renown") opposed (#133) and relator replied (#136). The court heard oral argument on the motion on August 12, 2015 (#141). This order follows.

**I.    PROCEDURAL HISTORY**

This is a *qui tam* action under the False Claims Act, 31 U.S.C. §§ 3729-33. Relator alleges that, while working at Renown from June 2006 through June 2014, she discovered the existence of a scheme whereby Renown knowingly submitted false inpatient reimbursement claims to Medicare that should have been billed on a less expensive, outpatient basis.

Initially, relator sent two document production requests to Renown. The court set the relevant timespan for production as June 1, 2006 through June 30, 2014, an eight-year period. (*See* #98.) Over the ensuing months, the parties reached compromises on a variety of issues, such as narrowing of search terms and limiting the production of relevant emails to certain individuals. Renown has produced or will produce emails for (1) June 2006 through March 2011 and (2) February 2013 through June 2014. However, as explained below, Renown has not produced emails for a so-called "gap period" between April 2011 and February 2013.

Renown explains technology, email retention policy, and cost as the reasons for the existence of the gap period. Between April 2011 and February 2013, Renown used Arcserve, a then-leading backup solution system, to back up email and other data. (#133 at 8.) Prior to April 2011, the beginning of the gap period, Renown lacked an email retention policy and retained all emails. (*Id.*) Thus, as of March 2011, Renown possessed email for every employee from the beginning of their employment until that date, and all of these emails were backed up and are now located on the March 2011 backup tapes. (*Id.*) With the advent of Arcserve in April 2011, Renown also adopted an email retention period of six months: as emails became six-months old, they became inactive data and were then stored on a backup tape. (*Id.*) Because Renown began routinely backing up its network servers and stored emails, the gap-period emails are presently located on a variety of backup tapes that post-date March 2011.

On the belief that the March 2011 tapes held the greatest number and scope of historical emails relevant to this litigation, Renown restored the March 2011 backup tapes, via a third-party vendor, and produced emails contained therein. (#133 at 6-7.) Renown indicates that the restoration cost alone, *i.e.*, excluding attorney review and production, exceeded $35,000. (*Id.* at 7.) Including review and production, the cost surpassed $100,000. (*Id.*)

Due to time and expense, Renown has not attempted, and remains unwilling, to restore the gap-period tapes. *Id.* It avers that its IT department cannot restore the gap-period emails in-house; therefore, it would have to outsource the work for a total cost of at least $248,000, which includes data processing and contract attorney review. Relator's position is that Renown should be ordered to produce them because they are highly relevant to her claims.

## II.   LEGAL STANDARD

Rule 26 of the Federal Rules of Civil Procedure outlines the standard for production. Generally, parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ." Fed. R. Civ. P. 26(b). However,

> A party need not provide discovery of electronically stored information ["ESI"] from sources that the party identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery . . . , the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may

> nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C).

Fed. R. Civ. P. 26(b)(2)(B). The court may also "specify the conditions for the discovery[,]" *id*., which may include cost sharing. *See 2006 Advisory Committee Notes to FRCP 26(b)*.

Therefore, when considering a motion to compel production of ESI, the court conducts a three-part inquiry. First, the court determines whether the party opposing production has demonstrated that the ESI is not reasonably accessible due to undue burden or undue cost. *See* Fed. R. Civ. P. 26(b)(2)(B). Second, upon a requisite showing, the court asks whether the party seeking production has demonstrated, notwithstanding the inaccessibility, good cause for production in light of the factors discussed in Rule 26(b)(2)(C) and the Advisory Committee notes. *See id*.; *see also 2006 Advisory Committee Notes to FRCP 26(b)* (listing seven factors).

Finally, if the ESI is not reasonably accessible, the court may consider whether cost sharing is appropriate. *Nogle v. Beach St. Corp*. No. 2:10-cv-01092-KJD-GWF, 2012 WL 3687570, at *8 (D. Nev. Aug. 27, 2012) (explaining that the court "should only consider shifting the cost of production . . . when the requested information is not reasonably accessible . . .").[1] When considering cost shifting, courts in this circuit rely on the seminal *Zubulake* factors. *See Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 324 (S.D.N.Y. 2003) ("*Zubulake I*") (identifying seven factors); *Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 284 (S.D.N.Y. 2003) ("*Zubulake II*") (applying those factors); *Tierno v. Rite Aid Corp*., No. C-05-02520-TEH, 2008 WL 3287035, at *4 (N.D. Cal. July 31, 2008) (characterizing the *Zubulake* factors as a "gold standard" in ESI discovery disputes).

---

[1] The parties apparently contemplate that cost shifting may be considered regardless of the reasonable accessibility determination. The court disagrees. *See* Part III.C.1, *infra*.

3

### III.   DISCUSSION AND ANALYSIS

The court considers in turn each step of the tripartite inquiry.

**A.   Are the gap-period emails not reasonably accessible because of burden or cost?**

   **1.   Undue Burden**

Under Rule 26(b)(2)(B), it is Renown's burden to show that the gap-period emails are not reasonably accessible due to undue burden. The parties agree that the requested production concerns only backup tapes for the gap period. Renown contends that the fact of "backup tapes" alone establishes that the emails are not reasonably accessible, and it relies on a string of cases that have held backup tapes are inaccessible. *See Zubulake I*, 217 F.R.D. at 319-20; *Nogle*, 2012 WL 3687570, at *8 ("Information stored on archival backup tapes is generally considered not reasonably accessible") (citing *Laethem Equip. Co. v. Deere & Co.*, 261 F.R.D. 127, 145 (E.D. Mich. 2009) and *Zubulake I*); *U.S. ex rel. Carter*, 305 F.R.D. 225, 239 (S.D. Cal. 2015); *OpenTV v. Liberate Techs.*, 219 F.R.D. 474, 477 (N.D. Cal. 2003) ("backup tapes are considered inaccessible, because they are not organized for retrieval of individual documents or files."). On the weight of this authority, Renown urges that backup tapes are inaccessible *per se*.

Relator responds that a *per se* approach is not embodied within or permitted by Rule 26. She invites the court to analyze whether the gap-period emails, under the particular facts of this case, are reasonably inaccessible due to undue burden. She points out that the 2006 amendments to Rule 26 did not adopt a bright-line test that turns on the type of media in which the ESI is stored, *e.g.* a "backup" tape. Instead, she argues that Rule 26(b)(2)(B) grounds reasonable inaccessibility in either undue burden or undue cost.

As a preliminary matter, the plain language of Rule 26(b)(2)(B) instructs that "undue burden," rather than the format of the ESI, is to guide the court's analysis. Technological features of the storage media do enter the analysis, but only as they relate to the undue burden inquiry. Stated differently, undue burden is fact specific and no format is inaccessible *per se*. Even if a particular format typically yields an inaccessibility finding, the party opposing production, who bears the burden at this step, must establish that restoration and production of its particular tapes

1 or other storage media, due to their particular aspects and features, would impose undue burden or
2 cost. Other cases may be helpful to such a showing, but they are far from dispositive.

3       The court concludes that Renown has failed to show that the gap-period emails are not
4 reasonably accessible because of undue burden. As described above, Renown has produced
5 emails from the restored March 2011 backup tapes. In so doing, Renown has demonstrated that it
6 is technologically feasible to restore and produce the gap-period emails. Renown argues that the
7 burden of restoration is so great that it cannot feasibly restore the tapes in-house (#133 at 9);
8 therefore, defense counsel indicated at oral argument that if the court orders production, Renown
9 must and will again use a third-party vendor (#141). By implication, Renown will ameliorate the
10 burdens of in-house production, though at some cost. As Renown acknowledges, the tapes
11 containing the gap-period emails have already been identified. (*See* #133 at 9.) Accordingly, the
12 court cannot fathom what burden accompanies third-party restoration. Renown has not stated that
13 use of a vendor will nevertheless impose burdens—in terms of staff resources, delay of other
14 critical IT projects, or inadequate attention to existing technology infrastructure.

15       At bottom, there will be a burden *or* a cost, but not both. Because Renown must make
16 "particular and specific demonstration[s] of fact" that "provide sufficient detail" as to an undue
17 burden, *see Tyler v. City of San Diego*, No. 14-cv-01179-GPC-JLB, 2015 WL 1955049, at *2
18 (S.D. Cal. Apr. 29, 2015) (relying on other discovery standards when discussing the opposing
19 party's step-one demonstration), the remaining question is only whether undue cost of the third-
20 party vendor makes the gap-period emails not reasonably accessible.

21       **2.    Undue Cost**

22       Undue cost is the second factor that the court considers in the reasonable inaccessibility
23 analysis. As above observed, Renown indicated at oral argument that it will use a third-party
24 vendor to restore the gap-period emails, a decision that it deems "the most cost-effective
25 method." (#133 at 9.) On the basis of a quote for the restoration, Renown states that the likely
26 cost is $136,000, with a range of $96,000 to $147,400. (*Id.*) Because this sum includes only data
27 services, without storage or attorney review time, Renown estimates that the actual cost is
28 between $248,000 and $310,000. (*Id.* at 9-10.) At oral argument, relator argued that the relevant

5

cost is only that of data production, excluding any review or storage costs, and that the smaller sum is a miniscule expense to an entity with $2.6 billion in annual patient revenues.

The court rejects Renown's argument that "cost" under Rule 26(b)(2)(B) includes document review and storage. Renown cites no authority for the proposition that review costs—ordinarily borne by the producing party—fall into cost under Rule 26(b)(2)(B). The position stands in opposition to *Zubulake II*, where the court held that "where cost-shifting is appropriate, only the costs of restoration and searching should be shifted." 216 F.R.D. at 290. It would be a curious result to interpret cost at the first step to include attorney time, but not allow its recovery at the third step—if, indeed, cost-shifting is appropriate. *Zubulake II*'s exclusion of these costs at the third step persuades the court that they are not properly included as a "cost" in the first.

The $136,000 figure for restoration is not an undue cost that renders the gap-period emails reasonably inaccessible. Undue cost is examined not as a number alone, but instead within context of myriad facts. As the Western District of Washington explained in a case concerning home-security provider ADT,

> it is difficult to conclude that the ESI sought in this case is "not reasonably accessible" in light of the fact that the Plasmon System [an effectively non-functional ESI archival system at issue in the case] continues to be used by ADT personnel. It is not simply a disaster back-up system. The fact that a company as sophisticated as ADT (which is wholly-owned by Tyco, International, Ltd., a Fortune 500 company) chooses to continue to utilize the Plasmon System instead of migrating its data to its now-functional archival system should not work to plaintiff's disadvantage. In *AAB Joint Venture v. U.S.,* the court noted "the Court cannot relieve Defendant of its duty to produce those documents merely because Defendant has chosen a means to preserve the evidence which makes ultimate production of relevant documents expensive." . . . "To permit a party to 'reap the business benefits of such technology and simultaneously use that technology as a shield in litigation would lead to incongruous and unfair results.'" The same is true here.

*Starbucks Corp. v. ADT Sec. Servs., Inc.*, No. 08-CV-900-JCC, 2009 WL 4730798, at *6 (W.D. Wash. Apr. 30, 2009) (internal citations omitted).

As in *Starbucks Corp.*, the context of this case demands a finding that restoration is not unduly costly. During the gap period, Renown elected to store typical disaster recovery tapes with archival data. This is an important distinction because archival data may contain the only remaining copies of relevant documents. As noted in *The Sedona Principles*:

> Organizations that use backup tapes for archival purposes should be aware that this practice is likely to cause substantially higher costs for evidence preservation and production in connection with litigation. Organizations seeking to preserve data for business purposes or litigation should, if possible, consider employing means other than traditional disaster recovery backup tapes. They should not be used for record keeping.

Comment 5h, The Sedona Conference, *The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic Document Production*, at 35 (2d ed. 2007) (hereinafter "*The Sedona Principles*"). ESI is now a common part and cost of business. Businesses are best situated to weigh for themselves the costs and benefits of various technology solutions in light of their needs. These needs should include some thought to the risk of litigation and corresponding discovery obligations. To the extent that restoration costs in this case owe to Renown's failure to earlier implement a sensible email retention policy and its choice to use an archival/backup solution that did not maintain ESI in an indexed or otherwise searchable manner—a conclusion that Renown itself advances—Renown must bear some responsibility within the consideration of whether the restoration cost is undue.

To illustrate the risk of Renown's gap-period practice of combining storage of disaster recovery tapes with archival data, the court analogizes to record storage before the digital age. In the not-too-distant past, companies maintained their paper records in chronological order and by various subject matters, such as accounting, human resources, board minutes, and litigation. Records were organized and kept this way so that companies could retrieve archived records for business purposes. Orderly maintenance of old files also eased compliance with discovery requests. Relatedly, companies developed record retention policies, which typically called for document destruction after the passage of a certain number of years. When a complex, document-intensive lawsuit arose, lawyers were relegated to spending weeks in records warehouses, where they sifted and winnowed through hundreds or thousands of document boxes. Aside from shredded documents, parties could retrieve responsive files, including pivotal written communications such as letters and memoranda.

Renown had a records retention policy before and after the gap period that allowed for searching, reviewing, and printing documents relevant to discovery requests and Renown's own

1  business needs.  The policy and corresponding technology features simultaneously served as a
2  backup system for disaster recovery and also an archival system of documents kept for future
3  business purposes.  Applying this hard-copy analogy here, during the gap period, Renown in
4  effect stored randomly hundreds of thousands of documents, no differently than if had tossed files
5  into banker's boxes without labels or organization.  It then shipped those boxes to the warehouse
6  for haphazard storage, row upon row.  As there is no easy way to locate particular documents in
7  the gap-period area of the warehouse (*i.e.* the particular backup tapes), not only opposing counsel,
8  but also company employees themselves would have to go through each box, one at a time, to
9  retrieve anything for discovery or businesses purposes.  Had this occurred in 1995, only twenty
10  years ago, it is highly likely that the court would conclude that despite the cost, the gap-period
11  documents must be reorganized and produced.

12  Based upon the foregoing, the court concludes that the ESI in this case is not reasonably
13  inaccessible due to undue cost.  In light of the court's discussion of Renown's practices, $136,000
14  is not an unreasonable sum.  *Compare Gen. Elec. Co. v. Wilkins*, No. 1:10-CV-00674 LJO, 2012
15  WL 570048, at *5 (E.D. Cal. Feb. 21, 2012) (finding reasonable inaccessibility due to undue cost
16  where backup restoration estimates exceeded $2,000,000).  The restoration cost, as relator
17  correctly notes, is an infinitesimally small portion of Renown's annual revenues.  Absent a
18  demonstration through authority or other cogent arguments that a $136,000 bill makes the cost
19  undue in light of Renown's decisions and gap-period practices, the court is compelled by Rule 26
20  to find that the emails are reasonably accessible and discoverable.  Relator's motion to compel
21  shall be granted.

22  **B.     Does good cause support production of the gap-period emails?**

23  Although the court's step-one finding regarding reasonable accessibility ends the inquiry,
24  the court nevertheless considers in the alternative whether good cause supports discoverability of
25  the gap-period emails.  Even when ESI in not reasonably accessible, Rule 26(b)(2)(B) permits the
26  court to order production upon the requesting party's demonstration of good cause.

27  To decide whether good cause exists, the court must apply a "balancing test of the costs
28  and potential benefits of the requested discovery under Rule 26(b)(2)(B)," taking into account

seven factors: (1) the specificity of the discovery request; (2) the quantity of information available from other and more easily accessed sources; (3) the failure to produce relevant information that seems likely to have existed but is no longer available on more easily accessed sources; (4) the likelihood of finding relevant, responsive information that cannot be obtained from other, more easily accessed sources; (5) predictions as to the importance and usefulness of further information; (6) the importance of the issues at stake in the litigation; and (7) the parties' resources. *2006 Advisory Committee Notes to FRCP 26(b)*; *Nogle*, 2012 WL 3687570, at *7. The court considers each factor in turn.

### 1. The Specificity of the Discovery Request

Relator argues that she has dramatically narrowed the scope of this case by limiting her claims to a subset of specialties and procedures. (#130 at 10.) Correspondingly, she has repeatedly and consistently narrowed her discovery requests and worked with Renown to reduce their production burden. (*Id*. at 11.) Relator's counsel stated at oral argument, and defense counsel did not contest, that the parties have already agreed to the precise search terms that would be applied to the restored gap-period emails; therefore, relator argues that ultimate production will be limited and the specificity of the request has been increased. (#141.) In its brief, Renown contends that relator's document production requests have been extremely broad because she requests all documents "related" or relating" to broad categories of topics. (#133 at 18-20.) However, Renown articulates no specific argument that the instant motion to compel production of the gap-period emails is overly broad, and its position at oral argument was only that discovery in this case has entailed "a lot of documents." (#141.)

This factor favors relator. The parties have worked diligently for the past several months to narrow, clarify, and/or remove from consideration many areas of dispute, including deciding on keyword searches and limiting custodians. Because of the agreement regarding the search terms, the court finds that the discovery relator seeks in her motion is sufficiently specific. Indeed, it is plain that she seeks only germane business communications regarding certain events that relate to the claims in this case.

9

### 2. Quantity of Information Available from Other and More Easily Accessed Sources

Relying on *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) for the proposition that email has become the primary form of business communication, relator argues that there is no alternative or readily accessible source of the communications contained in the gap-period emails. (#130 at 11-12.) Renown's position is that it has searched and produced over 68,000 documents from other, more easily accessible sources, including its internal server system and individual employees' personal hard drives. In restoring, cataloguing, searching, reviewing, and producing these documents, Renown avers that it has spent over $850,000. Renown suggests that this information is comparable to the gap-period emails, and it argues that relator has not identified any particular documents that she believes are missing from their existing production, either specifically or by category. (#133 at 21.)

This factor favors relator. That thousands of other documents have been produced does not supplant the need for the gap-period emails. The court agrees with relator that email has become the principal form of workplace communication. As the court in *Zubulake II* noted, "an email contains the precise words used by the author. Because of that, it is a particularly powerful form of proof at trial the offered as an admission of a party opponent." 216 F.R.D. at 287. For this reason, the court cannot adopt Renown's view that the emails are comparable to information already produced. The gap-period emails are highly and, very likely, uniquely relevant to relator's claims.

### 3. Failure to Produce Relevant Information that Seems Likely to Have Existed but Is No Longer Available on More Easily Accessed Sources

The parties agree that this factor is neutral. The court concurs.

### 4. The Likelihood of Finding Relevant, Responsive Information that Cannot Be Obtained from Other, More Easily Accessed Sources

Relator asserts that the gap period represents a critical span of time because significant events occurred during that gap period that are highly relevant to her claims. These include key meetings with two physician groups, which Renown identified as the source of instructions to

always bill certain types of procedures as inpatient. Her motion details seven specific developments during the gap period. (#130 at 12-15.) Moreover, she attests that while employed at Renown, "almost all written communications among hospital personnel were conducted or distributed via email, including business and policy discussions and decisions, billing and revenue issues, and other matters pertinent to the allegations in this action." (#130-3 at ¶4.) Renown counters that due to the large number of documents already produced, it is unlikely that relevant evidence on any topic exists only within the gap-period emails, and there is no reason to believe that this six-month period is uniquely important to relator's claims. (#133 at 12.)

This factor also favors relator. She has demonstrated in great detail the events that occurred during that gap period and how email communications during this time span might well relate to her claims. Because of the role of email communications at Renown, it is highly likely that the gap-period emails contain relevant statements regarding these events. The court is persuaded that the gap-period emails likely contain communications unavailable from other sources.

### 5. Predictions of the Importance and Usefulness of Further Information

For similar reasons as those already discussed, relator predicts the gap-period emails will provide important information, and she provides several examples of discussions that the emails likely contain. (#130 at 15-17.) Renown responds that these examples are merely speculative, and the likely usefulness is diminished due to the volume of prior production. (#133 at 23.)

Based upon the discussion of factor four, this factor favors relator.

### 6. Importance of Issues at Stake in the Litigation

The parties strongly differ in their analyses of the importance of issues at stake in this case. Not surprisingly, relator points out that the False Claims Act is a potent tool for rooting out waste and fraud in government and that preventing, reporting, and prosecuting fraud against the government is an issue of great importance. (#130 at 17-18.) In contrast, Renown characterizes this case as one of mere wealth transfer. It notes that the United States declined to intervene and that proper classification of inpatients is already being addressed through regulatory proceedings:

the government has adopted audits to detect and recover payments for mistaken classification of inpatients. (#133 at 23-24.)

This factor favors relator. The court disagrees with Renown that this case is simply about a transfer of wealth from one party to another. Instead, *qui tam* actions are an important means of addressing fraud claims on behalf of taxpayers and the United States. That fact imbues this case with heightened importance.

### 7.   The Parties' Resources

Renown argues that the final factor is neutral because both parties have resources. It contrasts its position as Reno's only non-profit hospital with relator's recovery of $1.1 million in a prior *qui tam* lawsuit. (#133 at 24-25.) Relator argues that the award is misleading due to difficulties she experienced in obtaining employment following the prior suit and, in any case, the recovery does not mean her resources are endless. Moreover, relator again observes that Renown "generates in excess of $2.6 billion in total patient revenue annually." (#136 at 13.)

This factor is neutral. Although Renown's resources are substantially greater than those of relator, the record suggests that she is not penniless.

### 8.   Conclusion

As the court has described, five of the relevant factors favor relator, while two are neutral. Consequently, the court finds that relator has carried her step-two burden of demonstrating good cause. The court holds in the alternative that, even were the gap-period emails reasonably inaccessible due to undue burden or undue cost, good cause supports their discoverability.

**C.   Is cost shifting appropriate?**

The third and final step is an examination of cost shifting. As the court explains below, cost shifting is appropriate only when the ESI is reasonably inaccessible but the court finds good cause to order its production. In this case, the relevant factors do not support cost shifting.

### 1.   Cost shifting may be ordered only when the ESI is not reasonably accessible.

The parties—certainly Renown—seemingly contemplate that the cost shifting may be ordered even when the ESI is found reasonable accessible. (*See* #130 at 18; #133 at 25.) There is some disagreement among district courts in the Ninth Circuit about whether the court may shift

1  costs when it determines that the ESI is reasonably accessible. *Compare U.S. ex rel. Carter,*, 305
2  F.R.D. at 240 ("this preference for cost-shifting . . . is proper even as to accessible data so long as
3  the factors set forth in Rule 26(b)(2)(C) evidence cost-shifting's sustainability.") *with Conn. Gen.*
4  *Life Ins. Co. v. Earl Scheib, Inc.*, No. 11-cv-0788-GPC-WVG, 2013 WL 485846, at *3 (S.D. Cal.
5  Feb. 6, 2013) ("shifting the cost of production . . . should be considered only when data is sought
6  from an inaccessible format.").

7  As the Supreme Court has observed, "the presumption is that the responding party must
8  bear the expense of complying with discovery requests." *Oppenheimer Fund, Inc. v. Sanders*,
9  437 U.S. 340, 358 (1978). In the seminal *Zubulake* cases, Judge Scheindlin remarked that "[a]ny
10 principled approach to electronic evidence must respect this presumption[,]" and for this reason,
11 she held that cost shifting is appropriate only upon a finding that the ESI is inaccessible.
12 *Zubulake I*, 217 F.R.D. at 317-18. Consistently, many federal courts, including this district and
13 most courts in this circuit to have specifically considered the issue, have held that cost shifting is
14 appropriate *only* when the ESI is not reasonably accessible. *E.g.*, *Nogle*, 2012 WL 3687570, at
15 *8; *OpenTV*, 219 F.R.D. at 476 ("Shifting the cost of production from the producing party to the
16 requesting party should be considered only when inaccessible data is sought."); *Io Grp. v. Veoh*
17 *Networks, Inc.*, No. C06-03926-HRL, 2007 WL 1113800, at *7 (N.D. Cal. Apr. 13, 2007); *see*
18 *also Peskoff v. Faber*, 251 F.R.D. 59, 61 (D.D.C. 2008) (citing *Oppenheimer*, 437 U.S. at 358);
19 *Laethem*, 261 F.R.D. at 145.

20 It is true that the ESI amendments to the Rules of Civil Procedure did not adopt the
21 *Zubulake* approaches wholesale. Nonetheless, this court follows the weight of authority in this
22 circuit, a great deal of which postdates the 2006 amendments to Rule 26, and holds that cost
23 shifting is predicated on a finding that the ESI is not reasonably accessible. Beyond consistency
24 with general principles of discovery and the foregoing authority, this interpretation of Rule
25 26(b)(2)(B) is superior for three reasons. First, the court's authority to shift costs arises from its
26 ability to specify conditions for "the discovery." *See* Fed. R. Civ. P. 26(b)(2)(B). The use of
27 "the" has meaning. The Rule does not state that the court may specify conditions for "any and all
28 electronic discovery," but instead, for "the discovery" that the "court may nonetheless order,"

namely, the ESI made discoverable upon the requesting party's showing of good cause. *See id.* (expressly providing the discretion to specify conditions following the discussion of good cause); *see also Webster's Third New International Dictionary of the English Language Unabridged* 2368 (1986) (explaining that "the" is "used . . . to indicate that a following noun or noun equivalent refers to someone or something previously mentioned . . ."). Second, *The Sedona Principles* share this interpretation. *See* Comment 13a, *The Sedona Principles*, at 80 ("Amended Rule 26(b)(2)(B) specifically notes that an order compelling the production of *electronically stored information that is 'not reasonably accessible' may be subject to conditions*, including 'payment by the requesting party of part or all of the reasonable costs of obtaining information from sources that are not reasonably accessible.'") (emphasis added).

Finally, this reading of Rule 26(b)(2)(B) is consistent with the approaches taken by district courts in this circuit that have not specifically contemplated this issue. Although the court has not exhaustively canvassed every ESI cost-shifting decision, it is convinced by the following: when other courts have not reached the cost-shifting question, they have done so upon either a finding of reasonable accessibility, or upon the conclusion that the requesting party failed to demonstrate good cause for production of reasonably inaccessible ESI. *Compare Starbucks Corp*, 2009 WL 4730798 (omitting entirely the cost shifting analysis after concluding that the ESI was reasonably accessible) *with Gen. Elec. Co.*, 2012 WL 570048 (omitting the analysis in absence of good cause). For these reasons, courts may order cost shifting in one, limited circumstance: the ESI is reasonably inaccessible due to undue burden or undue cost, but the requesting party nevertheless renders it discoverable under the relevant factors.

### 2. Even were the gap-period emails not reasonably accessible, cost-shifting is unwarranted.

*Zubulake I* held that courts should consider seven factors in the cost-shifting analysis, weighted in the following order: (1) the extent to which the request is specifically tailored to discover relevant information; (2) the availability of such information from other sources; (3) the total cost of production, compared to the amount in controversy; (4) the total cost of production, compared to the resources available to each party; (5) the relative ability of each party to control

costs and its incentive to do so; (6) the importance of the issues at stake in the litigation; and (7) the relative benefits to the parties of obtaining the information. 217 F.R.D. at 324. Many of these factors mirror those of the good-cause inquiry, and the court will rely on its prior analysis where appropriate.

### a. Factors 1 and 2: Relevance and Availability

The court has examined considerations of relevance and availability in its good cause discussion, and it relies on the same here. These factors weigh against cost-shifting. The gap-period emails are highly relevant and contain information not likely available in other discoverable documents.

### b. Factor 3: Cost of Production Compared to Potential Recovery

Relator argues that this case entails the potential for a multimillion dollar recovery. Citing *Zubulake I*, 217 F.R.D. at 321 ("A response to a discovery request costing $100,000 sounds (and is) costly, but in a case potentially worth millions of dollars, the cost . . . may not be unduly burdensome."), relator contends that this factor weighs against cost shifting a $136,000 restoration cost. (#130 at 20.) Renown responds that it is impossible to analyze this factor because the amount in controversy is not yet certain. (#133 at 27-28.)

This factor weighs against cost shifting. Even in light of the parties' diverging positions on the potential recovery in this case, the facts and vigor with which the parties have litigated confirm that "this is not a nuisance value case, a small case or a frivolous case." *Zubulake II*, 216 F.R.D. at 288. Thus, "[a]ssuming this to be a multi-million dollar case, the cost of restoration is surely not 'significantly disproportionate' to the projected value of this case. This factor weighs against cost-shifting." *Id*.

### c. Factor 4: Cost of Production Compared to the Parties' Relative Resources

Relator contends that the parties' resources are disproportionate (#130 at 21), while Renown argues that both parties are capable of sharing in the cost of production (#133 at 28).

The parties' resources weigh against cost shifting. The court relies on its prior discussion of the parties' resources. Here, however, the parties' resources are to be compared relatively.[2] There is no dispute that Renown's resources "dwarf" those available to relator, even if "she may have the financial wherewithal to cover at least some of the cost of restoration." *Zubulake II*, 216 F.R.D. at 288. Although this disparity "weighs against cost shifting, it does not rule it out." *Id*. Although the court in *Zubulake II* ordered partial cost shifting, this court is persuaded that factual distinctions counsel the opposite result. Unlike Ms. Zubulake, relator is not a highly-compensated bank executive who earned $650,000 per year.

### d. Factor 5: Ability and Incentives of the Parties to Control Costs

Relator argues that Renown has the unilateral power to control the cost of restoration, as it possessed the sole ability to choose Arcserve and determine its email retention policy. Additionally, she notes that Renown decided on its own which emails to produce, without first discussing with relator the emails that she desired. (#130 at 21-22.) Renown counters that relator, as the requesting party, has the sole ability to control costs, for she alone determines the scope of her discovery requests. (#133 at 28.)

The court agrees with relator that Renown could have, but did not, discuss which emails would be produced prior to restoring the March 2011 backup tapes. Moreover, relator has tailored her gap-period email requests and Renown has the unilateral ability to choose its third-party vendor. Yet the court also recognizes that, upon vendor selection, the cost of restoration is somewhat fixed. *See Zubulake II*, 216 F.R.D. at 288 ("once that vendor is selected, costs are not within the control of either party."). To the extent Renown can control costs moving forward, its ability rests in efficient and cost-effective document review. Because Renown's ability to control cost is not absolute, the factor is neutral.

---

[2] In contrast, the good cause analysis invites consideration of resources in the absolute, omitting as it does the word "relative." *See 2006 Advisory Committee Notes to FRCP 26(b)*.

16

**e.     Factor 6: Importance of Issues at Stake in the Litigation**

The court relies on its prior characterization and analysis of the parties' positions. Because liability and corresponding recovery will recompense the public, this factor weighs against cost shifting.

**f.     Factor 7: Benefits of the Information to Each Party**

The court believes this factor is largely subsumed by the relevance analysis. There is little doubt that the gap-period emails are of great value to relator's case—indeed, her briefing makes this much clear. Yet these emails will allow Renown to better assess its potential liability and prepare its defenses, which will prove useful as the case progresses to dispositive motion practice and trial, and also in future settlement discussions. As such, the benefits of the emails are not unilateral. They are far greater to relator, however, and that fact supports cost shifting.

**g.     Conclusion**

The foregoing factors render cost shifting unwarranted. The weightiest factors, relevance and availability of alternatives, balance powerfully against cost shifting. Combined with the first two cost factors, the court is persuaded that it is appropriate to adhere to the traditional rule in this case. Only the last factor supports shifting the cost of restoration to relator. But with no other factors countervailing the first four, this least important consideration is insufficient to tip the balance. Accordingly, even were the gap-period emails not reasonably accessible, the cost-shifting factors require that Renown bear the cost of restoration.

### IV.     CONCLUSION

Because the court has determined that the gap-period emails are not reasonably inaccessible due to undue burden or undue cost, Rule 26(b) requires their production. Relator's motion to compel is **GRANTED**. Moreover, even were the emails not reasonably accessible, good cause supports their discovery. In that alternative instance, the relevant factors do not support shifting the cost of their restoration. Accordingly, Renown's request for cost shifting is **DENIED**.

It is further ordered that Renown and relator **MEET AND CONFER** and discuss a schedule for production of the gap-period emails. The parties shall submit reports regarding the

same no later than **Friday, September 4, 2015**. If there is agreement on production, the parties may submit a proposed order in lieu of reports. The parties are reminded to adhere to the current discovery plan and scheduling order.

**IT IS SO ORDERED.**

**DATED**: August 25, 2015.

**UNITED STATES MAGISTRATE JUDGE**