UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| UNITED STATES OF AMERICA, *ex rel.* CECILIA GUARDIOLA, | Case No. 3:12-cv-00295-LRH-CLB |
|---|---|
| Plaintiff/ Relator, | ORDER |
| v. | |
| RENOWN HEALTH, RENOWN REGIONAL MEDICAL CENTER, and RENOWN SOUTH MEADOWS MEDICAL CENTER, | |
| Defendants. | |

Before the court is relator Cecilia Guardiola's motion to award her a share of the proceeds recovered administratively and separately by the United States from defendants Renown Health, Renown Regional Medical Center, and Renown South Meadows Medical Center (collectively "Renown"). ECF No. 231. The United States ("the Government") filed a response (ECF No. 232), and Guardiola replied (ECF No. 235). Guardiola argues that the court should award her a share of the proceeds recovered separately by the Government via the Recovery Audit Contractor ("RAC") and/ or the Medicare Administrative Contractor ("MAC"), as they constitute an "alternate remedy" under the False Claims Act, 31 U.S.C. § 3730(c)(5), ("FCA" or "the Act"). The Government argues that these proceeds are not an alternate remedy because the RAC audits began in 2010, two years before Guardiola brought her *qui tam* suit, and because the Government's recovery did not entirely moot or preclude Guardiola's *qui tam* suit. The court agrees with Guardiola; it therefore grants her motion and awards her $1,021,448.52, which represents a 29% share of the recovered $3,522,236.27, as stipulated to by the parties.

1

## I. BACKGROUND

On June 1, 2012, Guardiola filed this *qui tam* action alleging that Renown "defraud[ed] government-funded health insurance programs" through improper billing, in violation of the FCA, 31 U.S.C. § 3729 *et seq.* ECF No. 107 at 2-3. Pursuant to 31 U.S.C. § 3730(b)(2), Guardiola filed the complaint under seal, and it was served upon the United States for review. The Government extended the 60-day time period for review several times, ultimately declining to intervene in the action in mid-September 2013. Guardiola filed an amended complaint in January 2014 (ECF No. 17), which was served on Renown (ECF No. 18).[1]

"To supplement CMS's [Centers for Medicare and Medicaid Services] efforts to protect the fiscal integrity of the Medicare program, Congress enacted the RAC program. Congress told the Secretary [of the Department of Health and Human Services] to conduct a demonstration project using RACs to 'identify underpayments and overpayments and recoup overpayments under the Medicare program.'" *Palomar Medical Center v. Sebelius*, 693 F.3d 1151, 1156 (9th Cir. 2012) (quoting Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub.L. No. 108-173, § 306(a), 117 Stat. 2066, 2056 (2003)). This demonstration project ran from March 2005 to March 2008 and culminated in "RACs successfully correcting more than $1 billion in improper Medicare payments." *Id.* at 1157. Given this success, "Congress made the RAC program a permanent part of the Medicare Integrity Program and expanded its coverage to all states." *Id.* (citing 42 U.S.C. § 1395ddd(h)(1), (3)).

Beginning in October 2008, HDI was awarded the contract for RAC Region D, and with the CMS's approval, "performed patient status reviews, which may have included services billed by Renown." ECF No. 231-2 at 5; ECF No. 231-4 at 7. The Government's records show that HDI began sending Renown document requests pertaining to these reviews in 2010. *See* ECF No. 232-2. The record provides that HDI's RAC contract was an "options years" contract—there were series of 1-year contracts that ran from 2008 to 2018, which CMS had the option of canceling or extending each year (though it always renewed the contract). ECF No. 231-2 at 6, 8; ECF No. 231-4 at 7. The RAC's contract was in part governed by the Statement of Work, which, in relevant part,

---

[1] A Second Amended Complaint was filed in January 2015. ECF No. 107.

provided that the RAC was to prevent overlap with other contractors, CMS, OGC, DOJ, OIG, and/or other law enforcement entities performing potential fraud reviews. *See* ECF No. 231-5. To ensure that more than one entity did not review a claim, the RAC reviewed the "RAC data warehouse" to see if a claim was "excluded" (another entity was reviewing, or had reviewed, the claim) or suppressed (the claim was not to be reviewed). ECF No. 231-4 at 9. CMS additionally had the power to stop an audit by contacting the RAC (ECF No. 231-4 at 12), and it could issue a "stop-work order" which prevented the RAC from performing certain audit activities, including "issuing additional requests for medical records to a provider or issuing additional improper payment notifications," (ECF No. 231-2 at 7). CMS could also effect a "litigation-hold," which it did in November 2017 in regards to this litigation. ECF No. 231-2 at 20. As stipulated to by the parties, during the pendency of Guardiola's *qui tam* suit, the Government recovered $3,461,612.56 from Renown via the RAC.[2] ECF No. 221 ¶ 3.

Guardiola and Renown eventually reached a settlement agreement in her *qui tam* suit in July 2016, resulting in a $9.5 million dollar award to the United States, and a stipulated dismissal of Renown with prejudice. ECF Nos. 182 & 183. Guardiola, as the relator in this *qui tam* action, was awarded a 29 percent share of this settlement recovery, amounting to $1,707,324. ECF No. 183-1 at 3. During her *qui tam* suit, Guardiola discovered that the Government had already recovered a portion of the covered conduct of her *qui tam* suit via the RAC and MAC. Therefore, she did not pursue these proceeds in her settlement with Renown and reserved the right to claim a relator's share of these proceeds as an "alternate remedy." ECF No. 180; ECF No. 183-1 at 6.

Following the settlement, Guardiola motioned this court for a share of the alternative remedy. ECF No. 179. The United States did not directly respond to this motion, but instead moved for leave to file an *amicus curiae* brief in opposition. ECF No. 184. On September 14, 2016, the court ruled it lacked jurisdiction to determine Guardiola's proceeds because the Government was not a party to the original action. ECF No. 190. When Guardiola moved to amend her complaint

---

[2] As provided by the parties, because the proceeds recovered by the MAC were "miniscule" in comparison to those recovered by the RAC, the parties reference only the RAC, though they stipulated that the total amount recovered and at issue in the instant motion ($3,522,236.27) included proceeds recovered by both the RAC and MAC. *See* ECF No. 231 at 4 n.2.

3

(ECF No. 191), the court ruled that because sovereign immunity would bar her claim, amendment was futile (ECF No. 197).

Guardiola appealed these rulings to the Ninth Circuit (ECF No. 198), where the Government reversed its position and asserted that the FCA acts as a waiver of sovereign immunity (*see United States of America ex rel. Cecilia Guardiola v. Renown Health and United States of America (Intervenor)*, No. 16-17205, Dkt 22-2 (9th Cir. 2017)). Guardiola then moved this court to issue an indicative ruling under Rule 62.1 (ECF No. 204), which the court granted (ECF No. 206). Shortly thereafter, the Ninth Circuit remanded the matter to this court for the limited purpose of enabling the court to consider Guardiola's 60(b) motion (ECF No. 207), and this court vacated its prior rulings (ECF No. 208). Guardiola then voluntarily dismissed her appeal. ECF No. 209.

The court allowed limited discovery to be conducted on Guardiola's alternate remedy theory. ECF Nos. 220 & 224. In relavant part, the parties also stipulated to the following facts:

> 6) The amounts described in paragraphs B.3 and B.4 represent all overpayments recovered by the United States for Inpatient Billing Practices from RAC Recoveries and MAC Recoveries at issue in Relator's "alternate remedy" claims. But for being recovered by the United States as RAC Recoveries or MAC Recoveries, these amounts would have been recoverable as Covered Conduct as part of the Settlement Agreement. Because these amounts were recovered separately by the United States as RAC Recoveries or Mac Recoveries, they were excluded from the Covered Conduct, Settlement Amount and Settlement Agreement.
>
> 7) In the event Relator prevails on her "alternate remedy" claims,
>
>   a. the value of funds recovered by the United States for Inpatient Billing Practices as an "alternate remedy" under the False Claims Act will equal $3,522,236.27;
>   b. the value of the amount to be paid by the United States to Relator will be $1,021,448.52, which represents a 29% share of this amount; and
>   c. the amounts provided in this paragraph 7 will be the amounts awarded in any judgment entered by the Court in favor of Relator on her "alternate remedy" claims.

ECF No. 221 at 4.

Guardiola again filed a motion for share of the alternate remedy, the instant motion. ECF No. 231. She argues that these proceeds were recovered after she commenced her *qui tam* action. She argues that because these proceeds would have been recoverable in her *qui tam* suit *but for* having been recovered by the Government through the RAC and/or MAC, the proceeds constitute

4

an "alternate remedy" under the FCA. Of which, she argues, she is entitled to the same 29 percent share as she received in her initial suit.

The United States filed its response, arguing that the overpayments recovered from Renown via the RAC process did not constitute an "alternate remedy" under the FCA. ECF No. 232. The Government argues that because the RAC began its audit in 2010, two years prior to Guardiola commencing her *qui tam* suit ("pre-existence"), and because the RAC recovery did not entirely preclude or fully release or moot Guardiola's suit, it cannot constitute an "alternate remedy" under the FCA. ECF No. 232 at 9. The Government also motioned the court to seal Exhibit A to its response (ECF Nos. 232 & 233), which the court granted (ECF No. 234). Accordingly, Guardiola then replied. ECF No. 235.

Upon review of the instant motion, it became apparent to the court that though the Government had filed a motion to intervene while this suit was on appeal before the Ninth Circuit, the Court did not rule on that motion before the appeal was voluntarily dismissed and the case was returned to this court. *See United States of America ex rel. Cecilia Guardiola v. Renown Health and United States of America (Intervenor)*, No. 16-17205 (9th Cir. 2017). Additionally, the Government's response to the instant motion was docketed as an *amicus* but appeared to be filed as an intervenor. *See* ECF No. 232. Therefore, the court summoned the Government to clarify its position in this case. ECF No. 236. Accordingly, the Government filed a response adopting and incorporating its intervention motion before the Ninth Circuit as its unopposed motion to intervene in the matter before this court. ECF No. 237. With good cause appearing, the court granted the Government's motion to intervene on February 14, 2020. ECF No. 238.

The court now rules on Guardiola's pending motion to award her a share of proceeds recovered administratively and separately by the United States from Renown.

## II. LEGAL STANDARD

"The FCA, 31 U.S.C. § 3729 *et seq.*, is an anti-fraud statute that prohibits the knowing submission of false or fraudulent claims to the federal government." *U.S. ex rel. Bledsoe v. Community Health Systems., Inc.*, 342 F.3d 634, 640 (6th Cir. 2003). "The FCA establishes a scheme that permits either the Attorney General, § 3730(a), or a private party, § 3730(b), to initiate

a civil action alleging fraud on the Government." *U.S. ex rel. Eisenstein v. City of New York, New York*, 556 U.S. 928, 932 (2009). If the private individual, known as the relator, brings the *qui tam* suit, he or she must file the complaint under seal and serve it on the Government. 31 U.S.C. § 3730(b)(2). The complaint remains under seal for at least 60 days while the Government decides whether to intervene in the suit. *Id.* The Government may request an extension of the 60-day period with a showing of good cause. § 3730(b)(3). "If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action." § 3730(c)(3). If successful, the relator is entitled to a 25-30 percent share of the eventual proceeds recovered, as well as reasonable expenses, attorney's fees and costs. § 3730(d)(2). If the Government declines to intervene, it "may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty." § 3730(c)(5). "If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section." *Id.*

"In any action brought under section 3730, the United States shall be required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence." 31 U.S.C. § 3731(d). While the statute is not clear that this standard applies to suits in which a relator seeks a share of an alternate remedy, the court agrees with the parties that a preponderance of the evidence standard is appropriate and uses that standard in reaching its decision. *See Grogan v. Garner*, 498 U.S. 279, 286 (1992) ("Because the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants[.]").

To the court's knowledge, no court has yet ruled on whether a RAC and/ or MAC audit, which recovers proceeds that would have been covered-conduct recoverable in a simultaneously occurring *qui tam* suit, constitutes an "alternate remedy" under the FCA. The court therefore conducts a statutory interpretation inquiry beginning with "the plain language of the statute." *U.S. ex rel. Barajas v. United States*, 258 F.3d 1004, 1010 (9th Cir. 2001).

///

## III. DISCUSSION

**The court grants Guardiola's motion.**

First, the court addresses what the Government calls the "pre-existence" requirement. The Ninth Circuit determined that, "[a]n alternate remedy under § 3730(c)(5) is a remedy achieved through the government's pursuit of a claim after it has chosen not to intervene in a qui tam relator's FCA action." *Barajas*, 258 F.3d at 1010. The Government argues that because the audit process began in 2010, two years before Guardiola brought her *qui tam* action and more than three years before the Government decided not to intervene, the "pre-existence" requirement fails. Guardiola argues that while the audit process may have begun in 2010, the RAC contracts were not a "single, unbroken and unchanging process," but rather were a series of contracts that could have been stopped or paused by the Government at any time. ECF No. 235 at 3. Additionally, she argues that CMS had control over all RACs and could suppress claims so that the RAC could not review them while other fraud investigations occurred.

In considering whether the Government began pursuing the RAC recovery before or after it decided not to intervene, the court looks at the RAC audit process and the relationship between the RAC and CMS. As provided by the record, HDI was awarded the RAC Region D contract in 2008 and began sending Renown document requests based on CMS approved new issues in 2010. While the Government argues that HDI was pursuing the same audit of the "inpatient-outpatient New Issue" since 2010, it points to nothing in the record to support this conclusion. The record does not make clear that a document request made in 2010 pertained to the same audit as one made in 2012 or 2013. It appears that the Government is asking the court to find that document requests made regarding one issue in one year and those document requests made in a different year on a potentially new or different issue, pertain to the same continuous audit. The record cannot support such a conclusion. Furthermore, such a conclusion would mean that no relator could ever recover on these types of claims because the Government began auditing providers in 2010 and presumably will continue auditing providers for the foreseeable future.

The Government further argues that HDI did not elect to audit Renown beginning in 2012 or make the required *choice* to audit Renown after the Government declined to intervene. The

7

court agrees that HDI did not make this choice, however, the record provides that the Government did. Based on the Statement of Work provided to HDI along with each RAC contract, the RACs are to take precautions to ensure that they are not reviewing claims that are either suppressed or excluded. In part, this is to prevent overlap between RACs and CMS, OGC, DOJ, OIG, and/or other law enforcement fraud investigations. The Government argues that even if the Department of Justice ("DOJ") was aware of the *qui tam* suit (which as the entity that decides whether to intervene in a *qui tam* suit it would have been), no statute imposes a duty on them to stop or interfere with the RAC's statutorily mandated work. The court disagrees.

It is clear from the record that CMS directed the RAC's actions. In order to prevent overlap, the RAC was required to review the RAC data warehouse to determine whether it could review specific claims and attempt to recover overpayment. However, a review of the data warehouse is only as good as the data input into the data warehouse. If the RACs, CMS, OGC, DOJ, OIG and other law enforcement do not update the data warehouse based on claims they are reviewing and for which they are attempting to recover overpayment, RACs will presumably be interfering with other fraud reviews. To find that the DOJ holds no duty to keep a RAC from interfering in a *qui tam* suit in which the Government declines to intervene, when such a suit will involve great expense to the relator, would be counter to the very purpose of the FCA. *See Bledsoe*, 342 F.3d at 648 (quoting S. Rep. 99-345 at 23-24, 1986 U.S.C.C.A.N. at 5288-89) ("Congress made it clear that its 'overall intent in amending [§ 3730] [was] to encourage more private enforcement suits.'").

This reasoning is directly in line with the Ninth Circuit's reasoning in *Barajas*: "[t]he use of the term 'alternate remedy' makes clear that the government must choose one remedy or the other; it cannot choose both." 258 F.3d at 1010. The Statement of Work makes clear that the Government does not want overlap in investigations and overpayment recovery. Therefore, these contracts do not contemplate a time when the RAC is recovering proceeds that are covered conduct in another fraud investigation or cause of action like Guardiola's *qui tam* suit.[3] This is a logical

---

[3] *See also Bledsoe*, 342 F.3d at 648 (quoting S. Rep. 99-345, at 27, 1986 USCCAN at 5292) ("Specifically, the Senate Report made clear that '[w]hile the Government will have the opportunity to elect its remedy, it will not have an opportunity for due recovery on the same claim or claims. In other words, the Government must elect to pursue the false claims action either judicially or administratively and if the Government

8

conclusion—if the Government had intervened, it too would not want to have spent time and taxpayer resources investigating the claims only to find that the RAC had already recovered the funds. To find that a relator is not entitled to the same protections is, again, directly contrary to the plain purpose of the FCA.

The Government further argues that section 1395ddd(h)(7) of the Medicare Integrity Program provides that the RAC audits do not impede an FCA suit. The statute provides: "A recovery of an overpayment to [an] individual or entity by a recovery audit contractor under this subsection shall not be construed to prohibit the Secretary or the Attorney General from investigating and prosecuting, if appropriate, allegations of fraud or abuse arising from such overpayment." 42 U.S.C. § 1395ddd(h)(7). A plain reading of this statute provides that the Government is not precluded from investigating or filing suit against a provider that a RAC has recovered overpayment from if, after recovering payment, the Government determines there may be fraud. Nothing in this statute can be read to say that RAC recovery of overpayment made while a simultaneous *qui tam* suit is pending in which the Government declined to intervene is *precluded* as an alternate remedy.

Here, Guardiola filed her suit in June 2012, and in mid-September 2013, the Government declined to intervene. After declining to intervene, the record provides that the Government did not suppress the RAC's claim review of the covered conduct of Guardiola's *qui tam* suit, and it did not provide a stop-work order or litigation-hold to the RAC until 2017. The record further provides that from late September 2013 until February 2014, the RAC continued sending document requests to Renown. The court finds these new document requests, which the Government failed to suppress when it had the authority and ability to do so, constituted a pursuit of the claim after the Government had declined to intervene in the *qui tam* suit. Therefore, the "pre-existence" requirement is met.

Next, in determining whether recovery by a RAC could constitute an alternate remedy, the court looks again to the Ninth Circuit's reasoning in *Barajas*. The Ninth Circuit explained:

declines to intervene in a qui tam action, it is estopped from pursing [sic] the same claim administratively, or in a separate judicial action.'").

9

> The language of § 3730(c)(5) places no restrictions on the alternate remedies the government might pursue. It specifies broadly that the government may pursue "*any* alternative remedy available to [it]" (emphasis added). The term "any" is generally used to indicate lack of restrictions or limitations on the term modified. *See Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 (9th Cir. 1999) ("According to Webster's *Third New Int'l Dictionary* (3d ed. 1986), 'any' means 'one, no matter what one'; 'ALL'; 'one or more discriminately from all those of a kind.' This broad meaning of 'any' has been recognized by this circuit." (citations omitted)); *Turner v. McMahon*, 830 F.2d 1003, 1007 (9th Cir. 1987) ("[U]se of the adjective 'any' indicates that Congress intended that overpayments must be recouped without restriction.").

*Barajas*, 258 F.3d at 1010-11. The Ninth Circuit's broad reading of the statute therefore supports a finding that RAC and/ or MAC recoveries can constitute an "alternate remedy" under the FCA.

The Government next argues that to be an alternate remedy, the effect of the alternate remedy must be to "discontinue, and thereby preclude, the relator's *qui tam* suit." ECF No. 235 at 14. As the Ninth Circuit noted in *Barajas*, "[i]f the government chooses not to intervene in the relator's action, but, instead chooses to pursue 'any alternate remedy,' the relator has a right to recover a share of the proceeds of the 'alternate remedy' to the same degree that he or she *would have been entitled* to a share of the proceeds of an FCA action." 258 F.3d at 1010 (emphasis added). The parties' stipulation reads: "*But for* being recovered by the United States as RAC Recoveries or MAC Recoveries, these amounts would have been recoverable as Covered Conduct as part of the Settlement Agreement." ECF No. 281 ¶ 6 (emphasis added). This stipulation therefore provides that had the Government not conducted the RAC and MAC recoveries, Guardiola *would have been entitled* to a 29 percent share of those proceeds in her FCA *qui tam* action. The stipulation language is exactly the situation the alternate remedy provision was designed to protect against: when a relator would have recovered a share of the proceeds in her *qui tam* action but for the Government proceeding in a different manner without her, and not sharing those proceeds. *See Barajas*, 258 F.3d at 1012 ("It would be inconsistent not only with the plain meaning of the broad language employed in the statute, but also with the purpose of the statute, to allow the government to obtain from a qui tam defendant a remedy that could have been obtained in an already-filed FCA action, and then to argue that the proceeds of that remedy need not be shared with the whistleblower because the remedy was not an 'alternate remedy' within the meaning of the FCA.").

The Government argues that to be an alternate remedy, the alternative must have entirely precluded Guardiola from all recovery. The court disagrees—that is not the law of this Circuit. First, the Ninth Circuit's opinion in *Barajas*, the Circuit's most precedential case on FCA "alternate remedy" claims, does not support this reasoning. *See id.* While in *Barajas* the relator was ultimately prohibited from pursuing its *qui tam* suit due to the Government recovering alternatively, the Court never held that preclusion is a base requirement to recover on an alternative remedy theory. *Id.* at 1012-13. Second, the Ninth Circuit's opinion in *United States v. Van Dyck* does not lend support to this reasoning. 866 F.3d 1130 (9th Cir. 2017). *Van Dyck* starts at a different procedural posture than this action—there, the Court was deciding whether a relator could intervene in a criminal proceeding and it did not even reach the conclusion of whether a criminal forfeiture constituted an alternate remedy under the statute. *Id.* at 1135. Additionally, simply because the Court found that "conclusion of the criminal forfeiture action does not preclude Relators from going forward with the qui tam action and receiving a portion of the proceeds," that does not mean that total preclusion is required to constitute an alternate remedy. *Id.* Third, the Government cites to the Fourth Circuit's opinion in *United States ex rel. LaCorte v. Wagner*, in support of this reasoning. 185 F.3d 188 (4th Cir. 1999). Like *Van Dyke*, *LaCorte* starts from a different procedural posture—there, the Court was deciding whether a relator from a prior *qui tam* suit could intervene in a different relator's *qui tam* suit. *Id.* at 190. Because this is expressly prohibited under the FCA, the would-be intervenors argued that the new *qui tam* suit was an "alternate remedy." *Id.* at 191. The Government cites to one portion of the Court's opinion, in which the Court discusses its alternative reasoning if it were to believe that the FCA permits intervention: "Section 3730(c)(5) assumes that the original qui tam action did not continue." *Id.* at 192. The *LaCorte* Court cites to no authority for this reasoning, and therefore, the court respectfully disagrees—the alternative remedy provision does not presume that the *qui tam* suit does not proceed, it simply provides that if the Government does not intervene and proceeds with an alternative remedy, the relator is entitled to a portion of the proceeds recovered.[4]

---

[4] Additional cases cited by the Government on this point are not mandatory authority and the court finds further discussion unnecessary.

11

Finally, in considering whether the RAC and/ or MAC proceeds constitute an "alternate remedy" under the FCA, the court considers whether Guardiola has established that there exists "overlap between the conduct alleged in [her] *qui tam* suit and the conduct" on which the Government recovered with the RAC. *See Bledsoe*, 342 F.3d at 650-51. Again, the court looks to the parties' stipulation which provides the necessary finding: "*But for* being recovered by the United States as RAC Recoveries or MAC Recoveries, these amounts would have been recoverable as Covered Conduct as part of the Settlement Agreement." ECF No. 281 ¶ 6. The court finds that because Guardiola would have been able to recover the proceeds recovered by the RAC as covered conduct in her *qui tam* suit, there is sufficient overlap between the two that Guardiola is entitled to recover.

The court finds that this conclusion is properly in line with the purpose of the FCA. As the Sixth Circuit noted in *Bledsoe*, Congress "emphasized its belief that '[i]n the face of sophisticated and widespread fraud . . . only a coordinated effort of both the Government and the citizenry will decrease this wave of defrauding public funds.'" *Bledsoe*, 342 F.3d at 648 (quoting S.Rep. 99-345 at 23-24, 1986 U.S.C.C.A.N. at 5288-89)). *Qui tam* suits are costly, and if the government declines to intervene, the relator takes all the risk and bears all the costs in pursuing the suit. It would be inconsistent with the plain meaning of the broad language of the FCA to allow the Government to obtain recovery from the RAC and/ or MAC processes that would have been recoverable in the *qui tam* action, and then exclude the relator from those proceeds. It would also hinder the purpose of the FCA—relators will be less likely to engage in costly *qui tam* suits if, after years of litigation, they find out their claims have already been recovered by a RAC or MAC and that they are unable to recover. The Government declined to intervene but continued pursuing the same claims via the administrative RAC procedure. This is exactly what the "alternative remedy" provision was designed to prohibit. Therefore, because Guardiola would have been entitled to her relator's share of the proceeds recovered by the RAC and MAC in her *qui tam* action, the court finds Guardiola is due her relator's share of these recovered proceeds as an alternate remedy.

///

///

**IV. CONCLUSION**

IT IS THEREFORE ORDERED that Cecilia Guardiola's motion to award her a share of proceeds recovered administratively and separately by the United States from Renown (ECF No. 231) is **GRANTED.** Guardiola is hereby **AWARDED** $1,021,448.52, which represents a 29% share of $3,522,236.27, as stipulated to by the parties.

IT IS FURTHER ORDERED that the parties are to file a **JOINT STATUS REPORT** within **30 DAYS** of the date of this Order informing the court of any further issues, or foreseeable issues that may be raised, in this case. If there are none appearing, the parties should provide the court with good cause why this case should not be closed.

IT IS SO ORDERED.

DATED this 4th day of March, 2020.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE